Filed 1/4/16 (reposted as an "A" document to include footer notation signalling separate opinions)

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| HOWARD JARVIS TAXPAYERS ASSOCIATION et al., | ) ) ) | |
| Petitioners, | ) ) | S220289 |
| v. | ) ) | |
| ALEX PADILLA, as Secretary of State, etc., | ) ) ) | |
| Respondent; | ) ) | |
| LEGISLATURE OF THE STATE OF CALIFORNIA, | ) ) ) | |
| Real Party in Interest. | ) ) | |

In 2014, the California Legislature sought to place on the general election ballot a nonbinding advisory question, Proposition 49. The measure would have asked the electorate whether Congress should propose, and the Legislature ratify, a federal constitutional amendment overturning the United States Supreme Court decision *Citizens United v. Federal Election Comm'n* (2010) 558 U.S. 310.

In response to a petition for writ of mandate urging the unconstitutionality of the Legislature's action, we issued an order to show cause and directed the Secretary of State to refrain from taking further action in connection with placement of Proposition 49 on the ballot. Our action did not rest on a final determination of Proposition 49's lawfulness. Instead, we concluded "the

**SEE CONCURRING AND DISSENTING OPINIONS**

proposition's validity is uncertain" and the balance of hardships from permitting an invalid measure to remain on the ballot, as against delaying a proposition to a future election, weighed in favor of immediate relief. (See *American Federation of Labor v. Eu* (1984) 36 Cal.3d 687, 697.)

We now resolve the merits of Proposition 49's constitutionality. We conclude: (1) as a matter of state law, the Legislature has authority to conduct investigations by reasonable means to inform the exercise of its other powers; (2) among those other powers are the power to petition for national constitutional conventions, ratify federal constitutional amendments, and call on Congress and other states to exercise their own federal article V powers; (3) although neither constitutional text nor judicial precedent provide definitive answers to the question, long-standing historical practice among the states demonstrates a common understanding that legislatures may formally consult with and seek nonbinding input from their constituents on matters relevant to the federal constitutional amendment process; (4) nothing in the state Constitution prohibits the use of advisory questions to inform the Legislature's exercise of its article V-related powers; and (5) applying deferential review, Proposition 49 is reasonably related to the exercise of those powers and thus constitutional. We deny the instant petition for a writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

In *Citizens United v. Federal Election Comm'n*, *supra*, 558 U.S. 310, a divided United States Supreme Court invalidated federal election law restrictions on the political speech of corporations, holding that a speaker's identity as a corporation, as opposed to natural person, could not justify greater regulation of speech than the First Amendment would have otherwise permitted. (*Id.* at pp. 319, 365.) In the few years since its issuance, *Citizens United*'s holding concerning the speech rights of corporations has generated considerable democratic debate,

receiving criticism in the presidential State of the Union address,[1] giving rise to resolutions in Congress to amend the Constitution,[2] and sparking calls for reconsideration within the United States Supreme Court itself.[3]  Many have agreed with the Supreme Court majority, while others have concluded the Constitution must be amended to permit renewed restraints on corporate involvement in popular elections.

The Legislature first joined issue with *Citizens United* in Assembly Joint Resolution No. 1, introduced in 2012 and adopted by both houses of the Legislature in 2014.  (Assem. Joint Res. No. 1, Stats. 2014 (2013–2014 Reg. Sess.) res. ch. 77.)  The resolution declared: "Corporations are legal entities that governments create and the rights that they enjoy under the United States Constitution should be more narrowly defined than the rights afforded to natural persons."  (*Ibid.*)  Acknowledging *Citizens United*'s holding to the contrary, the resolution exercised the Legislature's federal constitutional power to "apply to the United States Congress to call a constitutional convention for the sole purpose of proposing an amendment to the United States Constitution that would limit corporate personhood for purposes of campaign finance and political speech and would further declare that money does not constitute speech and may be legislatively limited."  (Assem. Joint Res. No. 1, Stats. 2014 (2013–2014 Reg. Sess.) res. ch. 77; see U.S. Const., art. V ["The Congress . . . on the application of

---

[1]     President Barack H. Obama, State of the Union address to Congress (Jan. 27, 2010) 156 Congressional Record–House H415 (daily ed. Jan. 27, 2010).

[2]     Senate Joint Resolution No. 19, 113th Congress, 1st Session (2013); see Senate Report No. 113–223, 1st Session, pages 2–3 (2013).

[3]     See *American Tradition Partnership v. Bullock* (2012) 567 U.S. ___, ___ [183 L.Ed.2d 448, 448–449, 132 S.Ct. 2490, 2491–2492] (dis. opn. of Breyer, J.) (dissent joined by Ginsburg, Sotomayor & Kagan, JJ.).

3

the legislatures of two-thirds of the several states, shall call a convention for proposing amendments . . . ."].)

Separately, the Legislature enacted Senate Bill No. 1272 (2013–2014 Reg. Sess.) (Senate Bill No. 1272), "[a]n act to submit an advisory question to the voters relating to campaign finance . . . ." (Stats. 2014, ch. 175.) A lengthy preamble decried *Citizens United*, noted the article V process for amending the United States Constitution, and asserted "[t]he people of California and of the United States have previously used ballot measures as a way of instructing their elected representatives about the express actions they want to see them take on their behalf, including provisions to amend the United States Constitution." (Stats. 2014, ch. 175, § 2, subd. (m); see generally *id.*, § 2.) The measure "call[ed] a special election to be consolidated with the November 4, 2014, statewide general election" (Legis. Counsel's Dig., Sen. Bill No. 1272 (2013–2014 Reg. Sess.); see Stats. 2014, ch. 175, § 3) and directed the Secretary of State to submit to voters at that election an advisory question asking whether Congress should propose, and the Legislature ratify, a constitutional amendment overturning *Citizens United*, and thereafter to submit the results to Congress (Stats. 2014, ch. 175, § 4). The measure became law in July 2014, after both houses passed it and the Governor declined to sign or veto it. (See Cal. Const., art. IV, § 10, subd. (b)(3) [authorizing bills to become statutes after gubernatorial inaction].)

Subsequently, then Secretary of State Debra Bowen designated the advisory question Proposition 49 and began preparing ballot materials. The proposition was to read: "Shall the Congress of the United States propose, and the California Legislature ratify, an amendment or amendments to the United States Constitution to overturn Citizens United v. Federal Election Commission (2010) 558 U.S. 310, and other applicable judicial precedents, to allow the full regulation or limitation of campaign contributions and spending, to ensure that all citizens, regardless of

4

wealth, may express their views to one another, and to make clear that the rights protected by the United States Constitution are the rights of natural persons only?" (Stats. 2014, ch. 175, § 4, subd. (a).)

Petitioners Howard Jarvis Taxpayers Association and Jon Coupal (collectively, Howard Jarvis) promptly filed a petition for writ of mandate in the Third District Court of Appeal, seeking to prevent Secretary Bowen from proceeding with placement of Proposition 49 on the November 2014 ballot. A divided Court of Appeal denied relief.

Howard Jarvis next filed an original emergency petition for writ of mandate in this court. After expedited briefing, we issued an order to show cause and stayed Secretary Bowen from taking further actions in connection with Proposition 49 until after a final decision, effectively removing the advisory question from the November 2014 ballot. The order explained, "[t]ime constraints require the court to decide immediately whether to permit Proposition 49 to be placed on the November 4, 2014, ballot pending final resolution of this matter." A five-justice majority concluded Proposition 49's validity was uncertain and the cost of postponing a potentially lawful proposition to a later ballot, a course the Legislature itself had contemplated in an earlier version of the bill,[4] was outweighed by the cost of permitting a potentially invalid proposition to reach the ballot. " 'The presence of an invalid measure on the ballot steals attention, time and money from the numerous valid propositions on the same ballot. It will confuse some voters and frustrate others, and an ultimate decision that the measure is invalid, coming after the voters have voted in favor of the measure, tends to

---

[4]     See Senate Bill No. 1272 as amended March 28, 2014, section 1 (calling a special election in conjunction with the November 2016 general election).

5

denigrate the legitimate use of the initiative procedure.' (*American Federation of Labor v. Eu* (1984) 36 Cal.3d 687, 697.)"[5]

Our actions in August 2014 resolved whether Proposition 49 could be placed on the November 2014 ballot. Senate Bill No. 1272 directs only placement on that ballot (Stats. 2014, ch. 175, §§ 3–4), and this case is thus technically moot. But whether the Legislature ever has power to place advisory questions on a statewide ballot is important and undecided, and in the event we were to conclude Senate Bill No. 1272 was indeed constitutional, the Legislature could pass an identical measure directing placement of the same advisory question on a future ballot. In response to our order to show cause, Howard Jarvis and real party in interest the State Legislature of California have briefed the larger questions the petition raises: whether legislative advisory questions are ever permissible, and whether in particular Proposition 49 is permissible or should be enjoined from placement on any future statewide ballot. Notwithstanding that the passage of an election cycle has interposed mootness as a potential obstacle to resolving a significant election law issue, we conclude retaining jurisdiction and addressing the merits is the better course here. (See *Independent Energy Producers Assn. v. McPherson* (2006) 38 Cal.4th 1020, 1024; *Costa v. Superior Court* (2006) 37 Cal.4th 986, 994, 1005.)

---

**5** Justice Liu issued a separate concurring statement defending the decision to provisionally forestall a vote on Proposition 49, while Chief Justice Cantil-Sakauye dissented from the portion of the order granting a stay, maintaining that interim relief was unwarranted.

DISCUSSION

I.　　*Proposition 49 and the State Legislature's Power to Investigate*

Our Constitution vests "[t]he legislative power of this State . . . in the California Legislature which consists of the Senate and Assembly . . . ." (Cal. Const., art. IV, § 1.)  It is in the nature of state constitutions that they, unlike the federal Constitution, generally do not grant only limited powers.  (*Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 29.)  Consequently, "unlike the United States Congress, which possesses only those specific powers delegated to it by the federal Constitution, it is well established that the California Legislature possesses *plenary* legislative authority except as specifically limited by the California Constitution." (*Id.* at p. 31.)  Lying at the core of that plenary authority is the power to enact laws. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 254.)  It has been said that pursuant to that authority, "[t]he Legislature has the *actual* power to pass any act it pleases," subject only to those limits that may arise elsewhere in the state or federal Constitutions. (*Nougues v. Douglass* (1857) 7 Cal. 65, 70.)

Although the Legislature notes in passing that Proposition 49 resulted from a statute, it does not rest its argument for constitutionality on the syllogism that the legislative power includes the power to enact statutes, Senate Bill No. 1272 takes the form of an enacted statute, and thus for that reason alone the bill and Proposition 49 are within a constitutional source of power.  Instead, the Legislature argues it has the inherent power to conduct an investigation in order to select the wisest policy course.  Pursuant to that implied investigative power, the

Legislature contends, it may enact a statute placing an advisory question before the voters.**6**

We have since the early days of statehood recognized the act of creating a legislature imbues that body with certain implied authority characteristic of parliaments: "A legislative assembly, when established, becomes vested with all the powers and privileges which are necessary and incidental to a free and unobstructed exercise of its appropriate functions. These powers and privileges are derived not from the Constitution; on the contrary, they arise from the very creation of a legislative body, and are founded upon the principle of self preservation." (*Ex parte D. O. McCarthy* (1866) 29 Cal. 395, 403.) The scope and nature of these powers is "to be ascertained by a reference to the common parliamentary law." (*Ibid.*) Many or most of a parliament's common law powers relate to matters of self-regulation, such as determining membership and establishing internal rules of procedure (see *id.* at pp. 403–404), and are not relevant here. One, however, is: the inherent power "[t]o investigate, by the testimony of witnesses or otherwise, any subject or matter, in reference to which [a legislature] has power to act." (*Id.* at p. 404, italics omitted.)

The principal function of a legislature is "to enact wise and well-formed and needful laws" (*In re Battelle* (1929) 207 Cal. 227, 240), but a legislature cannot exercise sound judgment without information. Accordingly, "the necessity of investigation of some sort must exist as an indispensable incident and auxiliary to the proper exercise of legislative power." (*Id.* at p. 241; see *Special Assembly Int. Com. v. Southard* (1939) 13 Cal.2d 497, 503 [the power to enact legislation

---

**6** Because we conclude the investigative power permits advisory questions in connection with potential federal constitutional amendments, we express no opinion about other potential sources of authority for advisory questions.

8

" 'necessarily presupposes that the members of each house of the legislature must investigate the necessity for legislation' "].)  The details of how this implied power is to be exercised are consigned to the Legislature's discretion in the first instance: " 'The ascertainment of pertinent facts for legislation is within the power of the lawmaking department of government.  When a legislative body has a right to do an act it must be allowed to select the means within reasonable bounds.' " (*Parker v. Riley* (1941) 18 Cal.2d 83, 91; see also *id.* at p. 90 ["Intelligent legislation upon the complicated problems of modern society is impossible in the absence of accurate information on the part of the legislators, and any reasonable procedure for securing such information is proper."].)

The investigative power is not unlimited.  While the Legislature's powers and functions are extensive (see *Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 299), they must share space with powers reserved to the executive and judicial branches.  Although the Legislature's activities can overlap with the functions of other branches to an extent, the Legislature may not use its powers to "defeat or materially impair" the exercise of its fellow branches' constitutional functions, nor "intrude upon a core zone" of another branch's authority.  (*Marine Forests Society v. California Coastal Com.*, *supra*, 36 Cal.4th at p. 45.)  The investigative power, no less than any other, may not be used to trench upon matters falling outside the legislative purview.

Even aside from separation of powers concerns, the investigative power permits inquiry only into those subjects "in reference to which [the Legislature] has power to act." (*Ex parte D. O. McCarthy*, *supra*, 29 Cal. at p. 404, italics omitted.)  Investigation is permitted as a necessary aid to the execution of other legislative powers, not as an expansion of matters with respect to which the Legislature may act.  Where those other powers are subject to limit, so too an investigation in support of them may be constrained.  (See *Special Assembly Int.*

9

*Com. v. Southard*, *supra*, 13 Cal.2d at p. 504 [" 'when the power to legislate ceases, then the power to investigate for the purpose of aiding the legislature in exercising this power ceases, or stated another way, when the main power of legislating dies the incidental or implied power dies with it' "].) The investigative power, constitutionally implied as necessary for the execution of the Legislature's other powers, does not stand as an unbounded, freestanding power in its own right.

Finally, while the method of investigation is for the Legislature to choose in its broad discretion, within reason (*Parker v. Riley*, *supra*, 18 Cal.2d at pp. 90–91), we do not foreclose the possibility limits may arise from other constitutional provisions and the values they embrace.

Given these constraints, to determine whether a particular legislative action is authorized as an exercise of investigative power, we must in the first instance ascertain whether a nexus exists between the matter investigated and some potential action the Legislature has authority to undertake. Senate Bill No. 1272 seeks to conduct a statewide plebiscite on a proposed federal amendment and deliver its results to Congress. (*Id.*, § 4, subds. (a), (b).) The Legislature contends the plebiscite should be understood as part of an investigation into how and whether to exercise the Legislature's powers in connection with a potential future federal constitutional amendment. Accordingly, we examine next the extent of the role the federal Constitution contemplates for state legislatures in the amendment process.

II.    ***State Legislatures and Federal Constitutional Amendment***

The federal Constitution vests state legislatures with certain powers and duties in connection with amendments to the federal Constitution. (See U.S. Const., art. V (article V).) Article V provides in relevant part: "The Congress, whenever two-thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, or on the application of the legislatures of two-

10

thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three-fourths of the several states, or by conventions in three-fourths thereof, as the one or the other mode of ratification may be proposed by the Congress . . . ." This "unwieldy and cumbrous machinery" (*Barron v. Baltimore* (1833) 32 U.S. 243, 250) for altering the Constitution involves a two-stage process—proposal and ratification—with two paths available at each stage. In the first stage, proposal, either Congress or a national convention called for the purpose may propose an amendment or amendments. In the second stage, ratification, a supermajority of the several states, either through their legislatures or state conventions, must approve the proposal for it to become law. (See *United States v. Sprague* (1931) 282 U.S. 716, 730; *Bramberg v. Jones* (1999) 20 Cal.4th 1045, 1056.)

The Constitution identifies two explicit roles for state legislatures, one at each stage. At the proposal stage, a state legislature may apply to Congress for the calling of a national convention. (See, e.g., Sen. Joint Res. No. 23, Stats. 1935 (1935 Reg. Sess.) res. ch. 145, pp. 2713–2714 [calling for a convention to adopt a federal amendment permitting congressional regulation of intrastate commerce]; Sen. Joint Res. No. 25, Stats. 1911 (1911 Reg. Sess.) res. ch. 73, pp. 2183–2184 [calling for a convention to adopt a federal amendment providing for the direct election of Senators].) At the ratification stage, if Congress chooses the legislative ratification route, a state legislature may assent to, or reject, an amendment. (*Hawke v. Smith, No. 1* (1920) 253 U.S. 221, 226–228; see, e.g., Sen. Joint Res. No. 22, Stats. 1971 (1971 Reg. Sess.) res. ch. 45, pp. 4161–4162 [ratifying the 26th Amend.].) All but one of the 15 amendments to the federal Constitution adopted since California's statehood have been submitted to state legislatures for approval.

11

If instead Congress chooses the state convention ratification route, as it did for the Twenty-first Amendment repealing Prohibition, state legislatures may still assume a role. Article V conveys power as much through "what is reasonably implied" as through "what is expressed." (*Dillon v. Gloss* (1921) 256 U.S. 368, 373.) It grants to Congress and state legislatures those powers "necessary and incidental" to the carrying out of explicitly required tasks. (*State ex rel. Donnelly v. Myers* (Ohio 1933) 186 N.E. 918, 918; see *Dillon*, at pp. 373–376; *State ex rel. Tate v. Sevier* (Mo. 1933) 62 S.W.2d 895, 898.)[7] When Congress submitted the repeal of Prohibition to state conventions, state legislatures were implicitly charged with establishing the mechanics of the conventions. (*State ex rel. Tate*, at p. 898; *State ex rel. Donnelly*, at p. 918.) Legislatures across the country enacted legislation establishing how delegates were to be chosen and when and where conventions would meet. (Brown, Ratification of the Twenty-first Amendment to the Constitution of the United States (1938) pp. 521–700 [collecting laws]; see Stats. 1933, ch. 149, pp. 598–602 [establishing the procedures for Cal.'s convention to ratify the 21st Amend. to the U.S. Const.].)

The several states have never successfully called for a constitutional convention. To date, each of the 27 federal amendments is the product of a proposal by Congress. But this does not mean state legislatures can play no part until ratification. Legislatures are instituted with the inherent power to issue resolutions (Jefferson, A Manual of Parliamentary Practice (1st ed. 1801) § XXI),

_____

[7] See also The Federalist No. 44 (Cooke ed., 1961) pages 304–305 (Madison) ("No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorised; wherever a general power to do a thing is given, every particular power necessary for doing it is included"); The Federalist No. 33, *supra*, at page 204 (Hamilton) ("What is a power, but the ability or faculty of doing a thing? What is the ability to do a thing, but the power of employing the *means* necessary to its execution?").

12

statements that "declare[] policy or entreat[] action" but without the binding force of law (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 712). From the earliest days of the Republic, state legislatures have used that authority to press Congress to wield its own article V proposal power. Unlike the convention power, these resolutions have proven instrumental in reshaping the federal Constitution through amendment; beginning with the very first post-Bill of Rights amendment, one can find their influence underlying the Constitution's evolution.[8]

In 1793, the legislatures of Massachusetts and Virginia passed resolutions appealing to their representatives in Congress for a constitutional amendment overturning the United States Supreme Court's narrow construction of state sovereign immunity in *Chisholm v. Georgia* (1793) 2 U.S. 419. (See *New Hampshire v. Louisiana* (1883) 108 U.S. 76, 88 [Mass. res.]; *Florida v. Georgia* (1855) 58 U.S. 478, 519–520 (dis. opn. of Campbell, J.) [Va. res.].) Senator Caleb Strong of Massachusetts responded by moving that Congress propose such an amendment (*Florida v. Georgia*, at p. 520; 4 Annals of Congress (3d. Cong. 1794) pp. 25, 29–30), and the first post-Bill of Rights amendment was ratified in 1795 (U.S. Const., 11th Amend.). Similar resolutions preceded the Twelfth

---

[8]     At one point, the Drafters of the federal Constitution contemplated a more direct role for the states in initiating change. The penultimate version of article V would have granted the state legislatures themselves the power to propose amendments, but in the final days of the 1787 convention that power was excised in favor of the power to call for a convention. (See 2 Records of the Federal Convention of 1787 (Farrand edit., 1966 ed.) pp. 559, 629–630.) The elimination of a direct power to propose amendments has given rise to the current practice, whereby state legislatures resolve to Congress that it should act, and Congress in turn decides whether to invoke its article V proposal power. Such legislative resolutions are firmly ensconced in our constitutional traditions and, we have observed, are fully consistent with article V. (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 707.)

Amendment, ratified in 1804.  (See 13 Annals of Congress (7th Cong. 1st Sess. 1802) pp. 95–96 [Mass. res.]; 11 Annals of Congress (8th Cong. 1st Sess. 1803) pp. 509, 602–603, 1285 [N.Y. res.]; *id.* at p. 629 (1802) [N.C. res.]; *id.* at p. 472 (1802) [Vt. res.].)

Aside from changes wrought by the Civil War, the Constitution remained static for the next century, but when the next wave of changes came, state legislative resolutions were again at the forefront.  California's Legislature first urged the direct election of senators to Congress in 1874, and did so again in 1893 and 1900.[9]  Numerous other states took similar action; by 1896, the Idaho, Indiana, Iowa, Kansas, Ohio, Oregon, Wisconsin and Wyoming Legislatures had joined California in instructing their congressional representatives in favor of pursuing a federal amendment.  (Sen. Rep. No. 54–530, 1st Sess., p. 9 (1896).) Ultimately, dozens of states would join the chorus.  (See Hall, The History and Effect of the Seventeenth Amendment (1936) pp. 221–223, 512–528; Haynes, The Election of Senators (1906) pp. 108–109.)  These pleas spurred action in both houses of Congress.  (See, e.g., Ames, The Proposed Amendments to the Constitution of the United States During the First Century of Its History (1897) pp. 61–62 [noting the House of Representatives' passage of a proposed amendment as a response to repeated state legislative resolutions requesting one];

_____

[9]      See Assembly Concurrent Resolution No. 9 (1873–1874 Reg. Sess.) resolution chapter 20, page 973; Assembly Joint Resolution No. 7 (1893 Reg. Sess.) resolution chapter 15, page 620; Senate Joint Resolution No. 2 (1900 Ex. Sess.) resolution chapter 7, pages 27–28.  In 1911, the Legislature changed tacks and invoked its express article V powers, applying for a constitutional convention to propose an amendment providing for the direct election of Senators.  (Sen. Joint Res. No. 25, Stats. 1911 (1911 Reg. Sess.) res. ch. 73, pp. 2183–2184; see Remarks of Sen. Jones, 46 Cong. Rec. 2770 (1911) ["possibly Idaho and California got tired of knocking at the door of the Senate and concluded that they would take their own method"].)

45 Cong. Rec. 7109–7112 (1910) [introduction of proposed amend. by Sen. Owen of Okla. following a resolution from his state legislature requesting one].) By 1913, direct election of senators was a part of the federal Constitution. (U.S. Const., 17th Amend.)

State resolutions calling for a congressionally proposed federal amendment also preceded the Nineteenth Amendment, which extended suffrage to women. (O'Connor, *The History of the Women's Suffrage Movement* (1996) 49 Vand. L.Rev. 657, 667.) The same was true in advance of the Twenty-first Amendment, repealing Prohibition. (E.g., Conn. Pub. Acts 1931, ch. 272, p. 285, § 1.)

State pressure for constitutional change fails far more than it succeeds. Over the years, state legislatures have submitted thousands of resolutions, but Congress has proposed only a few dozen amendments. For example, state legislatures disturbed by the United States Supreme Court's reapportionment decisions[10] responded with a mixture of article V convention calls and state resolutions requesting that Congress itself propose a federal amendment restoring to the states broad power over apportionment. Ten states asked for Congress to propose an amendment, while one dozen exercised their own power to call for a convention. (Kyvig, Explicit & Authentic Acts (1996) p. 374 & fn. 14.) Ultimately, no amendment emerged from Congress, and an insufficient number of convention calls were submitted to require a national convention.

As the successful Seventeenth Amendment movement and unsuccessful reapportionment movement demonstrate, the use of a direct convention call and an

---

[10] See *Lucas v. Colorado Gen. Assembly* (1964) 377 U.S. 713; *Roman v. Sincock* (1964) 377 U.S. 695; *Davis v. Mann* (1964) 377 U.S. 678; *Maryland Committee v. Tawes* (1964) 377 U.S. 656; *WMCA, Inc. v. Lomenzo* (1964) 377 U.S. 633; *Reynolds v. Sims* (1964) 377 U.S. 533; *Baker v. Carr* (1962) 369 U.S. 186.

entreaty to Congress to propose an amendment are not mutually exclusive approaches. Just as different state legislatures may elect one route or the other to constitutional change, so a particular state legislature may prefer a multi-front approach and take both paths simultaneously. For example, in June 1935, with the country in the throes of the Depression, the Legislature concluded reform of federal securities and bonds taxation to ensure wealthy stock- and bondholders bore a greater share of the costs of government was urgently needed. The Legislature passed a resolution calling on Congress to propose a federal amendment limiting tax exemptions for these forms of property. (Sen. Joint Res. No. 21, Stats. 1935 (1935 Reg. Sess.) res. ch. 108, p. 2669.) Within weeks, it also used its direct federal power to call for a constitutional convention on the same subject. (Sen. Joint Res. No. 22, Stats. 1935 (1935 Reg. Sess.) res. ch. 144, pp. 2712–2713.)

III. *The Use of Advisory Questions to Facilitate the Exercise of Article V-related Powers*

Text and tradition thus firmly establish a state legislature's power to petition for and participate in federal constitutional change, by proposing a national convention for the consideration of an amendment, by issuing a resolution calling on Congress to itself propose an amendment, by deciding whether to ratify amendments that emerge from either of these paths, and by establishing ground rules in the event ratification is to be by state convention. If a state legislature can exercise these powers, that a legislature can also avail itself of implied investigative powers to explore the wisdom or desirability of choosing one or another course of action necessarily follows. (See *Parker v. Riley*, *supra*, 18 Cal.2d at pp. 90–91; *In re Battelle*, *supra*, 207 Cal. at pp. 240–241.)

As noted, however, the state law investigative power is not unbounded. Any investigation must be tethered to the exercise of other established legislative

powers, and the method chosen in a particular instance must be reasonable. The issue we face is whether the Legislature may pose to the electorate a single advisory question concerning the People's support for a federal constitutional amendment. Its resolution depends on the answer to two sub-questions. First, in the abstract, does anything in the text or structure of the state or federal Constitutions preclude the Legislature from posing an advisory question when exercising its own article V authority or entreating other bodies with article V authority (Congress and fellow state legislatures) to act?[11] Second, if there is no bar, is the specific question before us today, Proposition 49, a reasonable exercise of that implied state investigative power?

A.     *The Role in a Republic of Representative Consultation with the People*

The texts of the state and federal Constitutions are silent on the issue we face. The state investigative power is, as we have discussed, an inherent but implicit power of a legislature. The state Constitution does not otherwise clearly address the matter. The federal Constitution is even more terse: "As a rule the Constitution speaks in general terms, leaving Congress to deal with subsidiary matters of detail as the public interests and changing conditions may require; and Article V is no exception to the rule." (*Dillon v. Gloss*, *supra*, 256 U.S. at p. 376, fn. omitted.) Regarding what state legislatures may do when carrying out their article V roles, the federal Constitution leaves the scope of the powers and their limits unarticulated.

---

[11]     Because Proposition 49 relates solely to the exercise of power in connection with article V, we reserve for another day whether, in support of other powers not implicated here, an advisory ballot measure would be a permissible means of legislative investigation.

17

As for precedent, in our past decisions elucidating the constitutional principles that govern legislative investigations we have not been called upon to determine whether the investigative power may include the enactment of a statute placing an advisory measure on the statewide ballot. (Cf. *Parker v. Riley*, *supra*, 18 Cal.2d at p. 91 [approving formation of an independent commission]; *In re Battelle*, *supra*, 207 Cal. at p. 241 [approving formation of investigative committees]; *Ex parte D. O. McCarthy*, *supra*, 29 Cal. at p. 404 [approving summoning of witnesses].)

Where neither text nor precedent affords guidance, sometimes a "page of history is worth a volume of logic." (*New York Trust Co. v. Eisner* (1921) 256 U.S. 345, 349 (maj. opn. of Holmes, J.); see *Dyer v. Blair* (N.D.Ill. 1975) 390 F.Supp. 1291, 1303–1307 [looking to historical practice to understand the proper scope of state legislative power in connection with federal constitutional amendments].) The history of legislative consultation with the people, and in particular the historical use of advisory questions to inform judgments concerning federal constitutional matters, is illuminating here.

In 1721, noted British Whig and republican Thomas Gordon, writing pseudononymously as Cato, declared: "[T]he difference between free and enslaved countries lies principally here, that in the former, their magistrates must consult the voice and interest of the people; but in the latter, the private will, interest, and pleasure of the governors, are the sole end and motives of their administration." (1 Trenchard & Gordon, Cato's Letters (Hamowy edit., 1995) No. 38 (July 22, 1721) *The Right and Capacity of the People to judge of Government* (Gordon) p. 272.)[12] The seeds of a practice of consultation, the

---

[12] Cato's Letters, a series of republican critiques of tyranny and defenses of liberty and free speech, were broadly circulated and heavily influential among this

(*footnote continued on next page*)

nonbinding solicitation of the people's views to inform legislative judgments on significant matters, were planted in England in the 17th century. Initially, at least, the practice focused as much on the shaping of public opinion as its solicitation: "With the development of popular sovereignty in the 1640s, various members of Parliament opened communications with constituents to gain popular support for Parliamentary measures directed against the King." (Morgan, Inventing the People (1988) p. 220.) By the 18th century, however, a more genuine interest in popular views could be found; members of the House of Commons "often" would delay action "until they had consulted their constituents." (Gibbons, Ideas of Political Representation in Parliament 1651–1832 (1914) p. 25; see 1 Cato's Letters, at p. 271 ["[O]ur records afford instances, where the House of Commons have declined entering upon a question of importance, till they had gone into the country, and consulted their principals, the people: So far were they from thinking that private men had no right to meddle with government."].)

Consultation shortly took root in the colonies and soon became "much more an American technique than a British one." (Reid, The Concept of Representation in the Age of the American Revolution (1989) p. 86.) In New York and Massachusetts, consultation flourished; occasionally it was resorted to even in other colonies such as Pennsylvania that did not have an established town meeting structure through which to assess the popular will. (*Id.* at pp. 86–95.) When the Continental Congress was faced with its most momentous decision in the spring of 1776, it did not act unilaterally, but instead "delayed its vote on

---

(*footnote continued from previous page*)

nation's founding generation. (Bailyn, The Origins of American Politics (1968) pp. 53–55; Rossiter, Seedtime of the Republic: The Origin of the American Tradition of Political Liberty (1953) pp. 141–142, 357.)

19

Independence by three weeks 'to give an Oppertunity [*sic*] to the Delegates from those Colonies, which had not yet given Authority to adopt this decisive Measure, to consult their Constituents.' " (Maier, American Scripture: Making the Declaration of Independence (1997) p. 67 [quoting a letter from Maryland's congressional representatives]; see Kruman, Between Authority & Liberty (1997) p. 77.) Maryland's delegates desired " 'the fair and uninfluenced Sense of the People' on Independence" and asked their colonial assembly to " 'endeavour to collect the opinion of the people at large in some Manner or other.' " (Maier, at p. 67.) So too Massachusetts; there, the assembly asked every town to hold a special meeting, debate whether to declare independence, and advise its representatives where its people stood. (*Id.* at p. 59; see Luce, Legislative Principles (1930) p. 570; Reid, at p. 102.) And in 1780, New York's assembly sought popular instruction concerning whether to draft a colonial constitution. (Kruman, Between Authority & Liberty, *supra*, at p. 77.) Pre-constitutional America thus had an established tradition whereby the people's representatives could, if they so chose, solicit the people's views to inform momentous decisions.

The framers of the federal Constitution likewise accorded the people's views a foundational role. (See The Federalist No. 22, *supra*, at p. 146 (Hamilton) [the consent of the people is the "pure original fountain of all legitimate authority"]; The Federalist No. 49, *supra*, at p. 339 (Madison) ["the people are the only legitimate fountain of power"].) The First Amendment, Virginia Representative James Madison explained, ensured "the people may therefore publicly address their representatives[,] may privately advise them, or declare their sentiments by petition to the whole body; in all these ways they may communicate their will." (1 Annals of Congress (1st Cong. 1789) p. 766.) These popular views, Alexander Hamilton wrote, should matter (up to a point): "The republican principle demands, that the deliberate sense of the community should govern the

20

conduct of those to whom they entrust the management of their affairs; but it does not require an unqualified complaisance to every sudden breese of passion, or to every transient impulse which the people may receive from the arts of men, who flatter their prejudices to betray their interests." (The Federalist No. 71, *supra*, at p. 482 (Hamilton).) The opinion of Thomas Gordon as Cato that in a free nation representatives could and should " 'consult the Voice and Interest of the People' " was one "[a]ll [the Founders] could agree with." (1 The Founder's Constitution (Kurland & Lerner edits., 1987) p. 41.) The founding generation gave proof of their principles when they submitted the Constitution, not to the state legislatures, but to popular conventions for ratification. (U.S. Const., art. VII; see The Federalist No. 43, *supra*, at p. 296 (Madison) ["The express authority of the people alone could give due validity to the Constitution."]; Remarks of Col. Mason, 2 Records of the Federal Convention of 1787, *supra*, at p. 88 [the Constitution must be submitted "[t]o the people with whom all power remains that has not been given up in the Constitutions derived from them"].)

Although this history does not clearly delineate the permissible means of formal consultation, it reflects an implicit understanding that republican principles generally permit representatives to inquire of the people on fundamental matters. Consistent with that understanding, for more than a century, states have employed the particular means at issue here—an advisory ballot question—to inform decisions concerning federal constitutional matters.

Until adoption of the Seventeenth Amendment, the federal Constitution vested the selection of senators in state legislatures. (See U.S. Const., art. I, § 3.) By the late 19th century many states, especially in the Midwest and West, were inclined to transfer that power to the people themselves. (1 Haynes, The Senate of the United States: Its History and Practice (1938) pp. 96–104; Rossum, *California and the Seventeenth Amendment* in The California Republic (Janiskee & Masugi

21

edits., 2004) pp. 83–85.) In 1891, our Legislature placed on the next year's general election ballot an advisory question, asking the voters whether they were for, or against, " 'the election of United States Senators by the direct vote of the people,' " with the results to be submitted to the President, Congress, and every state in the Union. (Stats. 1891, ch. 48, p. 46.) The result was a landslide; better than 93 percent of those casting ballots favored direct election. (Rossum, at p. 84; Hall, The History and Effect of the Seventeenth Amendment, *supra*, at p. 230.) So informed, the Legislature requested that California's senators and representatives propose a constitutional amendment providing for the direct election of senators. (Assem. Joint Res. No. 7, Stats. 1893 (1893 Reg. Sess.) res. ch. 15, p. 620.)

Nevada in 1893 and Illinois in 1902 followed suit. The Nevada Legislature, viewing it as "expedient that the wishes of the people of this State upon the subject of the election of United States Senators should be unmistakably expressed" (1893 Nev. Stats., ch. 17, pp. 21–22), placed on the ballot an advisory question and forwarded the results (nearly eight to one in favor of amendment) to Congress and other states' Governors (*id.*, § 3, p. 22; Haynes, The Election of Senators, *supra*, at pp. 106, 110). Illinois' Legislature sought general constitutional guidance, asking the polity whether " 'the next General Assembly [should] take the necessary steps, under Article 5 of the Constitution of the United States, to bring about the election of United States Senators by the direct vote of the people?' " (Haynes, at p. 110, fn. 10.) Guidance it got; by a nearly six-to-one margin, voters favored legislative efforts to bring about a federal amendment. (*Id.* at p. 106.) So advised, the next year the Illinois Legislature petitioned for a national constitutional convention. (See *id.* at p. 108.)

Prior to ratification of the Seventeenth Amendment, our Legislature turned again to the advisory question mechanism to obtain advice on whom to select for the Senate under its not-yet-superseded federal power to choose senators. (Stats.

1909, ch. 405, § 2, p. 691 [providing for an "advisory vote for the purpose of ascertaining the sentiment of the voters" concerning senatorial candidates]; Stats. 1911, ch. 387, § 1, pp. 704–705 [directing that future general election ballots include the names of party candidates for Senate, with results of the advisory referenda to be forwarded to the Legislature].)  Here, California was following the lead of the many other legislatures that saw fit to inform their exercise of their federal power to choose senators through advisory plebiscites.  Nebraska was the first state to adopt this course, in 1875 (Kyvig, Explicit & Authentic Acts, *supra*, at p. 210); in 1899, the Nevada Legislature adopted an advisory procedure essentially identical to what California later enacted (Nev. Stats. 1899, ch. 71, pp. 86–87); and by 1911, more than half of all states had some form of advisory plebiscite in place (Kyvig, at p. 210; see generally Haynes, The Election of Senators, *supra*, at pp. 140–150).

In the 1920s and 1930s, as discontent over Prohibition grew, many state legislatures submitted to the people advisory questions asking whether the Eighteenth Amendment should be repealed.  The Rhode Island Legislature declared it "proper and desirable that each qualified elector should be permitted to exercise his constitutional right to register his opinion on this broad social and economic question" and directed that the results be sent to Congress.  (R.I. Acts 1930, ch. 1507, pp. 63–64.)  The people of Rhode Island favored, by more than three to one, constitutional change.  (Assn. Against the Prohibition Amendment, 32 Reasons for Repeal (1932) p. 34.)  The results were the same in Wyoming, where the legislature solicited the electorate's views and ordered the secretary of state to transmit the results to Congress (Wyo. 1931 Sess. Laws, H. J. Res. No. 4, p. 249); better than 70 percent favored a constitutional amendment (Ann. Rep. of the President of the Association Against the Prohibition Amendment for the Year 1932 (1933) p. 12).  Similar votes took place across the country.  (See, e.g., Conn.

23

Pub. Acts 1931, ch. 272, pp. 285–286, §§ 2–5 [petitioning Congress for repeal of the 18th Amend., subject to the electorate in an advisory vote signaling its desire for an amendment]; La. Acts 1932, Act No. 241 (La. Sen. Conc. Res. No. 3), p. 767, §§ 1–5 [submitting to an advisory vote a joint resolution petitioning Congress to call a constitutional convention to repeal or modify Prohibition]; Nev. Stats. 1925, Sen. Joint Res. No. 7, p. 358 [calling for a constitutional convention in the wake of a landslide pro-repeal advisory vote]; 32 Reasons for Repeal, at p. 34 [cataloguing the results of these and other advisory votes]; Ann. Rep. of the President, at pp. 9–12 [same].)  Repeal followed anon, proposed by Congress and ratified by the end of 1933.  (U.S. Const., 21st Amend.)

More recently, the Florida Legislature placed on the ballot two advisory questions asking whether the people supported federal constitutional amendments to prohibit forced busing and permit school prayer.  (Fla. Acts 1972, ch. 72–3, pp. 114–115, §§ 1–2.)  And in 2010, the Florida Legislature applied to Congress for the calling of a constitutional convention to propose a balanced budget amendment (Fla. Sen. Conc. Res. No. 10 (2010); see 160 Cong. Rec. S5563–S5564 (daily ed. Sept. 11, 2014)) and again placed on a subsequent general election ballot a nonbinding advisory question asking whether the federal Constitution should "be amended to require a balanced federal budget without raising taxes?" (Florida Sen. Bill. No. 2742 (2010 Reg. Sess.) § 1).

State legislatures have also seen fit to resort to advisory questions when debating whether to ratify a proposed amendment.  In the 1920s, Congress sent to the states an amendment overturning United States Supreme Court decisions limiting Congress's regulatory power over child labor.  (H. J. Res. No. 184, 68th Cong., 1st Sess. (1924) 43 Stat. 670; see *Bailey v. Drexel Furniture* (1922) 259 U.S. 20; *Hammer v. Dagenhart* (1918) 247 U.S. 251.)  Before acting, the Massachusetts legislature submitted the question of ratification to an advisory vote

of the people. (Kyvig, Explicit & Authentic Acts, *supra*, at p. 259.) In the 1970s, the Nevada Legislature had before it the proposed Equal Rights Amendment; as had Massachusetts a half-century earlier, it turned first to the electorate, asking voters whether they "recommend[ed] that the Nevada legislature ratify" the proposed amendment. (Nev. Stats. 1977, ch. 174, § 5, p. 322; see *Kimble v. Swackhamer* (1978) 439 U.S. 1385, 1386.) Contemporaneously, the Idaho Legislature adopted a rule that it would act on proposed federal amendments only after obtaining the results of a nonbinding popular vote on any proposed amendment. (Idaho Code former § 34–2217, repealed by Idaho Stats. 1995, ch. 227, § 1.) When the Twenty-seventh Amendment, regulating congressional salaries, was up for consideration in 1988, the legislature put the matter to a vote and, after the electorate strongly supported it, ratified the amendment. (Kyvig, at p. 466; Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-seventh Amendment* (1992) 61 Fordham L.Rev. 497, 539.)

When contested, these actions have been upheld. California's provision for including an advisory senatorial vote on primary election ballots was challenged as violating the one subject rule because it was adopted as part of an act also regulating binding, not merely advisory, primary voting. (*Socialist Party v. Uhl* (1909) 155 Cal. 776, 781; see Cal. Const., art. IV, § 9 [one subject rule].) In the course of rejecting the challenge, this court held: "There is nothing in the constitution—either the amendment of [former] section 2½ of article II, or any other provision—which prohibits the legislature from providing at a primary for an expression of a choice as to a candidate for United States senator. It is within the general legislative power to do so, and that it has provided for this advisory vote at a primary election is for the purpose of convenience" and sufficiently germane to the subject of primary elections. (*Socialist Party*, at p. 782.) We considered "whether legislation in connection with primary laws granting such

25

right of expression of a choice is prohibited by the constitutional provision particularly under consideration [relating to the one subject rule], *or any other*" and concluded it was not. (*Ibid.*, italics added.)

The Nevada Supreme Court rejected a federal constitutional challenge to the Nevada Equal Rights Amendment vote, explaining that the advisory question was not "a limitation on legislative power violative of article V of the federal constitution" but instead "simply specifie[d] a means by which to assist the legislature whether to consent or not to consent to the proposed amendment." (*Kimble v. Swackhamer* (Nev. 1978) 584 P.2d 161, 162–163.) Then Justice Rehnquist, acting as Circuit Justice, rejected an application for summary reversal of this decision, agreeing that the advisory question posed no article V problem: "Under the Nevada statute in question, ratification will still depend on the vote of the Nevada Legislature, as provided by Congress and by Art. V. I would be most disinclined to read either *Hawke, supra*, [253 U.S. 221,] or *Leser* [*v. Garnett* (1922) 258 U.S. 130], or Art. V as ruling out communication between the members of the legislature and their constituents.[13] If each member of the Nevada Legislature is free to obtain the views of constituents in the legislative district which he represents, I can see no constitutional obstacle to a nonbinding, advisory referendum of this sort." (*Kimble v. Swackhamer*, *supra*, 439 U.S. at pp. 1387–1388.) *Kimble* suggests, at a minimum, "there are at least some circumstances in which the submission of a ballot proposition relating to an

---

**13** The United States Supreme Court in *Hawke v. Smith, No. 1*, *supra*, 253 U.S. at pages 228–230 invalidated an attempt to subject a legislature's decision respecting ratification to a state law referendum because doing so would contradict article V's allocation of authority to the legislatures themselves. In *Leser v. Garnett*, *supra*, 258 U.S. at page 137, the Supreme Court reaffirmed that a state legislature's actions in ratifying amendments are purely federal in character and "transcend[] any limitations sought to be imposed by the people of a State."

amendment to the federal Constitution will not violate Article V" and establishes that article V does "not completely foreclose[] a state's electorate from contributing some input to the amendment process." (*Bramberg v. Jones*, *supra*, 20 Cal.4th at p. 1058; see *American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 707 [a popular initiative proposing in nonbinding fashion a federal amendment would raise no art. V issues].)

In 1986, the Idaho Attorney General considered the constitutionality of the then extant Idaho requirement that decisions whether to ratify federal amendments be deferred until after a nonbinding advisory referendum. (See Idaho Code former § 34–2217, repealed by Idaho Stats. 1995, ch. 227, § 1.) The Attorney General did not doubt that state legislatures could voluntarily submit nonbinding advisory questions concerning federal constitutional amendments to the electorate in individual cases; the legislature could choose to follow a "referendum first, legislative decision second" rule. The only potential problem with the advisory vote law involved its attempt to constrain future legislatures; that is, while any legislature in its discretion could decide to pose an advisory question before voting on ratification, the current state legislature could not mandate that future legislatures be required to do so. (Ops. Idaho Atty. Gen. No. 86–9 (1986).)

B.  *Advisory Questions and State Constitutional Limits*

Legislatures in California and elsewhere thus have established a tradition of using advisory ballot measures to determine the will of the people on questions pertaining to amendments to the federal Constitution. While " 'usage and custom, no matter how long continued, cannot create a right in the legislature that otherwise it does not possess' " (*Special Assembly Int. Com. v. Southard*, *supra*, 13 Cal.2d at pp. 508–509), we see no evidence the drafters of the California Constitution intended to deprive the Legislature of a tool other state legislatures

27

have long used to ensure they are truly speaking on behalf of their states in the federal constitutional amendment process.

Nevertheless, Howard Jarvis offers a series of arguments for why the structure and implications of various provisions of our state Constitution necessarily bar the Legislature from using an advisory question as a means of investigating the will of the people with respect to federal constitutional amendments. We consider four separate contentions: (1) the Constitution confines the means of investigation to investigation by committee; (2) the Constitution confines the Legislature's access to the ballot to specifically enumerated circumstances that do not include advisory questions; (3) the Constitution prohibits anyone from placing on the ballot a measure that does not enact law; and (4) the Constitution allocates legislative power to the people and the Legislature in a way that preserves clear lines of accountability and implicitly prohibits devices such as advisory questions that would blur those lines. None has merit; no constitutional provision or set of provisions prohibits the use of advisory ballot measures concerning federal constitutional amendments.

### 1. The Committees Clause

Howard Jarvis argues that the power to investigate is limited by California Constitution, article IV, section 11, which authorizes investigations by committee. Under that provision, "[t]he Legislature or either house may by resolution provide for the selection of committees necessary for the conduct of its business, including committees to ascertain facts and make recommendations to the Legislature on a subject within the scope of legislative control." (*Ibid*.) From this language, Howard Jarvis reasons that the Legislature may ascertain facts *only* through committee investigations, and not by any other means. This argument misapprehends the import of the committees clause.

28

Prior to the clause's adoption in 1940 (see Cal. Const., art. IV, former § 37, added by initiative, Gen. Elec. (Nov. 5, 1940)), the extent of the Legislature's ability to act through less than all of the members of one house was the subject of dispute.  (See *Swing v. Riley* (1939) 13 Cal.2d 513; *Special Assembly Int. Com. v. Southard*, *supra*, 13 Cal.2d 497; *In re Battelle*, *supra*, 207 Cal. 227.)  In *Battelle*, this court considered but rejected the argument that the Legislature could not investigate by committee, explaining that the Constitution implied a power to investigate and committee investigations were a permissible exertion of that power.  (*Id.* at pp. 240–244.)  In *Special Assembly*, we again construed the state Constitution as implying a power to investigate, including a power to investigate by committee.  (*Special Assembly*, at pp. 502–504.)  We held, however, that the Legislature was not a continuing body, that it ceased to exist between sessions, that its express powers ceased to exist at the same time, and accordingly that the implied power to investigate died too.  (*Id.* at pp. 504–507.)  Consequently, an interim committee established by the Assembly to conduct investigations after legislative adjournment and report to the next session of the Legislature was unconstitutional.  (*Id.* at p. 509; see *Swing v. Riley*, at pp. 517–520 [extending the same conclusion to a committee created by a joint resolution of both houses].)

At the next general election after *Special Assembly*, the Legislature placed on the ballot a constitutional amendment making explicit the power to investigate and act by committee and overturning the holdings that that power did not extend between legislative sessions.[14]  A ballot argument in support of amendment

---

[14]     As enacted, California Constitution, article IV, former section 37 specified that "[t]he resolution creating any such committee may authorize it to act either during sessions of the Legislature or after final adjournment."  (Voter Information Guide, Gen. Elec. (Nov. 5, 1940) text of Assem. Const. Amend. No. 2, p. 17.)  When the state Constitution was revised and modernized in 1966, the committees

(*footnote continued on next page*)

quoted directly from *In re Battelle*, *supra*, 207 Cal. at page 241: In " 'the preparation of wise and timely laws the necessity of investigation of some sort must exist as an indispensable incident and auxiliary to the proper exercise of legislative power.' " (Voter Information Guide, Gen. Elec. (Nov. 5, 1940) argument by Assemblymember Voigt in favor of Assem. Const. Amend. No. 2, p. 24.) Another argument explained that, although the inherent power to investigate by committee had always been recognized, "[a] recent court decision has held, however, that this practice in our State is without constitutional authority." (*Id.,* argument by Assemblymember Cronin, at p. 24 [implicitly referencing *Special Assembly*].) The amendment's purpose was to supply, explicitly, the constitutional authority *Special Assembly* had found lacking. (*Id.*, at p. 24.)

Accordingly, we read the text of the committees clause as language of expansion, not restriction. The ballot argument in support endorses extant precedent establishing an implied power of investigation. The amendment simply removes doubt over whether the Legislature may investigate and carry out other necessary functions also by way of committee; it does not require the Legislature henceforth to inform itself of facts bearing on the need for action only by way of committee. Nothing in California Constitution, article IV, section 11 constrains the Legislature from placing advisory questions on the ballot.

---

(*footnote continued from previous page*)

clause was moved to its present location, article IV, section 11. Six years later, the Legislature's calendar was amended to eliminate lengthy periods of adjournment between sessions, and the language relating to inter-session committees was deleted as superfluous. (See Prop. 4, as approved by voters, Gen. Elec. (Nov. 7, 1972).)

2. Legislative Access to the Ballot

Various provisions of the state Constitution expressly authorize the Legislature to place measures on the ballot for voter approval. The Legislature may amend or repeal a statute adopted by voter initiative, but generally only if the amendment or repeal is first submitted to and approved by the electorate. (Cal. Const., art. II, § 10, subd. (c).) The Legislature may authorize the issuance of bonds, but above a certain amount they must be submitted to the voters for approval. (*Id.*, art. XVI, § 1.) Finally, the Legislature may propose state constitutional amendments, but such amendments must be submitted to the voters for approval. (*Id.*, art. XVIII, §§ 1, 4.)

Invoking the interpretive canon *expressio unius est exclusio alterius*, Howard Jarvis argues these three specific instances in which legislative action must be ratified by the voters demonstrate no others are permitted. (See also dis. opn., *post*, at pp. 6–7 [arguing that the constitutional scheme precludes legislative access to the ballot in other circumstances].) Under the canon, the explicit mention of some things in a text may imply other matters not similarly addressed are excluded. (*In re J. W.* (2002) 29 Cal.4th 200, 209; *Lake v. Reed* (1997) 16 Cal.4th 448, 466.) Applied to specific grants of power, the canon may support " ' "an implied negative; an implication that no other than the expressly granted power passes by the grant; that it is to be exercised only in the prescribed mode." ' " (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 196; see *Wheeler v. Herbert* (1907) 152 Cal. 224, 237 [applying the canon to interpret the scope of the Legislature's powers under the state Constitution].)

Here, however, the canon has no application. The *expressio unius* inference arises only when there is some reason to conclude an omission is the product of intentional design. (*Marx v. Gen. Revenue Corp.* (2013) 568 U.S. ___, ___ [185 L.Ed.2d 242, 253, 133 S.Ct. 1166, 1175]; *Silverbrand v. County of Los*

31

*Angeles* (2009) 46 Cal.4th 106, 126.) The text must contain a specific list or facially comprehensive treatment. (See *Barnhart v. Peabody Coal Co.* (2003) 537 U.S. 149, 168 [the canon "has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence"]; *Chevron U.S.A., Inc. v. Echazabal* (2002) 536 U.S. 73, 81 [the canon requires a "series of terms from which an omission bespeaks a negative implication"]; *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1411 [the canon "is generally applied to a specific statute, which contains a listing of items to which the statute applies" and may not have any application to "an entire code"].) The provisions Howard Jarvis relies on are widely separated, both in where they are codified and as to how and when they were adopted. The provision allowing the Legislature to propose to the electorate amendments to initiative measures was adopted by the voters at the 1946 general election. (See Cal. Const., art. IV, former § 1b, enacted by Prop. 12 (Nov. 5, 1946 Gen. Elec.); *People v. Kelly* (2010) 47 Cal.4th 1008, 1038.) The provision providing for bond measures to be placed on the ballot was adopted at the 1878– 1879 Constitutional Convention. (Cal. Const., art. XVI, § 1.) The provision providing for the Legislature to place constitutional amendments on the ballot traces all the way back to California's first Constitution. (Cal. Const. of 1849, art. X, § 1.) Nothing suggests these provisions were intended as a conscious and comprehensive treatment, such that one might infer powers not explicitly conveyed were intentionally omitted.

More fundamentally, Howard Jarvis's argument rests on a misconception as to the nature of the constitutional provisions it cites. Each involves not a grant of authority but a limitation on legislative power—an occasion when the Legislature must turn to the voters, where otherwise it would have been at liberty to act without voter input. Whatever might be said for the logic of inferring from a few

specific grants of authority the *absence* of some more general authority, that logic cannot be turned on its head to infer from a few specific limits on legislative authority the *presence* of a broader, unstated limit on legislative authority. The *expressio unius* canon, were we to apply it here, would at most support the inference that the three cited instances are an exhaustive list of the circumstances in which submission of a matter to a plebiscite is mandatory. The canon and the scattered provisions Howard Jarvis cites offer no guidance at all on the actual question before us, whether the Legislature in its discretion *may* turn to the voters to ascertain their will concerning a possible amendment to the federal Constitution.

### 3. The Use of the Ballot for Nonlawmaking Purposes

In a closely related argument, Howard Jarvis notes this court's holding that the people by initiative may place on the ballot only measures that enact law. (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at pp. 694, 708–714; see Cal. Const., art. II, § 8, subd. (a) ["The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them."].) From this, Howard Jarvis reasons that the people's initiative and referendum power and the constitutional provisions mandating electoral review of particular actions by the Legislature (Cal. Const., art. II, §§ 8–10; *id.*, art. XVI, § 1; *id.*, art. XVIII, §§ 1, 4) define an exhaustive list of matters that may be placed on the ballot, that they all involve the adoption of law, and accordingly that the Constitution forbids ballot measures that do not enact laws.

This contention is a variation on the *expressio unius* argument just considered and rejected. It depends on the assumption that these scattered provisions of the Constitution—i.e., adding the people's right to place initiatives and referenda on the ballot to the Legislature's duty to place certain matters on the ballot—define the exclusive list of matters the electorate may vote on. But there is

33

no reason to infer provisions governing what the people may put on the ballot, and what the Legislature must put on the ballot, limit the wholly separate category, what the Legislature may put on the ballot. *Expressio unius est exclusio alterius* has no interpretive force here.

Howard Jarvis and the dissent contend that if, under *American Federation of Labor v. Eu*, *supra*, 36 Cal.3d 697, the people are limited to placing on the ballot only proposed laws, then the Legislature must be too. We reject that argument as well. Our decision in *Eu* defined limits on the initiative power, not limits on what the Legislature might do or limits on the proper use of the ballot. Indeed, we explicitly recognized that the Legislature's powers were broader than those conveyed by the initiative power: "Even under the most liberal interpretation, however, the reserved powers of initiative and referendum do not encompass all possible actions of a legislative body." (*Id.* at p. 708.) When the people established the Legislature, they conveyed to it the full breadth of their sovereign legislative powers. (*Nougues v. Douglass*, *supra*, 7 Cal. at p. 69.) When they adopted the initiative power in 1911, they restored to themselves only a shared piece of that power. (See *Eu*, at p. 708.) There is nothing incongruous in reading the state Constitution as allocating broader powers to the deliberative body representing the people than to the people directly. Such is the nature of a republic. (See generally U.S. Const., art. IV, § 4 [guaranteeing a republican form of government]; Browne, Rep. of Debates in Convention of Cal. on Formation of State Const. (1850) pp. 393–394 [noting the fundamentally republican nature of the state Constitution]; 1 Willis & Stockton, Debates & Proceedings, Cal. Const. Convention 1878–1879, p. 242 [the state Constitution implicitly establishes a republican form of government].)

Of course *Eu* of itself does not establish that the Legislature has the specific authority to ask an advisory question about a federal constitutional amendment

34

where the people might lack the power to opine unilaterally on the same matter; that issue, central to this case, was far afield from the question in *Eu*. The point, rather, is that nothing in *Eu* forbids this understanding, while the substantially broader powers assured the Legislature by the federal Constitution's article V and the state Constitution's article IV, section 1, in contrast to the narrower powers restored to the people by the latter section and the state Constitution's article II, section 8, support it.

Nor, contrary to the concern of our concurring colleague Justice Liu, does recognizing that the Legislature may pose an advisory question about constitutional matters impermissibly restore to the people a power constitutionally forbidden them. The state Constitution does not prohibit the people from speaking on such questions at the ballot box; it simply fails, in article II, section 8, as construed in *Eu*, to authorize their doing so unilaterally. That they may not speak when, pursuant to sources of constitutional power outside article II, section 8, they are asked, does not follow.

### 4.    Accountability

Finally, Howard Jarvis argues the state Constitution contains an implicit structural barrier to the use of advisory questions by the Legislature. It asserts new laws may come into being by legislative enactment, with no participation by the people, or they may come into being by initiative, with no involvement from the Legislature (Cal. Const., art. II, § 8; *id.*, art. IV, § 1), and in each instance, accountability for a given law is clear. Advisory questions on legislative matters, in contrast, would supposedly blur lines of accountability and hamper the ability of voters appropriately to evaluate their representatives at the ballot box: should they be held responsible for a particular legislative action pre-approved by the electorate, or not?

35

As an initial matter, we note our system of government is one in which the lines of accountability are inevitably blurred to some extent. In a representative democracy, legislators are generally expected to be responsive to their constituents. If a representative votes in favor of a legislative measure that tracks the results of an advisory ballot measure, a voter may not be able to know if the representative is voting his or her own conscience or instead is following the views of a majority of the representative's constituents. But even in the absence of an advisory measure, questions will sometimes arise as to whether a representative's vote on a particular matter is based on the representative's individual views or instead reflects those of his or her constituents, as embodied in polls or other gauges of public sentiment.

Moreover, our state Constitution guarantees to the people "the right to instruct their representatives." (Cal. Const., art. I, § 3, subd. (a).) Although this court has not had occasion to delineate the bounds of that right, its very existence is telling.

Instructions are a practice borrowed from England. They were employed frequently in the colonies as a formal means for the represented to communicate their views to representatives. (See generally Kruman, Between Authority & Liberty, *supra*, at pp. 76–81; Wood, The Creation of the American Republic 1776–1787 (1998) pp. 189–190; Terranova, *The Constitutional Life of Legislative Instructions in America* (2009) 84 N.Y.U. L.Rev. 1331, 1333–1339.) For example, states delivered instructions to their delegates in connection with the issuance of the Declaration of Independence, during the period of the Articles of Confederation, and to guide deliberations at the 1787 Constitutional Convention. (Kobach, *May "We the People" Speak?: The Forgotten Role of Constituent Instructions in Amending the Constitution* (1999) 33 U.C. Davis L.Rev. 1, 38–58.) Views varied as to their compulsory nature; while English legislators had

increasingly taken the position that instructions were precatory, some Americans in the colonial period treated them as more binding. (Kruman, at pp. 76–77; Terranova, at pp. 1333–1339; Kobach, at pp. 30–37.) A right to instruct congressional representatives was proposed as an addition to the draft First Amendment, but ultimately foundered on uncertainty over the effect to be given instructions, among other concerns. (1 Annals of Congress, *supra*, at pp. 760–776.)

Unlike the federal Constitution, the state Constitution has codified a right to instruct since before statehood. (See Cal. Const. of 1849, art. I, § 10 ["The people shall have the right freely to assemble together, to consult for the common good, to instruct their representatives, and to petition the Legislature for redress of grievances."].) Its incorporation into the state Constitution was accompanied by many of the same fundamental debates seen at the federal level in connection with the omission of the right from the First Amendment—Are representatives independent or agents? Do they represent the constituents of their district or the entire state/country? If a right to instruct were granted, would instructions be binding?—but the state convention ultimately struck a balance in favor of, rather than against, a right to instruct. (See Browne, Rep. of Debates in Convention of Cal. on Formation of State Const., *supra*, at pp. 42, 294–297.)

That right clouds to some extent the attribution of responsibility for representative actions. If instructions are given and disobeyed, no accountability problem arises; plainly the representative has voted his or her conscience, and the electorate may provide, if it chooses, the same response that met Edmund Burke.[15]

---

[15]  In 1774, Burke offered a classic commentary on the nature of representation in a speech to the electors of Bristol, England. He denounced binding instructions, explaining that while constituent opinions were of great

(*footnote continued on next page*)

But if the representative acts in a manner consistent with instructions, then observers may reasonably ask whether the representative was acting according to his or her personal choice or simply following instructions. The constitutional right of the people to instruct their representatives thus blurs, to some degree, the lines of accountability for representative actions.

In any event, whatever the general merits of the concern that advisory ballot measures blur accountability, the concern is less significant in the context of a measure such as Proposition 49 relating to federal constitutional amendment. Responsibility for the ultimate action sought, a proposed federal amendment, lies not with the Legislature *or* the people of California, but with the members of Congress, the entity constitutionally charged with proposing amendments. To the extent individual state legislators must be accountable for their role in steps leading to an amendment, they may be judged for their votes on the earlier resolution seeking a convention and on the bill placing the advisory question on the ballot.

C. *Conclusion*

The federal Constitution is our nation's fundamental charter and the source of its supreme law. Only supermajorities of the people's representatives and the several states can alter the course it sets for our country. (See U.S. Const., art. V.) Over the last century and more, state legislatures have seen fit to resort to the

---

(*footnote continued from previous page*)

interest, ultimately it was the representative's duty to act not as mere agent but as a member of a deliberative body acting in the best interests of the whole. (Bresler, *Rediscovering the Right to Instruct Legislators* (1991) 26 New Eng. L.Rev. 355, 362.) Bristol rewarded Burke's independence by declining to reelect him. (Bogus, *Rescuing Burke* (2007) 72 Mo. L.Rev. 387, 405–408; Bresler, at p. 362.)

ballot box for guidance on whether to propose or ratify potential federal constitutional amendments.  This past use of advisory questions to inform the federal constitutional process evidences a larger truth—a recognition of the particular appropriateness of consulting the polity in the course of exercising independent judgment with respect to such foundational matters.

That truth draws its strength from "the animating principle of our Constitution that the people themselves are the originating source of all the powers of government." (*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n* (2015) 576 U.S. ___, ___ [192 L.Ed.2d 704, 729–730, 135 S.Ct. 2652, 2671].)  If that be so, there can be little complaint with a legislature, before pursuing constitutional change, seeking to obtain from the people of the state "the deliberate sense of the community." (The Federalist No. 71, *supra*, at p. 482 (Hamilton).)  Moreover, the solemnity of the matter to be considered justifies obtaining popular input through an equally solemn formal vote, rather than a mere opinion poll or other unofficial solicitation of views.  While Hamilton (and many others) objected to binding instructions from the people, no similar constitutional objections attach to purely advisory votes.  Legislators may solicit and consider the views of the people on fundamental matters pertaining to federal constitutional amendments, while at the same time remaining free ultimately to act differently after due deliberation with fellow members of their representative body.  The Legislature possesses broad discretion, when conducting an investigation under its implied state constitutional authority, "to select the means within reasonable bounds." (*Parker v. Riley*, *supra*, 18 Cal.2d at p. 91.)  We conclude the enactment of a statute placing an advisory question on the ballot in order to investigate popular sentiment on a matter of federal constitutional dimension falls within that discretion.

Our concurring colleague, Justice Liu, expresses concern that we, like the Legislature, have rested authority for the advisory question here on the investigative power rather than on the plenary lawmaking power alone. (Conc. opn. of Liu., J., *post*, at pp. 35–36.) He argues that the lawmaking power and power to enact statutes are coextensive, and resort to any other power to justify a statute would raise doubts about the plenary nature of the lawmaking power. This line of argument confuses the form of legislative action—statute, resolution, something else—with the nature of the underlying power justifying the exercise of that action—lawmaking power, investigative power, ratifying power, something else. Though the lawmaking power may be exercised only by statute (Cal. Const., art. IV, § 8, subd. (b)), we have never held the converse, that every statute may be justified only as an exercise of the lawmaking power. When California joined the wave of states enacting statutes governing the ratifying conventions for the Twenty-first Amendment (*ante*, p. 12), its actions were not authorized by its general lawmaking powers alone, but pursuant to an implied article V power to regulate the procedures for that one-time only event. Justice Liu likewise would justify enactment of the statute here based not on the naked power to make laws, but on an implied article V power, albeit while adopting an unduly restrictive understanding of state legislative powers. Neither that explanation nor ours places in any doubt the plenary nature of the Legislature's lawmaking power.

Justice Liu also expresses concern that the means of investigation selected here is unlike the methods expressly addressed in previous cases. But novelty alone is no basis for imposing a categorical constitutional barrier where none otherwise exists. Here, as we have discussed, none does.

IV.  *The Nexus Between Proposition 49 and the Exercise of Powers Related to Federal Constitutional Amendment*

Having concluded the Legislature may use advisory ballot questions to facilitate the exercise of its article V functions, we next consider whether the specific measure before us, Proposition 49, is a reasonable exercise, not barred by any law, of the Legislature's power to investigate and determine the best course of action in connection with a potential federal constitutional amendment.  Howard Jarvis contends that because the Legislature has already submitted to Congress a call for a national convention, no further purpose can be served by a ballot measure.  We disagree.

In evaluating the connection between Proposition 49 and the Legislature's powers, we are mindful of our limited role.  " 'It is no small matter for one branch of the government to annul the formal exercise by another and coordinate branch of power committed to the latter, and the courts should not and must not annul, as contrary to the constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the constitution.' " (*Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 692.)  "[A]ll intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action.' " (*Id.* at p. 691.)  Nor, in holding up the Legislature's actions to the light of the Constitution, will we inquire into underlying motives; our review is confined to determining whether an action itself is at odds with constitutional imperatives.  (*City and County of San Francisco v. Cooper* (1975) 13 Cal.3d 898, 913; *County of Los Angeles v. Superior Court* (1975) 13 Cal.3d 721, 727.)  If any reasonable connection between the proposed

41

ballot measure and the Legislature's article V-related powers is discernable, it will suffice.**16**

We conclude there is a sufficient nexus between Proposition 49 and, at a minimum, the potential exercise of every one of the Legislature's amendment powers. For the legislators of a state collectively to call on Congress for a federal amendment, or to call for a national convention, is one matter. For the people of a state, by the millions, to vote in favor of pursuing an amendment is another. The 1892 plebiscite concerning direct election of senators yielded a resounding 93 percent to seven percent majority in favor of constitutional change. (Rossum, *California and the Seventeenth Amendment* in The California Republic, *supra*, at p. 84.) The Legislature rationally could believe that a decisive result in the present day might carry more weight with members of Congress, when deciding whether to propose or vote in favor of an amendment,**17** and with other state legislatures, in

---

**16** The dissent concedes both the Legislature's power to investigate and to carry out article V functions. (Dis. opn., *post*, at pp. 9–12.) But the dissent contends that, if allowed to submit an advisory question, the Legislature might use that power to interfere with the people's power of initiative by submitting rival "competing measures." (*Id.* at p. 9.) For fear of such abuse, the dissent evidently would impose on the Legislature the burden of showing the use of any advisory question is indispensable to the exercise of these recognized powers. (*Id.* at pp. 12–13.)

We have held that the people's initiative power does not extend to advisory measures proposing constitutional change. (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 694.) A legislative ballot measure inquiring about a federal constitutional matter, such as we address here, would never compete or interfere with any rival proposition that the people had the authority, under their initiative power as construed in *Eu*, to place on the ballot. There is no warrant to depart from the settled understanding that the Legislature has discretion to choose within reasonable bounds its means of investigation, without first having to demonstrate no alternative means exist. (See *Parker v. Riley*, *supra*, 18 Cal.2d at p. 91.)

**17** Arguably, the mounting wave of convention calls and pro-amendment state resolutions played a role in the United States Senate finally capitulating and

(*footnote continued on next page*)

their deliberations over whether to join California's call for a constitutional convention,[18] than the Legislature's call alone. Election results might also inform the Legislature's decision whether to formally supplement its convention call with a joint resolution asking Congress to propose an amendment, just as both methods of soliciting amendment were employed in the late 19th and early 20th century in connection with senatorial selection and in 1935 in connection with tax reform. (*Ante*, pp. 14–16.) Finally, if either Congress or a national convention were to propose an amendment, a plebiscite would inform the Legislature's decision on ratification. (See Idaho Sen. J. Res. No. 101 (50th Leg., 1st Reg. Sess. 1989), reprinted in 101 Cong. Rec. S7911 (daily ed. July 13, 1989) [ratifying the 27th Amend. following solicitation of a popular vote].)

Moreover, even a result at the ballot box rejecting the proposal could afford material assistance to the Legislature in determining how to exercise its article V-related powers. Although the Legislature has already called for a constitutional convention, "[w]hat the Legislature has enacted, it may repeal." (*California*

---

(*footnote continued from previous page*)

joining the House of Representatives in proposing a direct election amendment. (See Kobach, *Rethinking Article V: Term Limits and the Seventeenth and Nineteenth Amendments* (1994) 103 Yale L.J. 1971, 1976–1980.) The Legislature could reasonably conclude the members of Congress are not immune to showings of political and popular support for change.

[18] The California Legislature's pending convention call is without force until 33 other legislatures join in. (See U.S. Const., art. V.) Just as Pennsylvania's Legislature once coordinated a campaign to marshal the requisite number of convention calls in support of direct election of Senators (Hall, The History and Effect of the Seventeenth Amendment, *supra*, at pp. 223–225; Haynes, The Election of Senators, *supra*, at pp. 122–125, 275–276; Kyvig, Explicit & Authentic Acts, *supra*, at p. 210), so our Legislature may take steps directed at persuading other legislatures in order to make its own call meaningful.

*Redevelopment Assn. v. Matosantos*, *supra*, 53 Cal.4th at p. 255; see *Fletcher v. Peck* (1810) 10 U.S. 87, 135 (6 Cranch) ["one legislature is competent to repeal any act which a former legislature was competent to pass"].) Nothing in the text of article V establishes an intent to depart from this fundamental understanding about the nature of legislative bodies and to afford Congress and state legislatures only the power to make, but never to withdraw, proposals. Indeed, the logic of the amendment process the Article establishes urges strongly to the contrary. Convention calls take effect only when a supermajority, two-thirds of the legislatures, have joined in. A national consensus is a foundational necessity. To allow the making of calls, but not their subsequent negation, might place Congress under orders to call a convention when far fewer states, perhaps not even a majority, presently favored amendment. It follows that convention calls are not static; they can be, and as a matter of historical practice frequently have been, rescinded. (See, e.g., Nev. Assem. Res. No. 157 (1989 Reg. Sess.), reprinted in 101 Cong. Rec. S7911 (daily ed. July 13, 1989) [rescinding convention call]; Kyvig, Explicit & Authentic Acts, *supra*, at p. 378 [noting N.C. and Okla. rescissions of convention calls]; Paulsen, *A General Theory of Article V: The Constitutional Lessons of the Twenty-seventh Amendment* (1993) 103 Yale L.J. 677, 765–789 [cataloguing both state-by-state convention calls and their repeals].) The Legislature has called for a national convention; it might, upon sober and mature reflection informed by popular disapproval at the ballot box, reconsider and rescind as unwise that resolution.

Illustrative of the relevance an advisory vote can have even after a legislature has acted is the case of the Massachusetts legislature's 1924–1925 change of heart on the question of a child labor amendment. In 1924, Massachusetts was among those states petitioning Congress for submission of a constitutional amendment to the states to overturn United States Supreme Court

decisions limiting Congress's regulatory power over child labor. However, when Congress complied and proposed an amendment, the state's legislature did not immediately act but instead submitted the question of ratification to a November 1924 advisory vote of the people. The plebiscite demonstrated widespread popular opposition, with the amendment losing by more than three-to-one. Taking those views into account, the legislature reversed its support from the year before and declined to ratify the amendment. (Kyvig, Explicit & Authentic Acts, *supra*, at pp. 259–260.) So too, an advisory vote may guide a legislature in deciding whether to persist with efforts to obtain, or rescind a call for, a national convention or congressionally proposed federal amendment.

Accordingly, we conclude Proposition 49 is a reasonable and lawful means of assisting the Legislature in the discharge of its article V-related functions. Howard Jarvis has identified no constitutional obstacle. Proposition 49's placement on a statewide ballot may be upheld as an exercise of the Legislature's implied power under the California Constitution to investigate and determine the best course of action in connection with a potential federal constitutional amendment.

## DISPOSITION

We discharge the order to show cause, deny Howard Jarvis's petition for a peremptory writ of mandate, and vacate our previously ordered stay.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

## CONCURRING OPINION
## BY CANTIL-SAKAUYE, C. J.

As the majority observes, I dissented from this court's August 2014 order removing an advisory measure, designated Proposition 49, from California's November 2014 general election ballot. My vote was based on my conclusion that petitioners had failed to make a sufficient showing of the invalidity of the challenged measure to warrant removing it from the ballot.

The court's opinion, arrived at following full briefing, oral argument, and extensive deliberation, concludes that the Legislature properly exercised its authority in enacting the statute submitting that advisory measure to a vote of the statewide electorate. The decision upholds the Legislature's enactment as a permissible means of investigating policy options regarding the Legislature's exercise of authority under article V of the federal Constitution concerning a possible amendment to the federal Constitution. In the process the majority rejects the contrary arguments of petitioners. I agree with the majority's conclusion that, after full consideration, the challenged measure is valid and that petitioners' objections fail. Accordingly, I have signed the majority opinion.

I write separately to avoid any misunderstanding or implication that legislatively authorized advisory ballot measures are permissible only concerning the narrow universe of matters relating to the Legislature's role under article V of the federal Constitution (sometimes, article V). As I will explain, legislative authority to pose advisory ballot questions has long been properly employed — by our own Legislature, by the legislatures

of numerous other states, and by local legislative bodies (such as county boards of supervisors and city councils) throughout California and the nation — to obtain the views of the voters concerning *all* manner of subjects reasonably within a legislative body's authority to act. Nothing in today's decision should be viewed as calling into question the validity of all types of statewide and local advisory ballot measures, even those completely unrelated to any proposed amendment to the federal Constitution.

Before addressing the legal principles and precedent supporting the Legislature's general authority to submit advisory measures to a vote of the people, it is useful to review in some detail the long-standing historical and recent practice demonstrating that legislatively initiated advisory ballot measures have been used regularly and extensively concerning a wide variety of subjects both within California and nationwide. This considerable use of advisory ballot measures may not be as well known within the legal community or among the general public as it perhaps should be, but this practice is important to keep in mind when the question of the permissible scope of advisory ballot measures is considered.

## I. LEGISLATIVE USE OF GENERAL ADVISORY BALLOT MEASURES IN CALIFORNIA AND NATIONWIDE, UNCONNECTED WITH ANY ARTICLE V ROLE OR RELATED ISSUE

A. *Seven prior advisory policy measures submitted to California's statewide electorate*

As section 2, subdivision (m) of the challenged statute (Stats. 2014, ch. 175) itself observes, ballot measures seeking the nonbinding advisory views of the voters have been used in the past in this state. On seven prior occasions the Legislature has submitted advisory ballot measures to the statewide voters, most of them unconnected to any effort to amend the federal Constitution. And, like the statute currently under review, when the Legislature's questions pertained to issues over which the federal government has

2

ultimate control, the measures have directed that the ballot results be conveyed to Congress.

The first advisory ballot measure in California — an ugly reflection of its times, asking the statewide voters whether they were " '[f]or' " or " '[a]gainst' " Chinese immigration — was submitted to California voters by the Legislature in 1877 (Stats. 1877, ch. 5, p. 3), and appeared on the statewide general election ballot in September 1879, just a few months after the voters had approved a newly proposed state constitution at a special election in May 1879. That advisory measure required, similarly to the one at issue here, that the result of the balloting be conveyed to Congress. (Stats. 1877, ch. 5, §§ 2 & 3, p. 3.)

The next two advisory ballot measures were presented to the statewide voters in 1892. One implicated the Legislature's article V role — it sought the electorate's views concerning whether the federal Constitution should be amended (as it eventually was, more than two decades later) to provide for direct election of United States Senators. That advisory measure required, again similarly to the one at issue here, that the result of the balloting be conveyed to Congress. (Stats. 1891, ch. 48, § 3, p. 46.) The second advisory measure of that year asked whether the ability to read and write in English should be a requirement for voting in the state. (Stats. 1891, ch. 113, pp. 704-705.)

As explained in the majority opinion (*ante*, at pp. 22-23), in 1909, and again in 1911 — both prior to adoption of the Seventeenth Amendment to the federal Constitution — our Legislature, like those in numerous other states, asked voters to give their advice at the ballot box concerning which candidate the Legislature should appoint as United States Senator. (Stats. 1909, ch. 405, § 2, p. 691; Stats. 1911, ch. 387, § 1, pp. 705-705.) And in 1933, the Legislature posed to the statewide electorate two advisory ballot questions concerning the use of gasoline tax funds. (Stats. 1933, ch. 435, pp. 1125-1126.)

3

B. *Other states' submission of advisory measures to their statewide electorates*

Dating initially from the late 1700s, and with growing use in the mid 1800s, the legislatures of other states have sought the advice of their statewide voters on all kinds of matters unconnected with any article V issue and yet within the legislature's authority to act — ranging from whether to allow the establishment of banks, to abolition of forced labor by prisoners, to suffrage for women. (Goldman, *The Advisory Referendum in America* (1950) 14 Pub. Opinion Q. 303, 305-308 [describing the use of advisory measures in colonial times and in statewide 19th-century ballot measures in Mass., Ala., Wis., Nev., and N. Y.][1] (hereafter *The Advisory Referendum*).)

The use of such advisory and nonbinding ballot measures has continued nationwide in the intervening decades. For example, the Massachusetts Legislature put 12 advisory measures on the ballot from 1919 to 1998, and the Wisconsin Legislature placed 20 such measures on the ballot between 1948 and 1995. (Zimmerman, The Referendum (2001) p. 62.)

Focusing only on the most recent four decades, advisory measures wholly unconnected with any article V role have been placed on the statewide ballot by 12 state legislatures, all of which operate under constitutions similar to California's, in that none contains any provision specifically authorizing such legislative action. These most recent

---

[1] The author explained: A 1797 Massachusetts advisory ballot measure concerned whether to call a state constitutional convention; an 1819 Alabama advisory measure concerned whether to ratify an amendment to the state constitution; an 1847 Wisconsin measure concerned whether to allow or prohibit banks in the state; an 1879 Nevada measure, like the similar California ballot measure mentioned above, concerned whether to ban Chinese immigration; an 1883 New York measure concerned whether to abolish forced labor by prisoners; and another Massachusetts advisory ballot measure in 1895 concerned suffrage for women. (The Advisory Referendum, *supra*, 14 Pub. Opinion Q. at pp. 306-308.)

4

examples of statewide ballot measures have posed to the statewide voters the following policy questions addressing myriad issues coming within the legislature's authority to act.

Alaska: Should the legislature propose an amendment to the state constitution prohibiting the state from providing employment benefits to same-sex partners of public workers? Should a portion of the Alaska Permanent Fund be used to balance the state budget? Should the legislature revise the state's annuity program by adopting a longevity bonus for those 65 and older? Should the Legislature adopt a resolution placing before the voters an amendment to the state constitution calling for regular legislative sessions to be 120 days long with the possibility of a 10-day extension upon a majority vote?[2]

Delaware: Do the voters favor allowing the state to license various charitable organizations to sponsor and conduct lotteries under certain conditions? Do the voters favor state regulated and controlled slot machines?[3]

Idaho: In light of the fact that the United States Supreme Court ruled that the state's term limits law does not apply to members of Congress, should that law continue to apply to *state* elective offices? Should the state maintain previously adopted property

---

[2] Advisory election (Apr. 3, 2007) on benefits for same-sex partners of public employees (2006 Alaska Sess. Laws, ch. 1, 4th Special Sess.): voters answered no, according to data presented on ballotpedia.com (results of statewide elections described below and through fn. 23 are from the same source or from reports maintained by the particular state); advisory election (Sept. 14, 1999) on permanent fund (1999 Alaska Sess. Laws, ch.1, 1st Special Sess.): voters answered no; advisory vote on longevity annuity option, general election ballot (Nov. 4, 1986), Measure No. 3: voters answered yes (Inter-university Consortium for Political and Social Research, Referenda and Primary Election Materials (1994) pt. 49, p. 64); advisory vote on legislative session length, general election ballot (Nov. 7, 1978), Proposition No. 1 (1978 Alaska Sess. Laws, ch. 98, Sess. Law No. 78, 2d Sess.): voters answered yes.

[3] Advisory referendum (Nov. 6, 1984, election) on lotteries by charitable organizations (64 Del. Laws, ch. 414, p. 955): voters of the four targeted counties answered yes; advisory referendum (Nov. 2, 1976, election) on slot machines (60 Del. Laws, ch. 390, p. 1138): voters of the three targeted counties answered no.

tax relief, reducing property taxes and protecting funding for public schools, by keeping the sales tax at 6 percent?**4**

Illinois:  Should any health insurance plan that provides prescription drug coverage be required to include prescription birth control as part of that coverage?  Should the state increase its minimum wage to $10 per hour by a certain date?  Should the state constitution be amended to require that each school district receive additional revenue, based on its number of students, from an additional 3 percent tax on income greater than $1 million?**5**

Massachusetts:  Should taxpayer money be used to fund political campaigns for public office?  Should the commonwealth require that radio and TV broadcast outlets give free equal time to all candidates running for public office?  Should the commonwealth change the legal age for consuming alcohol from 21 to 18?  Should voluntary recitation of prayer be authorized in the commonwealth's public schools?**6**

---

**4**    Advisory ballot (Nov. 3, 1998, election) on whether to retain state term limits (submitted by 1998 Idaho Sess. Laws, ch. 255, p. 824):  the voters answered yes; advisory ballot (Nov. 6, 2006, election) on retaining the property tax (submitted by 2006 Idaho Sess. Laws, ch. 1, § 25, p. 36):  the voters answered yes.

**5**    The "Women's Health Referendum Act" required a statewide advisory public question (Nov. 4, 2014, election) on birth control in prescription drug coverage (2014 Ill. Laws, Pub. Act 98-696, 98th Gen. Assem.):  the voters answered yes; the "Minimum Wage Increase Referendum Act" submitted an advisory public question on the same ballot (Nov. 4, 2014, election) (2014 Ill. Laws, Pub. Act 98-657, 98th Gen. Assem.):  the voters answered yes; the "Tax for Education Referendum Act" submitted another statewide advisory public question (Nov. 4, 2014, election) concerning tax on income over $1 million (2014 Ill. Laws, Pub. Act 98-794, 98th Gen. Assem.):  the voters answered yes.

**6**    Legislative advisory question on taxpayer funding for political campaigns (Nov. 5, 2002, election), Question No. 3 (2002 Mass. Acts, ch. 184, § 174(c), p. 660):  the voters answered no; legislative advisory question on television and radio time for candidates (Nov. 6, 1990, election), Question No. 6  (1989 Mass. Acts, ch. 428, p. 732):  the voters answered yes; legislative advisory question on lower drinking age (Nov. 7, 1972,

(*footnote continued on next page*)

Nevada:  Should the state designate the third to last Friday in October as a new Nevada Day holiday, replacing a holiday long declared by the Legislature to fall on October 31?[7]

Oregon:  Should the state change the system for funding public schools in various ways specified in a menu of options, concerning income, property, and sales taxes, presented in four separate advisory measures?[8]

Vermont:  Should the legislature consider enactment of a lottery to supplement state revenues?  Should the state hold a constitutional convention?[9]

Wisconsin:  Should the death penalty be enacted in the state for cases involving first-degree intentional homicide if the conviction is supported by DNA evidence?  Do the voters favor restrictions on gambling, or new forms of gambling, or continuation of existing forms of gambling, as described in five separate advisory measures?  Should local control over vocational, technical and adult education be changed to state control,

---

*(footnote continued from previous page)*

election), Question No. 8 (1972 Mass. Acts, ch. 155, p. 74):  the voters answered yes; legislative advisory question on prayer in schools (Nov. 7, 1972, election), Question No. 9 (1972 Mass. Acts, ch. 607, p. 479):  the voters answered yes.

[7]      Nevada Day advisory question (Nov. 3, 1998, election), Question 4 (1997 Nevada Stat., ch. 202, p. 508):  the voters answered yes.

[8]      Modification of school finance system, advisory ballot measure, Measure No. 5A (May 15, 1990, statewide ballot).  This and four companion advisory measures, Nos. 5B through 5E, were authorized by 1989 Oregon Laws, chapter 1086, section 2, page 2214, and were presented on the ballot as a menu of options.  The voters answered yes, they wanted to change the current system for funding K-12 schools, but they advised against each of the four proposed options for doing so.

[9]      State lottery question (Nov. 2, 1976, election) (1976 Vt. Acts, No. 252, p. 372):  the voters answered yes; constitutional convention question (June 3, 1969, election) (1969 Vt. Acts, No. 74, p. 202):  the voters answered no.

with funding paid out of state tax revenues, instead of principally from local property tax revenues?  Do the voters favor greater state aid to municipalities for accelerated water pollution abatement facilities through the issuance of bonds?  Do the voters favor expanding state acquisition and development of land for recreational purposes through the issuance of bonds?[10]

Less frequently during the same most recent four decades, legislatures nationwide also have continued to exercise their traditional powers by seeking the advisory views of the electorate concerning, not a possible law or state constitutional amendment, but

---

[10]     Death penalty advisory (Nov. 7, 2006, election) Question No. 1 (2005 Sess. Laws, p. 1807; Wis. Sen. Joint Res. No. 5):  the voters answered yes.  Regarding the gambling measures (1991 Wis. Sess. Laws, p. 1783), all were submitted to state voters on the April 6, 1993, statewide ballot, as Questions 1 through 5.  Question 1, concerning gambling casinos on excursion vessels, asked, "Do you favor a law that would allow gambling casinos on excursion vessels operating in this state on the Mississippi River, Lake Michigan and Lake Superior?" (the voters answered no); Question 2, concerning restriction of gambling casinos, asked, "Do you favor a constitutional amendment that would restrict gambling casinos in this state?" (the voters answered yes); Question 3, concerning video poker and video gambling, asked, "Do you favor a law that would allow video poker and other forms of video gambling in this state?" (the voters answered no); Question 4, concerning pari-mutuel on-track betting, asked, "Do you favor continuing to allow pari-mutuel on-track betting on races in this state, such as horse, dog and snowmobile races?" (the voters answered yes); and Question 5, concerning the state-operated lottery, asked, "Do you favor continuing to allow the state-operated lottery?" (the voters answered yes).

The other Wisconsin referenda mentioned in the text above were posed at the April 1, 1969, election:  to the question of state control and funding of vocational education  (1969 Wis. Sess. Laws, p. 1518), the voters answered no;  to the question of water pollution control bonds (1969 Wis. Sess. Laws, p. 1518), the voters answered yes; to the recreational lands question (1969 Wis. Sess. Laws, p. 1518) the voters answered yes.

Advisory ballot policy measures have also been employed internationally.  (See DuVivier, *The United States as a Democratic Ideal? International Lessons in Referendum Democracy* (2006) 79 Temple L.Rev. 821, 847 [describing use in New Zealand, Denmark, Finland, Italy, Norway, Sweden, and the U.K.].)

instead connected with the legislature's authority to issue policy resolutions directed toward the federal government.

For example, federal environmental issues have been the subject of advisory questions in at least four states. The North Carolina Legislature asked voters if they were "for" or "against" location of a radioactive waste facility in the state, and directed that the results of the ballot be shared with the President, Congress, and other federal officials. Likewise, the Oregon Legislature asked: Should state officials continue challenges to federal selection of the state to house high-level nuclear waste repositories? The Wisconsin Legislature asked: Do voters support construction of a national or regional high-level radioactive waste disposal site in the state? The Massachusetts Legislature asked: "Shall the Commonwealth urge the President . . . and . . . Congress to enact a national acid rain program" requiring specific reductions in total national sulfur dioxide and allocate the costs of reductions equitably among the states?[11]

Concerning the federal government's military policies, the legislature of Massachusetts in 1970 polled its voters regarding "the future course of action by the United States in Vietnam," asking whether military victory, withdrawal pursuant to a "planned schedule," or immediate withdrawal was preferable.[12] Thereafter, in 1982 the

---

[11] Regarding the radioactive waste disposal referendum (May 6, 1986, election) (1986 N.C. Sess. Laws, ch. 1, p. 1, Ex. Sess.), North Carolina voters answered "against"; concerning continuing challenges to federal selection for nuclear waste repositories (May 19, 1987, election), Measure 1 (1987 Or. Laws, ch. 13, § 5, p. 17), Oregon voters answered yes; concerning the radioactive waste site question (Apr. 5, 1983, election) (1983 Wis. Sess. Laws, p. 881), Wisconsin voters answered no; concerning the national acid rain program question (Nov. 4, 1986, election) Question 8 (1986 Mass. Acts, ch. 167, p. 205), Massachusetts voters answered yes.

[12] Regarding the war in Vietnam (Nov. 3, 1970, election), Question No. 5 (1970 Mass. Acts, ch. 588, p. 437), Massachusetts voters selected the middle option — withdrawal pursuant to a "planned schedule."

legislatures of three states — New Jersey, Rhode Island, and Wisconsin — asked their voters whether the state should inform the President and Congress that the people desired a negotiated international nuclear weapons moratorium and arms reduction.[13]

Regarding the federal government's role in legislating concerning health care, the Massachusetts and New Jersey Legislatures each asked voters:  Should the state urge Congress to enact a national health care program?[14]

C. *Nationwide and in California:  Advisory measures submitted to voters by local legislatures (county boards and city councils)*

Nationwide, the use of legislative advisory ballot measures to ask voters similar policy questions is even more frequent at the level of local legislatures — county boards of supervisors and city councils.  (See <http://ballotpedia.org/Advisory_question> [as of January 4, 2016] ["Advisory questions are most commonly used at the local level, often to voice the opinions of [the] region to higher levels of government"].)  Cities have made use of such advisory measures since the late 19th and early 20th centuries.  (See, e.g., Zimmerman, The Referendum, *supra*, at p. 140 [describing such measures in New York City, Buffalo, Chicago, and Wilmington]; Crouch, *Municipal Affairs: The Initiative and*

---

[13]     Freeze of nuclear arms escalation (Nov. 2, 1982, election), Public Question No. 1 (1982 N.J. Laws, ch. 35, pp. 79-81):  New Jersey voters answered yes; referendum regarding nuclear armaments (Nov. 2, 1982, election) (1982 R.I. Pub. Laws, ch. 317, p. 1415):  Rhode Island voters answered yes; referendum on nuclear weapons moratorium and reduction  (Sept. 14, 1982, election) Question No. 1  (1981 Wis. Sess. Laws, p. 1710):  Wisconsin voters answered yes.  At least one other state legislature placed a similar measure on the statewide ballot via the state's indirect initiative procedures:  on the nuclear arms freeze initiative, Initiative No. 3 (Nov. 6, 1984, election) (1984 S.D. Sess. Laws, ch. 236, p. 422),  South Dakota voters answered no.

[14]     Regarding the Massachusetts legislative advisory question on national health care, Question No. 7 (Nov. 4, 1986, election) (1985 Mass. Acts,  ch. 324, p. 568), voters answered yes; concerning New Jersey's national health care referendum, Question No. 2 (Nov. 5, 1991, election) (1991 N.J. Laws, ch. 160, p. 802), voters answered yes.

10

*Referendum in Cities* (1943) 37 Amer. Poli. Sci. Rev. 491, 492, 501 [observing that "[m]any city councils have made use of . . . the advisory referendum, or 'straw vote' " advisory ballot, and noting that between 1910 and 1938, 32 such measures were submitted to the voters in Detroit] [hereafter *Referendum in Cities*].)

Local legislatively initiated advisory ballot measures in California reflect a similar pattern. Prior to 1940, and even though there was at that time no explicit constitutional or statutory authority for doing so, advisory policy measures often appeared on the ballot in Los Angeles and San Francisco. (See *Referendum in Cities, supra,* 37 Amer. Poli. Sci. Rev. at pp. 492, 501 [noting 46 "[p]ublic [p]olicy [r]eferenda" on the L.A. ballot, and 21 on the S.F. ballot].) Eventually, in 1976, the Legislature specifically codified and acknowledged the propriety of advisory measures placed on the ballot by local legislative entities, including county boards of supervisors and city councils. Elections Code section 9603, subdivision (a), expressly contemplates advisory measures to allow "voters within the jurisdiction, or a portion thereof, to voice their opinions on substantive issues, or to indicate to the local legislative body approval or disapproval of the ballot proposal." Counted from 1995, the most recent year for which data is readily available, there have been, in California alone, 184 such measures — mostly by cities, with others by counties — averaging more than nine statewide each year.

What has been the nature of these local advisory measures? They have mirrored the types of statewide policy inquiries described above, with a special focus on specific issues of local importance and within the local legislature's authority to act. Typical have been, for example, questions concerning the conduct of local elections. The City of Modesto has asked its voters: Should city council members be elected by district, or at large? The City of Davis has asked: Should city council elections be conducted pursuant to "choice voting" (also known as "instant runoff" or "preference" voting)? The City of

11

Lancaster has asked:  Should the city adopt an ordinance consolidating municipal elections with countywide school district elections?[15]

Other measures have probed the voters' policy preferences concerning a variety of miscellaneous local matters.  The City of Milpitas has asked:  Should the city council submit to the voters a proposal to revise the city charter in various ways, including enlarging the city council?  The City of National City has asked:  Should the city council establish a Citizens' Police Oversight Commission?  The City of South Gate has asked:  Should the city council enact a permit system regulating the number of vehicles that may be parked overnight?  The City of Half Moon Bay has asked:  Should the city adopt a policy of employing its powers of eminent domain only when the stated "public use" is not "primarily . . . based on the City's desire for 'increased City revenue' "?[16]

---

[15]    The California Elections Data Archive (CEDA) is a compilation of candidate and ballot results for all local California elections, prepared as a joint project of the Center for California Studies and the Institute for Social Research, California State University, Sacramento, and the Secretary of State (<http:// www.csus.edu/isr/reports/california _elections> [as of January 4, 2016]; <http:// www.sos.ca.gov/elections/county-city-school-district-ballot-measure-election-results> [as of January 4, 2016]).  For text and results of local measures listed through footnote 23, reference will be made to the relevant year's CEDA compilation, by city or county results.

City of Modesto, Measure J (Nov. 6, 2007, election):  voters answered "by district" (2007 CEDA, city results, p. 23); City of Davis, Measure L (Nov. 7, 2006, election):  voters answered yes (2006 CEDA, city results, p. 38); City of Lancaster, Measures A and B (Apr. 8, 2008, election):  voters answered yes (2008 CEDA, city results, p. 26).

Likewise, other cities and counties have addressed local election rules:  Should the city council call an election for the voters to decide whether the office of mayor should be elective, rather than appointed by the city council?  (City of Moreno Valley, Measure O (Nov. 2, 2010, election):  voters answered yes (2010 CEDA, city results, p. 31).)  Should mailed ballots be used for all future general district elections?  (San Bernardino County, Measure 1 (Aug. 30, 2011, election):  voters answered yes (2011 CEDA, county results, p. 14).)

[16]    City of Milpitas, Measure *I* (June 6, 2006, election):  voters answered no (2006 CEDA, city results, p. 35) (the measure asked:  "Should the Milpitas City Council place

*(footnote continued on next page)*

12

Many other advisory measures have addressed housing, development, and related public service issues. For example, the City of San Diego has asked: Do the voters endorse development of up to 5,000 low-rent apartments and townhomes scattered throughout the city? The City of Modesto has asked: Should the city council expand sewer service to certain areas? Los Angeles County has asked: Should a new flood control district be formed, or should an existing area be annexed to a current county flood control district?[17]

---

(*footnote continued from previous page*)

before the voters a charter city proposal that would require the following: (1) a budget reserve only for emergencies and not salaries, (2) voter approval of future capital projects over $15 million, (3) increase City Council from five to seven members, (4) an open recruitment process for top city management, (5) scheduled performance audits for all city departments, and (6) voter approval for city charter amendments?"); City of National City, Measure L (Nov. 5, 2002, election): voters answered yes (2002 CEDA, city results, p. 36); City of South Gate, Measure P (Apr. 5, 2005, election): voters answered no (2005 CEDA, city results, p. 20); City of Half Moon Bay, Measure O (Nov. 8, 2005, election): the voters answered yes (2005 CEDA, city results, p. 23).

Other representative local matters addressed questions such as: Should city council members' compensation be increased 5 percent? (City of Burbank, Measure 1 (Apr. 10, 2001, election): voters answered yes (2001 CEDA, city results, p. 16).) Should the city replace its employees' existing defined-benefit retirement plan with a defined-contribution plan? (City of Pacific Grove, Measure Y (Nov. 4, 2008, election): voters answered yes (2008 CEDA, city results, p. 30).)

[17] City of San Diego, Measure A (Nov. 5, 2002, election): the voters answered yes (2002 CEDA, city results, p. 36); City of Modesto, Measures N and O (Nov. 6, 2001, election): the voters answered yes (2001 CEDA, city results, p. 20); Los Angeles County, Measures J and K (Nov. 8, 2005, election): the voters answered no (2005 CEDA, county results, pp. 15-16).

Other similar measures have addressed the following questions: Should existing separate fire and police department buildings be consolidated into a single new building? (City of Sausalito, Measure B (Mar. 5, 2002, election): the voters answered no (2002 CEDA, city results, p. 28).) Should certain areas of the county remain official unincorporated communities, or should they be incorporated into a separate city? (L.A. County, Measures A & B (Nov. 3, 2009, election): voters answered yes to the first and no to the second (2009 CEDA, county results, p. 14).) Should the city council adopt an

(*footnote continued on next page*)

13

Numerous local advisory measures have inquired about specific land-related developments. For example, Siskiyou County has asked: Should certain river dams and associated hydroelectric facilities be removed? Imperial County has asked: Should the county create a new regional international airport to replace or augment the services provided by the county's existing international airport? The City of Hawthorn has asked: Should certain public lands be sold to generate general or earmarked revenue?[18] Still others have asked about gaming and related issues. For example, the City of Calexico has asked: Should a local ordinance give a city authority to negotiate agreements with

---

*(footnote continued from previous page)*

ordinance requiring removal of landscaping in order to restore and maintain primary views from private homes? (City of Malibu, Measure E (Apr. 8, 2008, election): voters answered yes (2008 CEDA, city results, p. 26).) Prior to transfer of ownership of a toxic Superfund site, should the county demand the Department of the Navy meet certain conditions, including thorough study, funding for remediation costs, identification of funds to reimburse the community for any contamination, and actual completion of site cleanup? (Orange County, Measure B (Nov. 5, 2002, election): voters answered yes (2002 CEDA, county results, p. 18).) If the water district implements fluoridation for some local users, should the prorated costs be passed on to those who receive the treated water? (Humboldt County, Measure B (Feb. 5, 2008, election): voters answered no (2008 CEDA, county results, p. 15).)

[18] Siskiyou County, Measure G (Nov. 2, 2010, election): voters answered no (2010 CEDA, county results, p. 19); Imperial County, Measure P (Nov. 8, 2005, election): voters answered yes (2005 CEDA, county results, p. 15); City of Hawthorne, Measure A (Nov. 11, 2001, election): voters answered no (2001 CEDA, city results, p. 16) (the measure asked whether voters would support sale of local airport property to fund improvements to educational, police and fire programs, and to create new jobs). Likewise, when the City of San Juan Capistrano's Measure DD (Nov. 5, 2002, election) asked voters whether they would support sale of more than 13 acres of city land to a private entity, they answered no (2002 CEDA, city results, p. 32).

14

Native American tribes concerning development and operation of gaming and entertainment resorts?[19]

Local voters have been questioned about their policy views concerning prioritization of existing taxes and related revenues. For example, the City of Plymouth has asked: Should 2 percent of revenue from the increase in the transient occupancy tax be used to fund streets, parking, and landscaping, and should another 2 percent of that revenue fund events, signs and advertising for tourism promotion? Kings County has asked: Should revenue from new voter-approved sales taxes be used for specified local criminal-justice system improvements? Tehama County has asked: Should tax proceeds funding police and fire services be distributed to the county and incorporated cities in proportion to their respective populations?[20]

---

[19] City of Calexico, Measure N (June 7, 2005, election): voters answered yes (2005 CEDA, city results, p. 17). Numerous similar subsequent local advisory measures have produced the opposite advice by voters. Regarding Yuba County's Measure G (Nov. 8, 2005, election), voters answered no (2005 CEDA, county results, p. 18); concerning Glenn County's Measure F (June 6, 2006, election), voters answered no (2006 CEDA, county results, p. 15); concerning the City of Richmond's Measure U (Nov. 2, 2010, election), voters answered no (2010 CEDA, city results, p. 23); see also Colusa County, Measure D (June 6, 2006, election): voters agreed that the county should oppose local off-reservation Indian casinos (2006 CEDA, county results, p. 15); City of Petaluma, Measure H (Nov. 7, 2006, election): voters agreed that the city council should "take all lawful steps" to oppose gaming on specific local lands (2006 CEDA, city results, p. 37).

[20] City of Plymouth, Measure S (Nov. 6, 2012, election): voters answered yes (2012 CEDA, city results, p. 21); see also City of Plymouth, Measure P (Nov. 2, 2010, election): to the same question posed earlier, the voters also answered yes (2010 CEDA, city results, p. 22); Kings County, Measure A (Mar. 6, 2001, election): voters answered yes (2001 CEDA, county results, p. 14); Tehama County, Measure A (Nov. 11, 2004, election): voters answered no (2004 CEDA, county results, p. 25). Similarly, the City of West Sacramento has asked: Should funding priority be given to building a new library, police facility, improving streets, public building access, after school programs, maintaining adequate reserves? (Measure J (Nov. 5, 2002, election): voters answered yes (2002 CEDA, city results, p. 41).)

Likewise, some advisory ballot questions have accompanied substantive measures proposing to raise sales and related taxes. The City of Richmond has asked: If a business license fee on sugar-sweetened beverages passes, should revenues be used primarily to fund after-school sports programs, sports fields, healthier school meals, as well as medical and obesity care for indigent children? The City of South Pasadena has asked: If proposed local tax increases are approved, should at least 65 percent of the generated revenue be used for infrastructure improvements, and no more than 35 percent expended for city employee salaries?[21] The City of Arroyo Grande, noting that an ordinance

---

[21] City of Richmond, Measure O (Nov. 6, 2012, election): voters answered yes (2012 CEDA, city results, p. 22); accord, City of El Monte, Measure C (Nov. 6, 2012, election): asked whether, if a business license fee on sugar-sweetened beverages passed, revenues should be used primarily for police and emergency services, as well as parks and recreation, and projects to treat childhood obesity, voters answered yes (2012 CEDA, city results, p. 25); City of South Pasadena, Measure AV (Nov. 6, 2007, election): voters answered yes (2007 CEDA, city results, p. 19).

Similar combined measures have asked: If voters approve a proposed measure increasing taxes, should those proceeds be used to fund only police and anti-gang operations, including drug resistance education and supervised after-school youth activities? (City of San Bernardino, Measure YY (Nov. 7, 2006, election): voters answered yes (2006 CEDA, city results, p. 32).) If voters approve a one-half cent sales tax increase, should half of the new revenues be spent "to restore services to the poor that have been cut due to State takeaways" and the other half on school programs "to restore educational services . . . eliminated due to State takeaways"? (City of Richmond, Measure C (June 7, 2011, election): voters answered yes (2011 CEDA, city results, p. 16).) If a sales tax measure is extended, should the proceeds fund a streetcar system and flood protection improvements? (City of West Sacramento, Measure U (Nov. 4, 2008, election): voters answered yes (2008 CEDA, city results, p. 39).) If voters were to approve a sales tax increase, should the additional revenues be used primarily for maintaining the city's roadways? (City of El Paso de Robles, Measure F-12 (Nov. 6, 2012, election): the voters answered yes (2012 CEDA city results, p. 33).) If voters were to approve a half-cent sales tax increase, should the proceeds fund street repair, parks, libraries, after school programs, child and senior facilities, police and fire services, and reduction of utility and property tax assessments? (City of Whittier, Measure V (Nov. 5, 2002, election): voters answered yes (2002 CEDA, city results, p. 28).) If voters approved a utility tax increase from 10 to 12 percent, should that increased revenue fund

(*footnote continued on next page*)

16

measure imposing a one-half cent sales tax to fund community needs was before the voters, presented a menu of options, asking in separate measures whether a portion of increased funds should go to (a) upgrading a specific highway interchange? (b) specific city infrastructure maintenance needs? (c) police and fire services? (d) improvements to make city facilities more accessible to those with disabilities?[22]

Finally, a few advisory ballot measures have concerned, not local policy issues, but instead — and analogously to the advisory measures underlying legislative resolutions described earlier — entreaties to the President and Congress regarding federal military policy.[23]

With this overview in mind, I turn to the question whether, as a general matter, the Legislature has authority to place an advisory measure on the statewide ballot.

## II. THE LEGISLATURE'S GENERAL RIGHT TO INFORM ITSELF IN ORDER TO CONSIDER WHETHER TO UNDERTAKE ACTION

As the foregoing discussion demonstrates, over numerous decades legislative bodies have submitted advisory ballot measures to the voters in California and throughout the country. If such measures were constitutionally impermissible, one would have

---

*(footnote continued from previous page)*

"public safety services, including paramedic programs"? (City of Sierra Madre, Measure 12-2 (Apr. 10, 2012, election): voters answered yes (2012 CEDA, city results, p. 24).)

[22] City of Arroyo Grande, Measures K-06, L-06, M-06, N-06 (Nov. 7, 2006, election): voters answered yes to the first three, no to the last (2006 CEDA, city results, p. 33).

[23] See Mendocino County Measure Y (Nov. 7, 2006, election), asking if voters supported ending military occupation in Iraq (2006 CEDA, county results, p. 17 [voters answered yes]); San Francisco City and County, Measure N (Nov. 2, 2004, election), asking a similar question — "shall it be city policy to urge the United States government to withdraw all troops from Iraq?" (2004 CEDA, county results, p. 22 [voters answered yes]).

17

thought that objections would have been raised on numerous occasions throughout the last century and that we would find judicial decisions striking down such measures. But the parties have pointed to no such decision and independent research has uncovered none. Instead, the validity of such legislatively instigated advisory ballot measures has apparently been so well accepted that judicial challenges to such measures have been very rare and, as explained below, the few that have been filed have been rejected.

A. *Prior actions and assumptions by the drafters of the 1879 Constitution and the voters who adopted it; early court decisions addressing challenges to advisory ballot measures; and scholarly commentary concerning the propriety of advisory measures*

As an initial matter, it is important to recognize that the drafters of the 1879 Constitution — the version of the charter that, as revised in 1966, remains operative today — *assumed* that under it, the Legislature had power to place an advisory measure upon the statewide ballot in order to acquire the official views of the electorate on a question of policy that was completely unrelated to any effort to amend the federal charter. Moreover, it is clear that the electorate that approved the charter assumed that the Legislature had authority to present such a measure for the people's vote.

As observed *ante*, part I.A., by statute in 1877 the Legislature placed an advisory measure on the September 1879 general election ballot, asking the voters whether they were " '[f]or' " or " '[a]gainst' " Chinese immigration. In the interim, a state constitutional convention had been called and was held in the closing months of 1878 and early 1879 (1 Willis & Stockton, Debates and Proceedings, Cal. Const. Convention 1878-1879 (Willis and Stockton)), at which the subject of Chinese immigration was a major focus. During the course of those debates the delegates, essentially all of whom expressed virulent and racist views on the issue (see, e.g., 1 Willis & Stockton, at pp. 627- 640; 2 Willis & Stockton, at pp. 641-662, 663-692, 695-702), explicitly discussed the impending advisory ballot measure. The existence and assumed propriety

18

of that impending measure was instrumental in derailing a proposed constitutional provision expressly barring such immigration; the delegates instead were content to let the electorate speak on the issue via the upcoming advisory ballot measure.[24] Accordingly, when the Legislature's advisory measure was finally presented to and acted upon by the voters in September 1879, just a few months *after* they had approved the new Constitution itself in May of that same year, the electorate voted on that advisory measure with the blessing of the constitutional delegates, who obviously assumed that the Legislature possessed and retained authority to submit such an advisory measure to the statewide voters. Nor is there any reason to believe that the electorate, having voted their approval of the new charter only months earlier, had any basis to suspect that under it, the Legislature lacked authority to have the people vote on that September 1879 advisory ballot measure.[25]

The few early lawsuits challenging advisory measures were rebuffed. As mentioned earlier, in both 1909 and 1911 our Legislature, like those in numerous other

---

[24] This movement was led by Mr. Rolfe, who argued against including the proposed immigration provision in the charter, proposing instead deference to the impending advisory vote: "[T]he last Legislature passed an Act submitting the question to the qualified voters of this State, to vote whether they are in favor or against Chinese immigration. Any gentleman may turn to the statutes and find it. They are called upon to vote for or against Chinese immigration. And upon the result of that the Governor and Secretary of State are to memorialize the President of the United States as to what that decision may be." (2 Willis & Stockton, *supra*, at p. 703, col. 1.) Ultimately, the delegates agreed with Mr. Rolfe, narrowly passing a motion to strike the express provision barring immigration. (*Id.*, at p. 704, col. 1 [noting that the vote was 54 to 51 to strike]; see, e.g., 3 Willis & Stockton, at pp. 1493 [the article as reported by the committee on revision and adjustment] & 1519 [as finally adopted].)

[25] The statewide voters, in line with the views of the convention delegates, overwhelmingly answered that they were "against" Chinese immigration. (See <http://digitalhistory.hsp.org/pafrm/doc/certificate-vote-act-ascertain-and-express-will-people-state-california-subject-chinese> [as of January 4, 2016].)

19

states, again posed advisory measures to the electorate, seeking its advice concerning which candidate the Legislature ― at that time possessing the power to appoint the state's United States Senators — should appoint to that position. (Stats. 1909, ch. 405, § 2, p. 691; Stats. 1911, ch. 387, § 1, pp. 705-705.) As the majority opinion observes, when the 1909 enactment placing this question on the 1909 primary election ballot was challenged as violating the Constitution's "one subject" rule in *Socialist Party v. Uhl* (1909) 155 Cal. 776, we upheld the statute, and commented: "There is nothing in the constitution . . . which prohibits the legislature from providing at a primary [election] for an expression of a choice as to a candidate for United States senator. It is within the general legislative power to do so . . . ." (*Id.*, at p. 782.)

The South Dakota Supreme Court had reached a consistent conclusion 14 years previously in *State ex rel. Cranmer v. Thorson* (S.D. 1896) 68 N.W. 202 (*Cranmer*), upholding the validity of a legislative advisory ballot measure outside the article V context. The South Dakota Legislature sought to pose a question to its statewide voters concerning whether a provision of the state charter, establishing Prohibition within the state, should be repealed. (*Cranmer*, at p. 202, citing 1895 S.D. Sess. Laws, ch. 38, p. 39.) A prospective voter, arguing that the ballot measure as phrased was not itself a proposed amendment, but instead a mere question seeking the electorate's nonbinding policy views about a possible future amendment, sought — similarly to petitioners in the present case — to enjoin the defendant secretary of state from placing such an advisory measure on the ballot. The state supreme court rejected that challenge, explaining that even if the measure sought merely the voters' advice and not their actual determination of the ultimate issue, the court was aware of "no law prohibiting the legislature from submitting *any question its wisdom may suggest*." (68 N.W. at p. 202, italics added.) Regarding the challenger's contention that the measure, as phrased, posed only a policy query to the voters, and that "the constitution will not be changed whatever reply may be returned" (*ibid.*), the court stated that the legislature was perfectly free to "submit a

20

question not intended to change the organic law" (*ibid*.), and concluded that the legislature "has done what it had a right to do." (*Id.*, at p. 203.) To determine otherwise and take the matter off the ballot, the court wrote, "would disturb the system of checks and balances which the constitution has so carefully constructed." (*Id.*, at p. 204; see also *Wyatt v. Kundert* (S.D. 1985) 375 N.W.2d 186, 191 [acknowledging the legislature's power to pose advisory "questions to a vote of the electors" on the statewide ballot];[26] accord, *Southeastern Mich. Fair Budget Coalition v. Killeen* (Mich.Ct.App. 1986) 395 N.W.2d 325, 330 ["the Legislature can do anything which it is not prohibited from doing" and may "place advisory questions on the ballot and . . . empower subordinate governmental entities to do so" as well].)

Scholars have long reached the same conclusion. More than 100 years ago, after describing some of the advisory policy measures mentioned above, Ellis Paxson Oberholtzer observed: "There is nothing, it would seem, that could prevent the legislature from resolving to ask the people for advice" by posing questions on the statewide ballot. (Oberholtzer, The Referendum in America (1911) p. 208 (hereafter The

---

[26] The court in *Wyatt* proceeded to find that the measure before it was in fact a form of referendum — a "legislative act[]" that would be effective only upon approval by the statewide voters — rather than a mere advisory ballot question. (*Wyatt v. Kundert, supra*, 375 N.W.2d at pp. 191-192.) See also *Wagner v. Summers* (S.D. 1913) 144 N.W. 730, in which the South Dakota Supreme Court upheld a statute specifying that acts of local legislatures (except time-sensitive matters affecting public safety) — including those legislative acts that did not make law but, as in that case, merely granted a permit by resolution — were subject to the electorate's veto review by referendum at the ballot. In reaching this conclusion the court stressed that the legislature enjoyed power "except as it is limited by the state Constitution and federal Constitution" and that all presumptions favored upholding legislation (*id.*, at p. 732). The court rejected an argument that the justices should set "some limit to the character of the acts which may be referred to the electors," and held instead that *"the Legislature in its wisdom must be left to prescribe what acts . . . may be referred [to the voters at the ballot], and that courts are without authority to declare limitations where none are prescribed by the Legislature."* (*Id.*, at p. 733, italics added.)

Referendum in America); see Lowell, *The Referendum in the United States*, in The Initiative, Referendum and Recall (Munro edit., 1912) p. 134 [noting that a legislature "can, of course, consult" "the electors" "by means of an informal vote"].) More recently, Markku Suski echoed those earlier observations: "[T]here seems to be nothing that would prevent a state legislature from organizing an advisory referendum" or ballot measure. (Suski, Bringing in the People: A Comparison of Constitutional Forms and Practices of the Referendum (1993) p. 89 (Bringing in the People).)

B. *Nothing in the majority opinion's analysis, or in fundamental legal principles that guide this analysis, supports a conclusion that advisory measures are confined to the article V context*

The majority's legal analysis, recognizing that the Legislature's legislative authority is plenary and there is nothing in the California Constitution that precludes the Legislature from placing an advisory measure on the ballot, itself supports the conclusion that no constitutional principle confines advisory measures to the article V context.[27] In this regard, four of the fundamental legal principles alluded to in the majority opinion bear repeating here.

First and foremost: The California Legislature's legislative power, unlike that of Congress under the federal Constitution, is plenary. As explained in hornbook passages of numerous decisions, the Legislature enjoys "all the powers and privileges which are necessary to enable it to exercise in all respects, in a free, intelligent and impartial manner, its appropriate functions, except so far as it may be restrained by the express provisions of the Constitution, or by some express law made unto itself, regulating and limiting the same." (*Ex parte D.O. McCarthy* (1866) 29 Cal. 395, 403.) Moreover,

---

[27] Likewise, the majority's analysis rejecting the structural points raised by petitioners (maj. opn., *ante*, at pp. 31-37) applies as well to advisory ballot measures outside the article V context. (See *post*, pt. III.)

22

" 'our Constitution is not a grant of power but rather a limitation or restriction upon the powers of the Legislature' " — and we do not look to it in order " ' "to determine whether the Legislature is authorized to do an act, but only to see if it is prohibited." ' " (*Dean v. Kuchel* (1951) 37 Cal.2d 97, 100.)[28]

Second:  An essential attribute of the legislative function is the " 'determination and formulation of legislative policy.' " (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 299.)  "In fact it could be said that policymaking is the legislative function."  (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1219.)  The Legislature's determination of policy comes into play not only with regard to its traditional lawmaking function, but also with regard to its traditional function concerning the issuance of resolutions reflecting a majority vote of each house, expressing approval or disapproval of legislation pending or proposed in Congress, or regarding programs or activities of the federal government.[29]  This resolution power has

[28]    In other words:  "[U]nlike the United States Congress, which possesses only those specific powers delegated to it by the federal Constitution, it is well established that the California Legislature possesses *plenary* legislative authority except as specifically limited by the California Constitution." (*Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 31.)  " 'The most cursory examination . . . confirms how distinctive state constitutions and governments are.  The Federal Constitution restricts the federal government both by imposing prohibitions on the government and by granting the government only limited powers.  Under state constitutions, by contrast, the second restriction is largely missing, and thus the states exercise plenary legislative power.' " (*Id.*, at p. 29.)

[29]    See, e.g., Wilson et al., California's Legislature (2011) pages 120-121 (describing the use of joint, concurrent, and separate Assem. and Sen. resolutions); Senate Concurrent Resolution No. 37, Statutes 2015 (2015-2016 Reg. Sess.) resolution chapter 48 (filed with Sect. of State, June 2, 2015) rules 5 and 6, concerning adoption of the joint rules of the Senate and Assembly for the 2015-2016 Regular Session; cf., 58 Cal.Jur.3d (2015) Statutes, § 2 ("A . . . joint or concurrent resolution is one that is concurred by both houses of the legislature" and "takes effect upon the filing of it with the Secretary of State"; a "resolution is not a legislative act, and the legislature in passing a resolution does not exercise its lawmaking power").

23

been long employed by the California Legislature and those of other states in numerous

and widely varied contexts.**30**

---

**30**    See, e.g., Joint resolutions urging building of national railroad (Stats. 1849-1850, p. 465); Senate Joint Resolution No. 8, Statutes 1919 (1919 Reg. Sess.) resolution chapter 15, page 1439 (urging that loans made to war allies not be forgiven or cancelled); Assembly Joint Resolution No. 6, Statutes 1919 (1919 Reg. Sess.) resolution chapter 17, page 1440 (urging acquisition of " 'Lower California' " and the Coronado Islands from Mexico);  Senate Joint Resolution No. 18 (Statutes 1919 (1919 Reg. Sess.) resolution chapter 29, page 1461 (urging support for self-determination of Ireland); Senate Joint Resolution No. 23, Statutes 1982 (1981-1982 Reg. Sess.) resolution chapter 15, page 6701 (urging counseling and treatment for Vietnam veterans suffering from posttraumatic stress disorders); Assembly Joint Resolution No. 8, Statutes 1993 (1993-1994 Reg. Sess.) resolution chapter 11, page 7766 (seeking federal assistance to fund services for undocumented immigrants); Assembly Joint Resolution No. 57, Statutes 2002 (2001-2002 Reg. Sess.) resolution chapter 183, page 8029 (urging that enforcement of immigration law remain a federal responsibility, and not a state or local law enforcement responsibility); Senate Joint Resolution No. 7, Statutes 2005 (2005-2006 Reg. Sess.) resolution chapter 35, page 6022 (urging Congress to protect women's right to equal pay for equal work); Assembly Joint Resolution No. 6, Statutes 2005 (2005-2006 Reg. Sess.) resolution chapter 57, page 6053  (urging relief and support for Darfur and its people); Senate Joint Resolution No. 16, Statutes 2008 (2007-2008 Reg. Sess.) resolution chapter 68, page 5753 (urging establishment of an emergency prescription program for veterans); Senate Joint Resolution No. 28, Statutes 2008 (2007-2008 Reg. Sess.) resolution chapter 107, page 5818 (urging new sodium consumption guidelines); Assembly Joint Resolution No. 49, Statutes 2008 (2007-2008 Reg. Sess.) resolution chapter 98, page 5803 (urging that the California gray whale be listed as an endangered species); Senate Joint Resolution No. 21, Statutes 2014 (2013-2014 Reg. Sess.) resolution chapter 32 (urging that Turkey acknowledge the Armenian Genocide).

Concerning the general use of resolutions in California and nationwide, see, for example, Note, *Legislative Notes and Reviews* (1920) 14 Am. Pol. Sci. Rev. 672 ("[d]uring the legislative sessions of 1919 over 300 resolutions and memorials were adopted [nationwide], of which 206 [were] of general public interest and 117 . . . questions of local interest"; in 1919 alone numerous state legislatures, including California's, enacted resolutions concerning the League of Nations, "aliens" and immigrants, military personnel, education issues, women's suffrage, transportation issues, and commodity prices, etc.); Leckrone and Gollob, *Telegrams to Washington: Using Memorials to Congress as a Measure of State Attention to the Federal Policy Agenda* (2010) 42 St. & Local Gov't Rev. 235, 239-240 (finding that more than 3,900 substantive "memorials," or resolutions, were submitted by state legislatures to Congress

(*footnote continued on next page*)

24

Third:  The Legislature possesses powers that are necessary, incidental, and "ancillary to the ultimate performance of [its] lawmaking functions."  (*Parker v. Riley* (1941) 18 Cal.2d 83, 89.)[31]  In this regard the Legislature needs to be able to obtain information supporting policy determinations that underlie any statutory law or resolution that it considers.

Fourth and finally:  "The presumption which attends every act of the legislature is that it is within the constitutional power" — and this "presumption . . . holds good until it is made to appear in what particular it is violating constitutional limitations." (*MacMillan Co. v. Clarke* (1920) 184 Cal. 491, 496-497.)  " 'If there is any *doubt* as to the Legislature's power to act in any given case, the *doubt should be resolved in favor of the Legislature's action.*  [Any] restrictions and limitations are to be construed *strictly,* and are not to be extended to include matters not covered by the language used.' . . . [Citations.]  Specifically, the express enumeration of legislative powers is not an exclusion of others not named unless accompanied by negative terms."  (*Dean v. Kuchel, supra,* 37 Cal.2d 97, 100, italics added in *Dean*.)  In other words, "all intendments favor

_____

*(footnote continued from previous page)*

from 1987 to 2006; the Cal. Legislature was the most active, with 542 during that period; and that nationwide, such measures were used to send signals to the federal government across a broad range of policy issues, especially those "topics traditionally reserved to Congress," including "defense and international relations and foreign aid" as well as "environment, health, and public lands [under] federal control"); Filindra and Kovács, *Analyzing US State Legislative Resolutions on Immigrants and Immigration:  The Role of Immigration Federalism* (2012) 50 Int'l Migration 33, 36 (of 36 resolutions by state legislatures to Congress between 1993 and 2007 concerning immigration issues, California issued 25).

[31]     Incidental powers are implied in order to permit the Legislature to operate within its proper sphere.  " 'When a legislative body has a right to do an act it must be allowed to select the means within reasonable bounds.' "  (*Parker v. Riley, supra*, 18 Cal.2d at p. 91, quoting *Attorney-General v. Brissenden* (1930) 271 Mass. 172, 180.)

the exercise of the Legislature's plenary authority." (*Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691.)

C. *Summary and conclusions concerning use of ballot measures to inform the Legislature regarding issues of policy*

As demonstrated earlier, advisory ballot measures have long been used by our Legislature, those of other states, and local legislatures, to obtain information to inform the legislative body about possible laws or resolutions. As observed more than 75 years ago, even when the ultimate decisionmaking power remains with the "presumably technically more qualified . . . legislature" (whose members retain and employ "full power to act independently, whether it be in accordance with or against the wishes of the people"), an advisory ballot measure is a useful device for securing "authoritative popular participation in public policy-making upon a non-legislating basis" and "facilitating communication between the electorate and its representatives." (*The Advisory Referendum, supra,* 14 Pub. Opin. Q. at pp. 304, 315.)

For similar reasons, nearly 40 years ago Chief Justice Rehnquist approved the same kind of advisory communication between the electorate and its representatives in *Kimble v. Swackhammer* (1978) 439 U.S. 1385. As the majority opinion observes (*ante*, at p. 26), in that matter, acting as circuit judge, then Associate Justice Rehnquist refused to remove from the Nevada ballot an advisory measure submitted by the state legislature, seeking the electorate's views on the proposed Equal Rights Amendment. Justice Rehnquist explained that he would be "most disinclined" to read the high court's prior cases or the federal Constitution "as ruling out communication between the members of the legislature and their constituents. *If each member of the Nevada Legislature is free to obtain the views of constituents in the legislative district which he represents, I can see no constitutional obstacle to a nonbinding, advisory referendum of this sort.*" (*Id.*, at pp. 1387-1388, italics added; see also *Kimble v. Swackhammer* (Nev. 1978) 584 P.2d 161 [rejecting challenges to the advisory measure in the face of a dissenting justice who

26

suggested that the legislature had no authority under the state constitution to submit such a ballot measure to the voters].)

As these sources, combined with the California constitutional history, cases and authorities addressing advisory measures, and myriad examples of advisory measures discussed above suggest — and in light of the guiding principles mentioned earlier, including the Legislature's plenary authority, its core role in shaping and articulating policy, and the deference that we afford to the Legislature's determination of its exercise of power — it follows that the Legislature may inform itself by enacting a statute that places an advisory question on the ballot in order to obtain the voters' policy views with regard to *any* potential action that the Legislature has authority to undertake. Whether the legislative body proceeds by posing a list of interrogatory policy questions to the electorate, or, as most often, a single, straightforward question, the goal is the same: to inform itself about the policy preferences of the voters relating to a matter upon which the legislative body has authority to act. And in pursuing this information-gathering goal by placing an advisory ballot measure before the voters concerning such a matter — whether related to its article V role, its general lawmaking function, or its power to issue resolutions — a legislative body acts reasonably and within its powers.

Nor do I perceive any reason to question, as a general matter, either the efficacy or the prudence of this form of information gathering by a legislative body. As the majority opinion observes, "[i]n a representative democracy, legislators are generally expected to be responsive to their constituents." (Maj. opn., *ante*, at p. 35.) In this regard, recent empirical scholarship suggests that in practice, the use of advisory measures is efficacious, providing pertinent information to a legislative body, and that legislative bodies have employed the information obtained from results of advisory ballot measures when deciding whether, and how, to undertake actions reasonably within their own powers. A study of local advisory ballot measures in California revealed that county boards and city councils complied with the advice of the voters more than 80 percent of

27

the time — while still exercising, of course, prudence and measured discretion to disagree and depart from that advice as appropriate. (Ely, *Government by Advice: Public Participation and Policymaking Through Advisory Ballot Measures* (2015) 47 St. & Local Gov't Rev. 92, 97, 99 [hereafter *Government by Advice*].)[32]

---

[32] The author reports that "[o]f the ninety-eight advisory measure outcomes assessed over a decade, 81.6 percent" of the time, the question-posing county board or city council "complied with voter sentiment" and that the "overall compliance rate with advisory votes increases to 87.8 percent when considering only the measures over which the local government [had jurisdiction to] directly exercise authority." (*Government by Advice*, *supra*, 47 St. & Local Gov't Rev. at p. 97.) Regarding situations in which the voters' advice is rejected, the author mentions the City of Arroyo Grande measure described *ante*, text and footnote 22, and comments: "Despite the vote outcome, the City of Arroyo Grande reportedly used the revenue for all four advisory measure purposes . . . . Elected officials likely saw little political risk to such noncompliance since the other approved uses were honored, general revenues are fungible, and the disapproved action [upgrades to meet ADA requirements] complied with a higher-level government mandate." (*Government by Advice*, at p. 98.) Further reflecting on instances in which the local board or council ultimately took a position amounting to noncompliance, the author comments: "[A] handful of cases illustrate that even when failing to comply with voter wishes, government decisions are sometimes shaped by critical information uncovered in the response to advisory votes. This measured discretion available to government officials is appealing to critics of direct democracy troubled by citizens making formally binding decisions on complex policy." (*Id.*, at p. 99.)

A similar point has been made concerning the effect of advisory measures in other countries. (DuVivier, *The United States as a Democratic Ideal? International Lessons in Referendum Democracy, supra*, 79 Temple L.Rev. 821.) There the author observes: "[A]n advisory referendum often proves preferable to one that binds. First, it does not conflict with an existing system of government that requires legislative supremacy. For example, in the United Kingdom, the 'notion of parliamentary sovereignty' dictates that Parliament cannot be formally bound by an advisory referendum. Consequently, an advisory referendum exerts pressure while simultaneously preserving the existing governance system. Second, an advisory process better reflects the reality that government actors must interpret and implement any measure. An advisory referendum allows a legislature flexibility to predict the outcome of a provision in a manner that reconciles possible conflicts and anticipates constitutional challenges in the courts." (*Id.*, at p. 848, fns. omitted.)

Finally, returning to a point alluded to at the start of this discussion, *ante*, part II.A.: There is no evidence that the Constitution, as revised in 1966, was intended to restrict, remove or preclude the Legislature's power to pose advisory ballot questions to the electorate. As noted earlier, the legislative article of the Constitution, as debated and adopted in 1879, was animated by the drafters' and the electorate's assumptions that the Legislature had power to submit an advisory ballot measure unconnected with article V to the statewide voters. That 1879 version of the Constitution remained in place, with amendments not relevant here, until the 1960s, when at the behest of the Legislature, the California Constitution Revision Commission (Commission) undertook to review and eventually to recommend numerous revisions to the charter's legislative article.[33] The voluminous record (working papers, drafts, reports, and transcripts)[34] of the resulting 1966 revisions reveals that the Commission drafters, as well as the Legislature, its

---

[33]    See Gould, Report on Materials of Constitution Revision Commission Relating to Provisions in California Constitution Recommended or Endorsed by Commission (Dec. 10, 1974) pages 1-2 (prepared for J. Rules Com. of Cal. Leg.; describing the history of Commission and its relation to the Leg.) (Report on Commission Materials); see *Californians for an Open Primary v. McPherson* (2006) 38 Cal.4th 735, 752-753 (describing the 1950s-1960s history relating to the 1966 recommendations of the Commission).

[34]    See generally Report on Commission Materials, *supra*, at pages 14-16 (describing the Commission's three initial art. IV committees — the Committee on Initiative and Referendum; the Committee on Legislative Procedure and Compensation; and the Committee on Restrictions on Legislation and on Crimes — and the provenance of the eight drafts considered by those committees and the Commission as a whole concerning art. IV); see 1 State Constitutional Conventions, Commissions & Amendments 1959-1978: An Annotated Bibliography (1989) (listing, among numerous other documents circa 1964 to Feb. 1966, seven reports by the Commission to the Leg. concerning art. IV; and at least eight drafts of art. IV). Finally, Dean of University of California, Berkeley, School of Law (Boalt Hall) Frank Newman, later a justice on this court, served prominently as one of 50 members of the Commission. He donated to this court's library his copies of the extensive working papers in this regard.

29

committees, and the Legislative Analyst — with all of whom the Commission coordinated its proposed changes — accepted as a fundamental guiding principle the proposition that the Legislature possesses plenary authority, and hence has all powers except as expressly limited in the charter itself.  (See, e.g., Robbins, Revision of Article IV of the California Constitution (1965) p. 2 [study by Commission staff attorney] (hereafter Revision of Article IV).)[35]

Moreover, the Commission advanced its "[p]roposals involving substantive change . . . only after especially detailed examination and only in instances where the change [was] needed and [would] promote a smoother-running state government." (Revision of Article IV, *supra*, at p. 3.)  A searching review of the extensive revision documents has found nothing to suggest any intent by the Commission or anyone else to restrict, remove or preclude the Legislature's power, as assumed by the drafters of the 1879 charter and voters who enacted it — and as illuminated by the history, cases and

---

[35]     In this regard the Revision of Article IV study explained that as a general matter the Commission proposed "two types of changes" — revisions and deletions.  With regard to deletions, the study observed that "specific delegations of power to the Legislature" were "actually never needed in the Constitution" because " 'It is accepted constitutional doctrine that state government is a government of inherent powers and that a state constitution unlike the Constitution of the United States is a document of limitations and not of grant, i.e., whereas the federal government has only specifically delegated powers, state government has all the powers of government except insofar as these powers are constitutionally limited.' "  (Revision of Article IV, *supra*, at p. 2.) Likewise, see also the general comments made by Commission member (and chairman of the reorganized art. IV subcommittee that had taken the place of the prior three committees) James Beebe, testifying before the Legislature's joint committee on legislative organization.  Addressing the general subject of "restrictions on the Legislature" that would be imposed by the proposed article, he explained that specific grants of power could be eliminated because it was established by case law that the Legislature already has "all of the power not expressly denied to it in the Constitution." (J. Com. on Legislative Organization, transcript of hearing (Nov. 6, 1964) p. 46.)

commentary discussed above — to place advisory policy measures, even those completely unconnected with any article V issue, on the statewide ballot.

For reasons set out above, when the Legislature in 2014 enacted the challenged statute posing to the statewide voters the advisory policy questions set out in Proposition 49, it performed well within its authority to inform itself concerning possible action that it might take regarding matters reasonably within its powers.

Moreover, and again for reasons set out above, it is important to avoid any implication that advisory ballot measures are proper only in connection with a legislative body's exercise of its functions under article V of the federal Constitution. Such a narrow view of legislative authority would find no support in any case or secondary source; it would conflict with the few but long-established judicial decisions that have rejected challenges to such legislative authority; it would necessarily imply the invalidity of myriad past advisory statewide ballot measures both in California and the other jurisdictions described earlier; likewise it would mean that all such measures previously submitted to the voters by local legislative bodies (county boards and city councils) — many hundreds in California alone in just the last four decades — were invalid and that the procedure may never again be employed to secure the people's views; and it would confine any future advisory ballot measure to the distinct subset of measures concerning possible amendment to the federal Constitution. Fortunately for the cause of full discourse and communication between our elected representatives and the people in our democracy, that is not the law.

### III. CONTRARY TO PETITIONERS' CONTENTION, THE STRUCTURE OF THE CALIFORNIA CONSTITUTION AND ITS REPUBLICAN FORM OF GOVERNMENT DO NOT POSE ACCOUNTABILITY CONCERNS THAT PRECLUDE THE LEGISLATURE FROM PLACING AN ADVISORY MEASURE ON THE BALLOT

Because petitioners have, in their briefing, argued that the structure of our constitutional scheme, our republican form of government, and concerns regarding

31

accountability, all militate against recognizing the validity of advisory ballot measures, we must address those claims now.  The majority opinion rejects these contentions by explaining, as an initial matter, that under our existing system of representative democracy "lines of accountability are inevitably blurred to some extent."  (Maj. opn., *ante*, at p. 35.)  Moreover, as the majority opinion observes, the people's "right to instruct their representatives," set out in the California Constitution, article I, section 3, subdivision (a), itself also blurs lines of accountability, and is inconsistent with petitioners' view that the state charter implicitly prohibits the Legislature's use of advisory ballot measures.  (Maj. opn., *ante*, at pp. 35-37.)[36]  I agree on both scores, but I

---

[36]    As the majority opinion observes, the people's right to instruct their representatives was set out in our initial charter in 1849 and remains in the 1879 Constitution as amended today.  I note that 14 other state constitutions include the same provision.  (Fla. Const., art. I, § 5; Idaho Const., art. I, § 10; Kan. Const. Bill of Rights, § 3; Me. Const., art. I, § 15; Mass. Const., pt. 1, art. XIX; Mich. Const., art. 1, § 3; Nev. Const., art. I, § 10; N.H. Const., pt. 1, art. XXXII; N.C. Const., art. I, § 12; Ohio Const., art. I, § 3; Or. Const., art. I, § 26; Tenn. Const., art. I, § 23; Vt. Const., ch. I, art. XX; W.Va. Const., art. III, § 16.)  In addition, a few additional state constitutions provide that the people may "make known their opinions to their representatives."  (Ill. Const. art. I, § 5; see Iowa Const., art. I, § 20; N.J. Const., art. I, par. 18; see also Wyo. Const., art. I, § 21 [guaranteeing the people's right "to make known their opinions"].)

On a related point, regarding the decision of this court in *American Federation of Labor v. Eu* (1984) 36 Cal.3d 687 (*AFL v. Eu*), holding that the initiative provision of the California Constitution does not authorize the voters to place an advisory question on the ballot through an initiative measure, and which case is discussed in the majority opinion, Justice Liu's concurring opinion, and Justice Chin's dissenting opinion:  I note that in *AFL v. Eu* no party brought to the court's attention the provision of the California Constitution explicitly granting the people "the right to instruct their representatives" or argued that in light of that constitutional right, the initiative provision of the California Constitution should be interpreted to permit the people to exercise their constitutional right to instruct their representatives through an advisory initiative measure.  By contrast, when the question of the validity of a similar advisory initiative measure came before the Idaho Supreme Court after this court's decision in *AFL v. Eu*, the Idaho court held that the advisory measure could be submitted to the voters through the initiative process as an exercise of the people's state constitutional right to instruct.  (*Simpson v. Cenarrusa* (Idaho 1997) 944 P.2d 1372, 1377.)  Because the present case does not involve an

(*footnote continued on next page*)

believe it is prudent and useful to flesh out petitioners' structural claims in slightly more detail and also to set out additional reasons why I conclude their assertions find no support in history, case law, or logic.

Petitioners argue that the people's creation of direct democracy rights in 1911 by necessary implication divested the Legislature of power to place advisory measures on the statewide ballot. They contend: "[T]he legislative power is shared by the people and the Legislature. *This power to enact law is essentially two sides of the same coin.*" (Italics added.) They assert that this court must protect both the people, in their exercise of the initiative power, and the Legislature, in the exercise of its own powers, against "encroachment and interference by the other." Applying these principles in the present context, petitioners claim, in essence, that when the people obtained direct democracy rights to make law in 1911, by implication they also necessarily and simultaneously stripped the Legislature of any power it previously had under the prior iterations of the Constitution to pose advisory questions to the statewide voters. This would have surprised the people who voted for these reforms more than 100 years ago, and this conclusion would be stunning today.

As observed earlier, prior to adoption of the initiative and referendum as part of the California Constitution in 1911, the Legislature had five times exercised its authority to place advisory measures on the statewide ballot in order to determine the voters' views on issues of public import concerning matters within the Legislature's power to act. In fact, as explained earlier, the Legislature's right to pose an advisory ballot question unconnected with any article V issue was assumed by the drafters of the 1879

---

(*footnote continued from previous page*)

advisory *initiative* measure, nothing in the court's opinion should be viewed as speaking to this point.

33

Constitution, and necessarily by the electorate who adopted it as well. (See *ante*, pt. II.A.) And as noted previously, in rejecting a single-subject rule challenge to one of those enactments — providing that the voters should be asked at the primary election their advice about which candidate the Legislature should appoint as United States Senator — this court upheld the statute, observing that nothing in the Constitution prohibits the Legislature from posing such a question on the ballot. (*Socialist Party v. Uhl, supra*, 155 Cal. 776, 782.) Although no other judicial decision resulted regarding any of these early California advisory ballot measures (there was no other court challenge, most likely because, as suggested earlier, few doubted the Legislature's authority to take such actions), both the history surrounding the drafting and adoption of the 1879 Constitution, and the early California constitutional precedents at that time clearly supported such broad authority. Our precedents recognized that, under the California Constitution, unlike the federal charter, the Legislature has plenary power to take actions unless expressly prohibited — and there was (and is) nothing in the California Constitution that prohibits the Legislature from soliciting the views of the voters on a matter of public concern through a ballot measure.

Neither was there in 1911, nor is there now, authority from *any* jurisdiction holding that a state legislative body lacks such power. To the contrary: as noted earlier, in 1896 the South Dakota high court had in *Cranmer* rejected a claim that the legislature had no power to place such a measure on the statewide ballot. The court concluded that it was aware of "no law prohibiting the legislature from submitting *any question its wisdom may suggest*," and that the legislature was perfectly free to "submit a question not intended to change the organic law." (*Cranmer, supra*, 68 N.W. at p. 202, italics added.) Consistently with that early decision, also as noted above, contemporaneous scholars addressing the burgeoning direct democracy movement found "nothing, it would seem, that could prevent the legislature from resolving to ask the people for advice" at the ballot

34

box.  (The Referendum in America, *supra*, at p. 208; see also Lowell, *The Referendum in the United States*, in The Initiative, Referendum and Recall, *supra*, at p. 134.)

Nevertheless, petitioners suggest that by necessary implication, legislative power to pose advisory questions to the electorate must have been removed in 1911, when the people of California followed the lead of South Dakota, Oregon, and 10 other states, adding what is now article II, sections 8 and 9 of the Constitution, giving themselves direct democracy rights of initiative and referendum.  (See, e.g., *People v. Kelly* (2010) 47 Cal.4th 1008, 1032 & fn. 30 [describing the early direct democracy movement].)  And yet petitioners point to nothing in the language or history of the initiative and referendum provisions made part of the California Constitution that year (Stats. 1911, res. ch. 22, Sen. Const. Amend. No. 22, § 1) purporting to speak to *the Legislature's* authority, or to restrict or preclude its power, by implication or otherwise, and in any manner.  There is simply no support for the view that, by granting to the people initiative and referendum power in 1911, there was any implied intent to limit or bar the Legislature's authority, which as noted earlier was assumed by all with regard to the 1879 charter, to pose advisory questions to the voters.[37]

The same "necessary implication" argument now advanced by petitioners (that the creation of direct democracy rights itself removed the Legislature's power to pose advisory ballot measures) was raised and rejected — once more by the South Dakota Supreme Court — this time in its 1985 decision in *Wyatt v. Kundert, supra*, 375 N.W.2d 186.  In the face of a majority opinion acknowledging the legislature's authority to pose

---

[37]    Indeed, at the time of the 1911 election at which the direct democracy provision was submitted to the voters, the Legislature was exercising such authority to ask the voters' advice at the upcoming primary and general elections of 1912, concerning which candidate the Legislature should appoint as California's United States Senator.  (See *ante*, part I.A.)

advisory "questions to a vote of the electors" on the statewide ballot (*id*., at p. 191), a dissenting justice argued that such power had been necessarily and implicitly withdrawn when the state constitution was subsequently amended to grant the people initiative and referendum power. (*Id*., at p. 198 (dis. opn. of Wuest, J.).) The majority rebuffed that contention, explaining that the South Dakota Constitution's direct democracy provision "has not removed the legislature's inherent referral power and the restrictions imposed by and through [the state charter's direct democracy provision] apply only to referendums of the people and not to a referendum by the legislature." (375 N.W.2d at p. 191; see also the Michigan appellate court decision in *Southeastern Mich. Fair Budget Coalition v. Killeen, supra*, 395 N.W.2d 325, 330 [the legislature may place advisory policy questions on the statewide ballot and empower local governmental entities to do so as well].) As noted earlier, this state of affairs led a 1993 scholarly study to conclude that nothing appears to prevent a state legislature from placing an advisory measure on the statewide ballot. (Bringing in the People, *supra*, at p. 89.)

Neither does petitioners' hypothesized implied limitation on the Legislature's authority find support in logic. The notion that the people, in enacting their direct democracy rights to propose and actually adopt statutes and state constitutional amendments, also necessarily (but only implicitly) intended to preclude the Legislature from posing advisory questions to the voters, is at best counterintuitive.

Nor do I find persuasive petitioners' corollary argument that the initiative process, once enacted, became, and remains, the sole province of the electorate — and that it contemplates no involvement by the Legislature. They assert in their reply brief that "the basic structure of the Constitution . . . indicates that there is a clear line drawn between the lawmaking function of the Legislature on one hand, and the [initiative] powers reserved to the people on the other hand." That unsupported assertion is dubious as a matter of constitutional law and history. It also is in tension with the recently enacted Ballot Initiative Transparency Act of 2014 (Stats. 2014, ch. 697), which reveals that the

36

Legislature itself contemplates that it does indeed have an important role to play by working with initiative proponents to enact statutes that were originally proposed as statutory initiatives, derailing a proposed initiative that was otherwise headed for the statewide ballot.[38]

In conclusion, petitioners' various structural objections underlying their assertions that the state charter implicitly bars advisory ballot measures do not come close to satisfying the standards of deference, clarity, and strict construction that, as explained in the decisions cited *ante*, part II.B., we adhere to when deciding whether a power is, by necessary implication, denied to the Legislature. The historical employment of the power to submit advisory ballot measures by our Legislature and local California legislative bodies, as well as state and local legislative bodies in other states, would render our acceptance of petitioners' structural challenge to the Legislature's action at this late stage all the more striking. (*Schabarum v. California Legislature, supra*, 60 Cal.App.4th at p. 1218 [cautioning against interpretation that raises significant separation of powers issue].)[39]

---

[38] See Elections Code section 9034, subdivisions (a) and (b) (initiative proponents must immediately advise the Secretary of State when they have collected 25 percent of the signatures necessary for qualification on the ballot, at which point each house of the Legislature must assign the initiative measure to its appropriate committees and hold joint public hearings not later than 131 days before the date of the election at which the measure is to be voted upon); *id.*, section 9604, subdivision (a) (allowing initiative proponents to withdraw an initiative at any time prior to qualification — hence permitting initiative proponents to leverage their signature-gathering efforts in order to promote appropriate legislative compromises, resulting in a statute enacted by the Legislature rather than an initiative measure placed on the ballot).

[39] With respect, I find the conclusions of Justice Liu's concurring opinion — that the Legislature lacks general authority to pose advisory questions to the state's voters, but that article V of the United States Constitution grants the Legislature the authority to pose advisory questions to the state's voters with respect to a proposed federal constitutional amendment — untenable for a number of reasons.

(*footnote continued on next page*)

37

(*footnote continued from previous page*)

First, as this opinion explains, every judicial decision that has addressed the issue, and every academic commentator that has spoken on the issue, has concluded that a state legislature generally has the authority to place advisory questions on the ballot. Justice Liu's concurring opinion cites *no* authority to support its contrary conclusion.

Second, the historical background of California's 1879 Constitution — the charter that, as amended, remains in place today — strongly demonstrates that the framers of the 1879 Constitution, as well as the California voters who adopted the proposed Constitution, understood that the California Constitution permits the Legislature to place an advisory question before the voters. That the subject matter of the particular advisory ballot measure at issue at that time happened to be discriminatory and offensive (see *ante*, pt. II.A., and conc. opn. of Liu, J., *post*, at pp. 29-30) does not negate the fact that the Constitution's framers and the voters clearly viewed a legislatively initiated advisory ballot measure as a constitutionally permissible procedural mechanism. This procedural instrumentality or tool — an advisory ballot measure — is not by its nature invariably discriminatory or offensive.

Third, the concurring opinion's novel thesis — that by granting legislative authority to the Legislature, the 1849 Constitution (and the 1879 charter, as amended) deprived the state's electorate of the authority to vote on an advisory measure submitted by the Legislature (conc. opn. of Liu, J., *post*, at pp. 19-23) — flies in the face of literally scores of legislatively initiated advisory ballot measures that have been submitted to statewide voters, both in California and throughout the country from this nation's inception. The concurring opinion declines to pay any respect to *this* substantial "page of history."

Fourth, Justice Liu's concurring opinion posits that the Legislature might in the future employ advisory ballot measures to submit questions to the electorate in an inappropriate and disingenuous manner, that the voters would succumb to such tactics rather than penalize legislators who act improperly by voting them out of office, and that courts need to intervene by barring all such measures from the ballot. (Conc. opn. of Liu, J., *post*, at pp. 37-40.) As Justice Corrigan stresses in her own concurring opinion (*post*, at pp. 1-2) Justice Sparks's opinion in *Schabarum v. California Legislature, supra*, 60 Cal.App.4th 1205, appropriately explains that separation of powers principles militate against any such judicial impulse to police the Legislature's exercise of its authority. Moreover, although advisory question ballot measures have long been employed nationally and locally, the concerns raised by hypothesized ballot questions set out in Justice Liu's concurring opinion have not materialized in practice.

Fifth, if, as Justice Liu's concurring opinion maintains, the vesting of legislative authority in a legislature inherently deprives the Legislature of the power to pose advisory questions to the electorate, it appears illogical for the concurring opinion to conclude that article V of the United States Constitution *impliedly* grants the Legislature

(*footnote continued on next page*)

38

## IV. CONCLUSION

For the forgoing reasons, and with the caveat that nothing in today's decision should be viewed as calling into question the validity of statewide and local advisory ballot measures that are unrelated to any proposed amendment to the federal Constitution, I concur in the majority's opinion and disposition.

CANTIL-SAKAUYE, C. J.

---

(*footnote continued from previous page*)

that authority with respect to proposed federal constitutional amendments. Nothing in the language or history of article V purports to grant a state legislature such authority and the federal Constitution has never been interpreted to grant the *federal* legislature — Congress — the implied power to submit an advisory question to the electorate, either with respect to a proposed federal constitutional amendment or any other subject.

Finally, I question two additional statements in Justice Liu's concurring opinion. First, the concurring opinion states that there is no disagreement with the holding in *AFL v. Eu, supra,* 36 Cal.3d 687, 707-714, that the initiative provision of the California Constitution does not authorize the voters to place an advisory question on the ballot through an initiative measure. (Conc. opn. of Liu, J., *post*, at pp. 31-32.) As observed *ante*, footnote 36, because this case does not involve the validity of an advisory *initiative* measure, the court's opinion cannot properly be viewed as expressing any view on that question. Second, the concurring opinion asserts that "the Legislature does not have general authority to submit statutes for voters to approve . . . ." (Conc. opn. of Liu, J., *post*, at p. 41.) The assertion on that point appears debatable, particularly in light of the language and history of article II, section 12 of the California Constitution, but the question whether the Legislature may place a proposed, nonadvisory statute on the ballot for the voters' approval or disapproval is also not before us in this case and the court's opinion does not address that question.

39

**CONCURRING OPINION BY CORRIGAN, J.**

With the benefit of time to fully consider the issues presented by this writ petition, which go to the fundamental structure of our state government, I agree with and join the majority opinion. Proposition 49 is a valid exercise of the Legislature's investigatory authority under the California Constitution. I also agree with the Chief Justice that the Legislature's power to submit advisory measures to the electorate is not limited to its role in the process of amending the federal Constitution. For the reasons stated by the Chief Justice, advisory measures that are reasonably related to any proper use of legislative power are permissible.

Both the majority opinion and the Chief Justice's concurrence appropriately emphasize that judicial review of the Legislature's exercise of its plenary powers must be restrained. Doubts should be resolved in favor of legislative action, and constitutional limitations on legislative authority strictly construed. (Maj. opn., *ante*, at p. 41; conc. opn. of Cantil-Sakauye, C.J., *ante*, at p. 26.) The foundations of these limits on the judicial function were soundly explained by Justice Sparks of the Third District Court of Appeal in *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205. I place great weight on the following considerations:

"The principle of strict construction arises from the very nature of California's tripartite form of government. Thus, subject to the reserved powers of initiative and referendum, '[t]he legislative power of this State is vested in the

California Legislature . . . .' (Cal. Const., art IV, § 1.) The people, in their Constitution, may place restrictions upon the exercise of the legislative power by the Legislature but the courts may not do so without violating the fundamental separation of powers doctrine. Judicial application of clear and unequivocal constitutional restrictions on the Legislature's authority merely enforces the people's exercise of the right to place restrictions upon the Legislature. On the other hand, legislative restraint imposed through judicial interpretation of less than unequivocal language would inevitably lead to inappropriate judicial interference with the prerogatives of a coordinate branch of government. Accordingly, the only judicial standard commensurate with the separation of powers doctrine is one of strict construction to ensure that restrictions on the Legislature are in fact imposed by the people rather than by the courts in the guise of interpretation." (*Schabarum v. California Legislature*, *supra*, 60 Cal.App.4th at pp. 1217-1218.)

**CORRIGAN, J.**

# CONCURRING OPINION BY LIU, J.

The question presented in this case is "whether the Legislature may pose to the electorate a single advisory question concerning the People's support for a federal constitutional amendment." (Maj. opn., *ante*, at p. 17.) The court answers yes to this narrow question and goes no further, "reserv[ing] for another day whether, in support of other powers not implicated here, an advisory ballot measure would be a permissible means of legislative investigation." (*Id.* at p. 17, fn. 11.) With this limited holding, I concur.

The court's reasoning in support of this result includes an informative survey of relevant constitutional history, and I agree that a " 'page of history is worth a volume of logic' " where, as here, the issue presented is novel and implicates basic questions about governmental structure and constitutional change. (Maj. opn., *ante*, at p. 18, quoting *New York Trust Co. v. Eisner* (1921) 256 U.S. 345, 349; cf. *National Labor Relations Bd. v. Noel Canning* (2014) 573 U.S. __, __–__ [134 S.Ct. 2550, 2559–2560] (*Noel Canning*).) But today's opinion goes astray when it invokes or, more accurately, *expands* the Legislature's investigative power in order to uphold the advisory ballot measure at issue here. (Maj. opn., *ante*, at pp. 7–10.) This theory is unnecessarily broad and could be read as an invitation for the Legislature to test the waters with future advisory ballot measures on a wide range of issues having nothing to do with a federal constitutional amendment. The Chief Justice would make that invitation explicit.

In her view, the Legislature may use advisory ballot measures "in order to obtain the voters' policy views with regard to *any* potential action that the Legislature has authority to undertake." (Conc. opn. of Cantil-Sakauye, C.J., *ante*, at p. 27; accord, conc. opn. of Corrigan, J., *ante*, at p. 1.) As I explain below, such wide-ranging use of advisory ballot measures is not authorized by our state Constitution and would potentially reshape the way electoral politics and policymaking are conducted in California. We should not take liberties with the careful structure of republican democracy that the framers of our Constitution have built and bequeathed to us.

I would not rely on the Legislature's investigative power in reaching today's result. Senate Bill No. 1272 is an effort by the Legislature to marshal the solemn voice of the people of California in support of a federal constitutional amendment. Article V of the United States Constitution assigns state legislatures a special role in facilitating and promoting constitutional change. I would simply hold that Senate Bill No. 1272 is a reasonable exercise of the Legislature's implied power under article V.

## I.

Senate Bill No. 1272 is titled the "Overturn Citizens United Act." (Stats. 2014, ch. 175, § 1.) In enacting this statute, the Legislature declared that the United States Supreme Court's decision in *Citizens United v. Federal Election Commission* (2010) 558 U.S. 310 "presents a serious threat to self-government by rolling back previous bans on corporate spending in the electoral process and allows unlimited corporate spending to influence elections, candidate selection, policy decisions, and public debate." (Stats. 2014, ch. 175, § 2, subd. (e).) It further declared that "Article V of the United States Constitution empowers and obligates the people of the United States of America to use the constitutional amendment process to correct those egregiously wrong decisions of the United

2

States Supreme Court that go to the heart of our democracy and the republican form of self-government." (*Id.*, subd. (*l*).) The statute directed the Secretary of State to submit to the voters an advisory question (Proposition 49) asking whether Congress should propose and whether the Legislature should ratify a constitutional amendment overturning *Citizens United*, and to report the results to Congress. (Stats. 2014, ch. 175, § 4, subds. (a), (b).) As all members of the court agree, the substantive merits of *Citizens United* and Proposition 49 are irrelevant to the question in this case.

Amending the federal Constitution is a difficult task, successfully accomplished only 27 times in our nation's history. To secure approval for a constitutional amendment, a political movement must convince an extraordinary number of citizens to take the movement's aims more seriously than they do most issues of ordinary government. This was by design. By making the process of constitutional change more "unwieldy and cumbrous" than ordinary lawmaking (*Barron v. Mayor of Baltimore* (1833) 32 U.S. 243, 250), article V of the federal Constitution serves as a bulwark against the whims of bare legislative majorities and ensures that rules entrenched in the "supreme law of the land" (U.S. Const., art. VI) represent the considered and collective judgments of the people of the United States. Senate Bill No. 1272 is a statute enacted in furtherance of the federal constitutional amendment process.

**A.**

Article V of the federal Constitution provides in relevant part: "The Congress, whenever two thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, or, on the application of the legislatures of two thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this Constitution, when ratified by the legislatures of three fourths of the

3

several states, or by conventions in three fourths thereof, as the one or the other mode of ratification may be proposed by the Congress . . . ." As this text makes clear, article V assigns key roles to state legislatures at the proposal and ratification stages of the federal constitutional amendment process.

Challenges to the manner in which state legislatures have exercised their article V powers have almost always been rejected. In *Hawke v. Smith, No. 1* (1920) 253 U.S. 221 (*Hawke*), the Ohio General Assembly adopted a resolution ratifying the proposed Eighteenth Amendment to the federal Constitution. A voter then filed a referendum petition calling for a special election to approve or reject the amendment. A different voter brought suit to enjoin state officials from complying with the referendum petition. The high court held that the referendum could not proceed, explaining: "The only question really for determination is: What did the framers of the Constitution mean [in article V] in requiring ratification by '*Legislatures*'? That was not a term of uncertain meaning when incorporated into the Constitution. What it meant when adopted it still means for the purpose of interpretation." (*Hawke*, at p. 227.) Subjecting the ratification decision to a referendum would violate article V's allocation of ratification authority to state legislatures. (*Hawke*, at p. 231; accord, *Barlotti v. Lyons* (1920) 182 Cal. 575, 577; *Prior v. Noland* (Colo. 1920) 188 P. 729, 731.)

In *Leser v. Garnett* (1920) 258 U.S. 130 (*Leser*), the plaintiff argued that the Nineteenth Amendment to the federal Constitution was invalid because the legislatures of several states had violated state constitutional provisions in ratifying the proposed amendment. The high court disagreed on the ground that state legislatures have authority to exercise their article V functions as they see fit, free from interference by the "limitations sought to be imposed by the people of a State." (*Leser*, at p. 137.)

4

More recent decisions are in accord.  *Walker v. Dunn* (Tenn. 1972) 498 S.W.2d 102 (*Walker*) involved a provision of the Tennessee Constitution prohibiting the state legislature from acting on any federal constitutional amendment unless the legislature had been elected after submission of the amendment.  The Tennessee Supreme Court upheld the state legislature's ratification of the Twenty-sixth Amendment, even though the legislature did not wait until the election cycle following submission.  The court concluded that the state constitutional provision was "a limitation upon the General Assembly of Tennessee in the exercise of its federally derived power" and accordingly was invalid.  (*Walker*, at p. 106; see *Trombetta v. Florida* (M.D.Fla. 1973) 353 F.Supp. 575, 577–578 (*Trombetta*) [invalidating similar Fla. constitutional provision].)

In *Dyer v. Blair* (N.D.Ill. 1975) 390 F.Supp. 1291 (*Dyer*), the court considered a provision of the Illinois Constitution, as well as rules adopted by Illinois's legislature, that required a three-fifths majority vote to ratify an amendment to the federal Constitution.  Each house of the legislature had approved the proposed Equal Rights Amendment by a vote of more than a majority but less than a three-fifths supermajority.  The court observed that the framers of the federal Constitution had a "basic understanding that state legislatures should have the power and the discretion to determine for themselves how they should discharge the responsibilities committed to them by the federal government."  (*Dyer*, at p. 1307.)  The court then explained that because the "delegation [in article V] is not to the states but rather to the designated ratifying bodies," state constitutional restrictions on the legislature's decisionmaking were invalid.  (*Id.* at p. 1308.)  The court held, however, that the majority vote in favor of ratifying the Equal Rights Amendment was insufficient because each house had concluded for itself that only a 60 percent supermajority would suffice.  (*Id.* at pp. 1308–1309.)

Subtler attempts at cabining the discretion of the state legislatures when performing their article V functions have also been rejected. In *American Federation of Labor v. Eu* (1984) 36 Cal.3d 687, we considered various state and federal challenges to an initiative advocating a federal balanced budget amendment. Among other provisions, the initiative proposed to suspend the compensation and benefits of state legislators who would not take specific actions to support a balanced budget amendment. (*Id.* at pp. 692–693.) We invalidated this aspect of the initiative on the ground that it would coerce state legislators to take actions in support of a particular constitutional amendment. (*Id.* at p. 694.) Similarly, in *Bramberg v. Jones* (1999) 20 Cal.4th 1045 (*Bramberg*), we considered whether a voter initiative could require future ballots for the United States Congress to include the statement "Disregarded Voters' Instruction on Term Limits" next to the names of incumbents who did not support a federal term limits amendment in the previous session. (*Id.* at p. 1047.) We held that the initiative was "impermissibly coercive" and thus violated article V. (*Bramberg*, at pp. 1060, 1063.)

In addition to the powers that article V expressly delegates, state legislatures have played a crucial role in achieving the popular mobilization necessary to ratify many of the amendments to the federal Constitution by issuing resolutions to Congress and to other states. Today's opinion recounts numerous examples throughout our nation's history, dating back to the founding era. (Maj. opn., *ante*, at pp. 13–16.)

State legislatures have also established state conventions when Congress has chosen that method of ratification. As today's opinion recounts, when Congress submitted the Twenty-first Amendment to state conventions, state legislatures across the country enacted legislation establishing how delegates were to be chosen and when and where conventions would meet. (Brown, Ratification

6

of the Twenty-first Amendment to the Constitution of the United States (1938) pp. 521–700 [collecting laws]; see Stats. 1933, ch. 149, pp. 598–602 [establishing procedures for Cal. convention to ratify the 21st Amend.].) Courts have found these actions to be within the legislatures' broad discretion to act in connection with the federal constitutional amendment process. (See *State ex rel. Donnelly v. Myers* (Ohio 1933) 186 N.E. 918 (*Myers*); *State ex rel. Tate v. Sevier* (Mo. 1933) 62 S.W.2d 895, 898 (*Sevier*).)

From the discussion above, it is evident that judicial decisions in this area have given state legislatures wide latitude in carrying out their article V functions and taking actions reasonably related to the federal constitutional amendment process. This judicial posture befits the nature of constitutional change. Occasions for amending the federal Constitution are, by design, infrequent and unusual. Each is a separate and solemn moment that requires a political process calibrated to the perceived problem at hand. Courts have recognized that the actors to whom article V delegates authority have broad discretion to address each proposal for constitutional change on an individualized basis. History and precedent suggest a very narrow role for the judiciary in monitoring the federal amendment process.

**B.**

The texts of the federal and state Constitutions do not address whether the Legislature may place an advisory measure on the ballot asking voters whether they support a federal constitutional amendment. Although we have previously recognized that such an advisory ballot measure "does not offend article V" (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 707), no court has confronted the precise question before us. But the historical use of advisory questions in connection with the federal constitutional amendment process sheds

7

light on the issue here.  (See *Dyer*, *supra*, 390 F.Supp. at pp. 1303–1307 [consulting historical practice to illuminate the scope of state legislatures' article V powers].)

The practice of state legislatures consulting the voters on federal constitutional amendments must be understood in historical context.  Since the founding, "the animating principle of our Constitution [is] that the people themselves are the originating source of all the powers of government."  (*Arizona State Legislature v. Arizona State Redistricting Comm'n* (2015) 576 U.S. __, __ [135 S.Ct. 2652, 2671].)  Because constitutional commitments bind future legislative majorities, cannot be easily undone, and speak on behalf of "the People of the United States" (U.S. Const. pmbl.), the framers repeatedly emphasized the necessity of the people's consent in amending the federal Constitution.

At the state conventions for ratifying the federal Constitution, advocates for ratification repeatedly invoked the sovereign will of the people as the sole ground for amending its terms.  In Pennsylvania, James Wilson remarked:  "This Constitution . . . opens with a solemn and practical recognition . . . :  — 'We, the *people of the United States*, in order to form a more perfect union, establish justice, &c., *do* ordain and establish this Constitution for the United States of America.'  It is announced in their name — it receives its political existence from *their* authority:  they ordain and establish.  What is the necessary consequence?  Those who ordain and establish have the power, if they think proper, to repeal and annul."  (2 Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution (1881) pp. 434–435 (Debates).)  In North Carolina, James Iredell similarly observed:  "[A]lterations can without difficulty be made, agreeable to the general sense of the people. . . .  Any amendments which either Congress shall propose, or which shall be proposed by such general convention, are afterwards to be submitted to the legislatures of the different states, or

8

conventions called for that purpose, as Congress shall think proper. . . . By referring this business to the legislatures, expense would be saved; and in general, it may be presumed, [that] they would speak the genuine sense of the people." (4 Elliot, Debates, at p. 177; see 3 Elliot, Debates, at p. 37 [statement of Edmund Pendleton at the Va. ratifying convention].) It is against this backdrop that state legislatures have regularly used advisory ballot measures in connection with the federal constitutional amendment process.

Today's opinion ably recounts the history of such advisory measures, with examples from a multitude of states concerning a wide range of proposed constitutional amendments from the late nineteenth century to the present day. (Maj. opn., *ante*, at pp. 21–25.) Challenges to these measures have not succeeded. (*Id.* at pp. 25–27.) As the court recognizes (*id.* at p. 18), it is appropriate in this case to "put significant weight upon historical practice." (*Noel Canning*, *supra*, 573 U.S. at p. __ [134 S.Ct. at p. 2559] (italics omitted).)

This robust body of shared historical practice suggests a common source of legislative authority. As noted, article V of the federal Constitution gives state legislatures a central role in the process of proposing and ratifying federal constitutional amendments. Under article V, the function of state legislatures is to convey to Congress and to other states an expression of the state's sovereign will with respect to federal law of the most fundamental character. Sovereignty ultimately lies in "the supreme authority in each State, the authority of the people themselves" (The Federalist No. 39 (Cooke ed., 1961) p. 254 (Madison)), and the ratification function assigned to state legislatures under article V is intended to elicit "a decisive expression of the people's will" (*Dillon v. Gloss* (1921) 256 U.S. 368, 374 (*Dillon*)). In submitting an advisory ballot measure to the electorate, a state legislature acts in furtherance of its article V function by vesting the people's will with a degree of solemnity that cannot be achieved through an opinion poll or

9

other means, and by ensuring and communicating to others that its support or opposition to a proposed amendment accurately reflects the people's will. (Maj. opn., *ante*, at pp. 37–38, 40–41.) It is no accident that the use of advisory ballot measures by state legislatures has historically clustered around proposals for amending the federal Constitution. "This past use of advisory questions to inform the federal constitutional process evidences a larger truth—a recognition of the particular appropriateness of consulting the polity in the course of exercising independent judgment with respect to such foundational matters." (*Id.* at p. 38.) Because it is particularly appropriate for a state legislature exercising its article V function to enlist the people's voice as an aid to expressing the state's sovereign will, the legislature's use of an advisory measure like Proposition 49 is properly understood as an exercise of implied power under article V.

The concept of implied powers under the federal Constitution has been well established since *M'Culloch v. Maryland* (1819) 17 U.S. 316 (*M'Culloch*), which held (among other things) that Congress had the power to establish a national bank. (*Id.* at p. 424.) Although *M'Culloch* is often cited for its interpretation of the necessary and proper clause (*M'Culloch*, at pp. 411–421), the high court's discussion of that clause appears only after the opinion has already made an affirmative case for Congress's implied power to create the bank (*id.* at pp. 401–411). *M'Culloch*'s primary arguments for the constitutionality of the national bank are based not on the necessary and proper clause but on the nature of the federal Constitution itself.

Chief Justice Marshall began the court's opinion by noting that although the Constitution does not enumerate a power to establish a bank, "there is no phrase in the instrument which, like the articles of confederation, excludes incidental or implied powers; and which requires that everything granted shall be expressly and minutely described. . . . The men who drew and adopted [the 10th]

10

amendment had experienced the embarrassments resulting from the insertion of [the word 'necessary'] in the articles of confederation, and probably omitted it to avoid those embarrassments.  A constitution . . . requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves." (*M'Culloch*, *supra*, 17 U.S. at pp. 406–407.)  Unlike the Articles of Confederation, the second article of which had narrowly limited the powers of the Congress of the Confederation to those "expressly delegated," the 1787 Constitution was meant to constitute a new system of government and to provide only the broad outlines of the powers of its component parts.

    *M'Culloch* went on to say that although the word "bank" or "incorporation" does not appear in the federal Constitution, the enumerated powers of Congress include the powers "to lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies." (*M'Culloch*, *supra*, 17 U.S. at p. 407.)  The court then explained that "it may with great reason be contended, that a government, entrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depends, must also be entrusted with ample means for their execution.  The power being given, it is the interest of the nation to facilitate its execution.  It can never be their interest, and cannot be presumed to have been their intention, to clog and embarrass its execution, by withholding the most appropriate means. . . . [¶] It is not denied, that the powers given to the government imply the ordinary means of execution." (*Id.* at pp. 408–409.)  *M'Culloch*'s elucidation of implied powers was based on "general reasoning" about the nature of a constitution.  (*Id.* at p. 411; see *id.* at p. 407 ["we must never forget, that it is *a constitution* we are expounding"].)  Only after upholding Congress's implied power to create the bank

did the opinion turn to refuting the objection that the necessary and proper clause is a limitation on, rather than a grant of, congressional power.  (*Id.* at p. 412.)

*M'Culloch*'s reasoning is not limited to powers granted in article I of the federal Constitution.  *M'Culloch* rests on a general principle that each power enumerated in the federal Constitution may imply other powers necessary to the exercise of the enumerated power.  (See The Federalist No. 44, *supra*, at pp. 304–305 (Madison) ["No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized; wherever a general power to do a thing is given, every particular power necessary for doing it is included."].)  Subsequent decisions have confirmed that this principle of constitutional construction applies to powers other than those assigned to Congress.  (See, e.g., *Chambers v. NASCO, Inc.* (1991) 501 U.S. 32, 43–44 [discussing implied powers of the federal courts]; *American Ins. Ass'n v. Garamendi* (2003) 539 U.S. 396, 414–415 [discussing implied powers of the President].)

Like articles I, II, and III of the federal Constitution, article V also conveys power as much through "what is reasonably implied" as through "what is expressed."  (*Dillon*, *supra*, 256 U.S. at p. 373; see *id.* at p. 376 ["As a rule the Constitution speaks in general terms, leaving Congress to deal with subsidiary matters of detail as the public interests and changing conditions may require; and Article V is no exception to the rule."  (Fn. omitted.)].)  In the article V context, courts have recognized a variety of implied powers.  The high court has held that Congress has the power to place a time limit on ratification of a proposed amendment by the states.  (*Dillon*, at pp. 375–376.)  And as noted, when Congress chose the state convention method for ratifying the Twenty-first Amendment, legislatures across the country established the mechanisms by which those conventions would be constituted.  In challenges to such actions, state courts held

12

that their legislatures had implied power under article V to establish conventions when Congress elects the convention method of ratification. (See *Sevier*, *supra*, 62 S.W.2d at p. 898; *Myers*, *supra*, 186 N.E. at p. 918.)

Here the Legislature's briefing contends that "[f]or the people of this state, Proposition 49 represents their only means under article V of the federal Constitution to be heard on this momentous question [i.e., whether *Citizens United* should be overturned by constitutional amendment]. Elections on advisory ballot questions have been held in a wide variety of other states to ascertain and to formally convey the will of the voters as to whether the U.S. Constitution should be amended in various respects, and the courts have repeatedly upheld the submission of such measures to the electorate. The California Legislature is likewise entitled to seek this input from the voters as a matter 'incidental and ancillary' to its constitutional power and responsibility to ratify proposed amendments to the U.S. Constitution." I would hold that the Legislature has implied power under article V to submit Proposition 49 to the electorate because the use of an advisory ballot measure uniquely serves to aid the Legislature's expression of California's sovereign will.

As I explain in the rest of this opinion, the Legislature does not have general authority under the California Constitution to submit advisory questions to the electorate. But even if this means the Legislature has no authority under state law to submit an advisory measure on a federal constitutional amendment (see dis. opn., *post*), such a limitation must yield to the federal authority that article V confers on the Legislature. As discussed above (*ante*, at pp. 4–6), courts have consistently invalidated state law limitations, including state constitutional limitations, on a state legislature's exercise of its federal functions under article V. (See *Leser*, *supra*, 258 U.S. at p. 137; *Hawke*, *supra*, 253 U.S. at p. 231; *Dyer*,

13

*supra*, 390 F.Supp. at pp. 1307–1308; *Trombetta*, *supra*, 353 F.Supp. at pp. 577–578; *Walker*, *supra*, 498 S.W.2d at p. 106.)

Because article V's "delegation is not to the states but rather to the designated ratifying bodies" (*Dyer*, *supra*, 390 F.Supp. at p. 1308), state legislatures "have the power and the discretion to determine for themselves how they should discharge the responsibilities committed to them by the federal government" (*id.* at p. 1307). It may be that certain elemental precepts of state law — for example, state constitutional provisions that create a legislature and define its membership — must remain operative when a state legislature exercises federal functions. But this case does not concern the character or legitimacy of the Legislature as the duly constituted and properly functioning legislature of California. This case concerns the source and validity of a substantive power that the Legislature seeks to exercise, and as this court has recognized, "a state may not, through restrictions imposed by state law, interfere with a state legislature's ability to fulfill its function and responsibilities as contemplated by Article V of the federal Constitution." (*Bramberg*, *supra*, 20 Cal.4th at p. 1058; see *Leser*, *supra*, 258 U.S. at p. 137 [a state legislature exercising "a federal function derived from the Federal Constitution . . . transcends any limitations sought to be imposed by the people of a State"].) Accordingly, even if state law does not authorize the Legislature to submit Proposition 49 to the electorate, the Legislature may do so as an exercise of its implied power under article V.

## II.

The analysis above affirms the Legislature's broad latitude to act in the unique context of amending the federal Constitution and amply justifies today's narrow holding. Yet the court's opinion rests not only on the Legislature's role under article V but also on "the Legislature's power to investigate." (Maj. opn.,

14

*ante*, at p. 42.)  This doctrinal move unnecessarily calls into question the narrowness of today's holding — for if investigation by use of an advisory ballot measure "is permitted as a necessary aid to the execution of other legislative powers" (*id.* at p. 9), and if an advisory ballot measure is permissible so long as "a nexus exists between the matter investigated and some potential action the Legislature has authority to undertake" (*id.* at p. 10), then what is to distinguish the validity of an advisory ballot measure concerning a federal constitutional amendment from the validity of such a measure concerning any ordinary issue of public policy?  Although the court expresses no view on that question (*id.* at p. 17, fn. 11), the Chief Justice says there is no distinction at all.  She would hold that the Legislature may use advisory ballot measures "with regard to *any* potential action that the Legislature has authority to undertake," including matters "completely unconnected with any article V issue." (Conc. opn. of Cantil-Sakauye, C.J., *ante*, at pp. 27, 31.)

I find unpersuasive the court's reliance on the Legislature's investigative power as well as the Chief Justice's expansive view of the Legislature's power to use advisory ballot measures.  At the outset, I acknowledge that "[u]nlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature." (*Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691.)  "The legislature is vested with the whole of the legislative power of the state and may deal with any subject within the scope of civil government unless it is restrained by the provisions of the constitution, and the presumption that the legislature is acting within the constitution holds good until it is made to appear in what particular it is violating constitutional limitations." (*Macmillan Co. v. Clarke* (1920) 184 Cal. 491, 496–497.)  But limitations on the Legislature's power need not appear in the state Constitution "expressly"; they may exist "by necessary

15

implication." (*Methodist Hospital*, at p. 691.)  Below I explain why it is a necessary implication of our Constitution's text and history that the Legislature lacks general authority to submit advisory measures to the electorate.  Whether exercising its investigative power or any other power under state law, the Legislature may not statutorily alter the structure of government established by our Constitution.

## A.

We previously addressed the issue of advisory ballot measures in *American Federation of Labor v. Eu*, *supra*, 36 Cal.3d 687, where concerned citizens sought to place on the ballot a nonbinding resolution urging Congress to propose a federal balanced budget amendment and directing the Secretary of State to apply for a constitutional convention.  We invalidated this advisory ballot measure on the ground that it was not authorized by the initiative power.  (*Id.* at pp. 714–715.)  Observing that the initiative "is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them" (Cal. Const., art. II, § 8, subd. (a)), we explained that a measure that merely adopts a resolution or declaration of policy is one that "fails to adopt a statute."  (*American Federation of Labor v. Eu*, at p. 715.)

This precedent makes clear that a citizen-initiated advisory measure asking the electorate whether the Legislature should increase the gasoline tax, for example, would be unconstitutional.  The court in *American Federation of Labor v. Eu* reasoned that the initiative power does not authorize the people to place an advisory measure on the ballot.  But upon a moment's reflection, it is evident that our decision suggests a deeper structural principle.

Suppose citizens who support an increase in the gasoline tax qualify the following initiative for the general election ballot:  "Proposition X.  The People of

16

the State of California hereby enact the following statute:  In the next general election, the Secretary of State shall place on the ballot an advisory question asking the people of California whether the Legislature should increase the tax on retail sales of gasoline by 5 cents per gallon."  If Proposition X were to pass, would the statute it enacted be constitutional?  Of course not; otherwise, our decision in *American Federation of Labor v. Eu* would be easily evaded and reduced to a virtual nullity.  But the invalidity of Proposition X does not arise from the fact that it is an advisory ballot measure like the advisory initiative at issue in *American Federation of Labor v. Eu*.  Proposition X is *not* an advisory measure; it enacts a *statute* that directs the Secretary of State to place an advisory measure on the ballot at the next election.

The invalidity of Proposition X must be explained by reference to its substance, not its form.  Although Proposition X enacts a statute, the statute it enacts asks voters to do something they lack authority to do:  to adopt a resolution with no binding legal consequence in their official capacity as the people of California.  We recognized this principle in *American Federation of Labor v. Eu* when we said the provisions of the balanced budget initiative "adopt, and mandate the Legislature to adopt, a *resolution* which does not change California law and constitutes only one step in a process which might eventually amend the federal Constitution.  Such a resolution is not an exercise of legislative power reserved to the people under the California Constitution."  (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 694.)  In other words, the California Constitution reserves to the people the power to enact laws by initiative or referendum, but it does not reserve to the people the power to adopt nonbinding resolutions.

If Proposition X is invalid, then an identical statute enacted by the Legislature would be invalid as well because "[t]he electorate's legislative power is 'generally coextensive with the power of the Legislature to enact statutes.' "

(*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1042; see *Santa Clara County Local Transportation Auth. v. Guardino* (1995) 11 Cal.4th 220, 253; *Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 675.)  In resisting this conclusion, the court cites our recognition that " 'the reserved powers of initiative and referendum do not encompass all possible actions of a legislative body.' " (Maj. opn., *ante*, at p. 34, quoting *American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 708.)  But we made that statement in the context of explaining that the Legislature, but not the citizenry, has the authority to adopt or reject "a resolution which merely expresses the wishes of the enacting body." (*American Federation of Labor v. Eu*, at p. 708.)  Nothing in *American Federation of Labor v. Eu* suggests that the Legislature has authority that the citizenry lacks to place an advisory measure on the ballot.

Distinguishing Proposition X from its legislatively enacted twin would require us to hold that our state Constitution does not authorize the citizenry, on its own initiative, to vote on an advisory measure, but does authorize the citizenry to do so when directed by the Legislature.  Yet it seems dubious to say that our Constitution privileges the ordinary lawmaking process over the initiative qualification process as a gatekeeper for the people's exercise of their putative advisory voice.  After all, the Legislature is the agent of the people, not the other way around.

As I explain more fully below, the infirmity of Proposition X is not that the electorate, as opposed to the Legislature, has authorized the electorate to vote on a resolution.  It is that the people, having reserved to themselves only the powers of initiative and referendum while vesting in the Legislature all other "legislative power of this State" (Cal. Const., art. IV, § 1), have no constitutional authority to adopt a resolution.  Such authority cannot be conferred by statute, whether enacted by the people or by their representatives.

18

## B.

When the California Constitution of 1849 was ratified, article IV, section 1 provided:  "The legislative power of this State shall be vested in a Senate and Assembly, which shall be designated the Legislature of the State of California . . . ."  This language affirmed what the people had accomplished by forming the Legislature:  The people gave up the "legislative power of this State" and vested it in their duly elected representatives.  The only exceptions were provided expressly:  The people retained the power to approve or reject proposed constitutional amendments and proposed assumptions of debt.  (Cal. Const. of 1849, arts. VIII, X.)  By ratifying the 1849 Constitution and creating the Legislature, the people of California established a republic.  They divested themselves of authority to exercise certain forms of power, they authorized the Legislature to exercise those powers on their behalf, and they restrained their ability to take those powers back without amending the state Constitution.  Most prominently, the people gave up the authority to enact laws and vested that authority in the Legislature.  That is why the initiative and referendum had to be established by constitutional amendment in 1911 and why the Legislature does not have authority to submit ordinary statutes for the citizenry to enact by ballot.  (See *post*, at pp. 21–23.)

Apart from the power to enact laws (what I will call "lawmaking power," as distinguished from the more encompassing term "legislative power"), what powers were included in the people's grant of "legislative power" to their representatives under article IV, section 1 of the 1849 Constitution?  The basic contours of the legislative power are established by its historical roots in the powers of Parliament.  In *Ex parte D.O. McCarthy* (1866) 29 Cal. 395 (*McCarthy*), we explained:  "A legislative assembly, when established, becomes vested with all the powers and privileges which are necessary and incidental to a free and

19

unobstructed exercise of its appropriate functions. These powers and privileges are derived not from the Constitution; on the contrary, they arise from the very creation of a legislative body . . . . [¶] What powers and privileges . . . a legislative assembly takes by force and effect of its creation, are to be ascertained by a reference to the common parliamentary law." (*Id.* at p. 403.) We then cited Luther Stearns Cushing's 1856 treatise, Elements of the Law and Practice of Legislative Assemblies in the United States of America, for examples of "necessary and incidental" powers. (*McCarthy*, at pp. 403–404.)

As relevant here, one of the traditional powers characteristic of a parliamentary body was the power to adopt nonbinding resolutions. A resolution "expresses the wishes of the enacting body." (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 708.) As Cushing explained, "When the house expresses any opinion, with reference to any subject before it, either public or private; or its will to do something at a given time, (not incidental to the ordinary course of business); or declares its adopting of general orders relative to its proceedings; in all these cases, it expresses itself in the form of *resolutions* . . . ." (Cushing, Elements of the Law and Practice of Legislative Assemblies in the United States, *supra*, at p. 314, par. 799.) Historically, resolutions served as a means for one chamber of a legislative body to express an opinion directed at another chamber, for a committee to express an opinion directed at the chamber as a whole (*id.* at p. 778), for the legislature to express an opinion directed at the executive or the "crown" (*id.* at p. 359, par. 905), or for a state legislature to express an opinion directed at the federal government (see, e.g., 4 Elliot, Debates, *supra*, at pp. 540–545 [Ky. resolutions of 1798 & 1799]; *id.* at pp. 528–529 [Va. resolutions of 1798]).

In vesting "[t]he legislative power of this State" in the Legislature (Cal. Const. of 1849, art. IV, § 1), the people gave up their authority to exercise the

20

power to adopt resolutions — that is, to express an opinion in their official capacity as the people of California — and they restrained their authority to take that power back.  That power could not be returned to or shared with the people without a state constitutional amendment or some other source of authority such as article V of the federal Constitution.  Under the California Constitution of 1849, the people were not authorized to adopt a nonbinding resolution, just as they were not authorized to enact ordinary law.

As the Legislature's briefing explains, our state Constitution is now more democratic and less republican than it was in 1849.  In 1911, amid widespread perception that the Legislature had become corrupt and self-serving, Governor Hiram Johnson and a wave of representatives were elected on the promise of amending the state Constitution to give some power back to the people.  (Cal. Com. on Campaign Financing, Democracy by Initiative:  Shaping California's Fourth Branch of Government (1992) pp. 36–42.)  Those representatives proposed, and the people ratified, amendments to the California Constitution that created the broad outlines of our current structure of government.  Article IV, section 1 now provides:  "The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the powers of initiative and referendum."

Importantly, the departures from republican government introduced in 1911 were specific and circumscribed.  "When the people established the Legislature, they conveyed to it the full breadth of their sovereign legislative powers. [Citation.]  When they adopted the initiative power in 1911, they restored to themselves only a shared piece of that power."  (Maj. opn., *ante*, at p. 34.)  The powers "reserved" to the people did not "encompass all possible actions of a legislative body.  Those powers are limited, under article II, to the adoption or rejection of 'statutes.' . . .  [I]t does not include a resolution which merely

21

expresses the wishes of the enacting body . . . ."  (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 708.)  After 1911, as before, the people retain no authority to adopt a resolution.  (*Id.* at p. 694 ["Such a resolution is not an exercise of legislative power reserved to the people under the California Constitution."].)  That power continues to reside exclusively in the Legislature, and it cannot be restored to the people without a constitutional amendment.  The Legislature may not ask the people to vote on an advisory measure because the Legislature may not *statutorily* authorize the people to exercise a power that the people have *constitutionally* vested in the Legislature and divested from themselves.

Of course, this does not mean the Legislature may not investigate the views of the citizenry through committee hearings, town halls, opinion polls, meetings with constituents, social media, and myriad other information-gathering mechanisms aided by modern technology.  It just means the Legislature may not use *the ballot* for this purpose.  The framers of the 1849 Constitution knew well the ballot's singular political significance and the importance of circumscribing the purposes for which it could be used.  The words "election," "electors," and "ballot" appeared in the original charter 69 times.  Collectively, these usages contemplated only three ways in which the ballot would be employed:  to approve the assumption of state debt (Cal. Const. of 1849, art. VIII), to ratify state constitutional amendments (*id.*, art. X), and to elect constitutional officers.  The terms of our state Constitution today continue to authorize use of the ballot for the solemn and legally binding tasks of electing public officials and approving limited and specific types of laws.  Nothing in our Constitution contemplates use of the statewide ballot — the traditional means for solemn expression of the people's will — to gauge public opinion on a "purely precatory" nonbinding resolution. (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 708.)

22

In sum, the legislative power — i.e., the full range of parliamentary power, including the power to make laws and the power to adopt resolutions — was vested in the Legislature and divested from the people in the 1849 Constitution. That is why the 1911 amendment to article IV, section 1 was needed to authorize the people, not just the Legislature, to exercise general lawmaking power. And that is why the people do not have general authority to vote on advisory ballot measures. No constitutional amendment has returned that power to the people or authorized the Legislature to do so.

## C.

This understanding of how legislative power has been vested, divested, and shared throughout our constitutional history draws further support from the indirect initiative process that existed between 1911 and 1966. In addition to reserving to the people the powers of initiative and referendum, the 1911 amendment to article IV, section 1 of the California Constitution provided for "direct" and "indirect" initiatives, with the "indirect" initiative process authorizing the Legislature to place on the ballot, alongside a voter initiative, an alternative measure for the electorate to approve or disapprove. (Cal. Const., art. IV, former § 1, as amended Oct. 10, 1911 ["The legislature may reject any measure so proposed by initiative petition and propose a different one on the same subject . . . ."].) The specific authorizing language of this provision — "The legislature may . . . propose a different [measure] on the same subject" — would have been unnecessary if the Legislature already had general power to submit ordinary statutes for the people to enact by ballot. The indirect initiative confirms that the people originally vested in the Legislature and divested from themselves the power to enact ordinary laws, and then later authorized the Legislature to share a limited portion of that vested power with the electorate. No similar measure has

23

ever authorized the Legislature to share the power to adopt nonbinding resolutions with the electorate. It remains a power that the people have vested in the Legislature and divested from themselves.

The Center for State and Local Government Law at the University of California Hastings College of the Law, in an amicus curiae brief, contends that the Legislature has always had general power to submit statutes for the voters to enact and, because "[t]he greater power includes the lesser," also has power to submit advisory measures. According to amicus curiae, the 1911 indirect initiative provision "acknowledged" rather than authorized the Legislature's power to submit to the voters an alternative measure on the same subject as a citizens' initiative. For this proposition, amicus curiae relies on a report by the California Constitution Revision Commission (Commission) discussing 1966 and 1968 revisions that included elimination of the indirect initiative. The "Introduction" to the report said: "The Legislature can exercise all of the State's legislative power and can act upon any subject unless the power has been delegated to the federal government or exercise of the power is forbidden by the State or Federal Constitution. It therefore is unnecessary to grant power in the Constitution which the Legislature inherently possesses. It is appropriate, however, to prohibit or compel by constitutional provision certain exercises of the Legislature's inherent power. [Citation.] [¶] Our Constitution is encumbered by this type of unnecessary grant of power to the Legislature and by provisions which the Legislature is competent to enact by statute. Relying upon the rule of inherent legislative power, the Commission often has formulated recommended revisions which free our Constitution from these encumbrances." (Cal. Const. Revision Commission, Proposed Revision of the California Constitution (1968) p. 7; see conc. opn. of Cantil-Sakauye, C.J., *ante*, at pp. 29–30 & fn. 36.)

24

But this quotation, which states the Commission's *general* objective of eliminating unnecessary grants of power to the Legislature, does not illuminate whether the *specific* revision eliminating the indirect initiative was an instance of eliminating an unnecessary grant of power. As the Legislature's briefing notes, the Commission's *specific* rationale for eliminating the indirect initiative was that a separate proposed revision had "reduced the percentage of signatures required for an initiative statute from 8 to 5 percent, the same as required for the indirect initiative. The indirect initiative merely adds an additional step to accomplish the same result that can be accomplished under the initiative generally. Further, the indirect initiative has been used only four times, and only once successfully. Accordingly, it was determined that the indirect initiative could be deleted without impairing the right of the people to propose laws through the initiative procedure." (Cal. Const. Revision Commission, Proposed Revision of the California Constitution (1966) p. 52; see *People v. Kelly* (2010) 47 Cal.4th 1008, 1040 & fn. 55 [discussing history of elimination of indirect initiative].) Nothing in this explanation suggests that the indirect initiative provision merely acknowledged the Legislature's extant power to submit statutes to the electorate. The provision is most naturally read to grant the Legislature a power it did not previously have.

Amicus curiae also contends that article II, section 12 of the California Constitution — "No amendment to the Constitution, and no *statute proposed to the electors by the Legislature* or by initiative, that names any individual to hold any office, or names or identifies any private corporation to perform any function or to have any power or duty, may be submitted to the electors or have any effect" (italics added) — confirms that the Legislature has authority to place ordinary statutes on the ballot. But this provision became part of our Constitution in 1950 (Cal. Const., art. IV, former § 26, as adopted Nov. 7, 1950, renumbered June 8, 1976), when the Legislature possessed the power of indirect initiative. Moreover,

25

well before 1950 and ever since, our state Constitution has required the Legislature to submit to the people any statute that issues state bonds above a certain amount (Cal. Const., art. XVI, § 1) or that amends or repeals an initiative statute (*id.*, art. II, § 10, subd. (c)).  Thus, even after the indirect initiative was eliminated in 1966, article II, section 12's reference to a "statute proposed to the electors by the Legislature" has served to ensure that statutes authorizing state debt and statutes amending or repealing initiative statutes do not name any individual to hold office or any private corporation to perform any function or duty.  It does not necessarily imply that the Legislature has general authority to propose statutes to the voters.  (Cf. Czesla, Review of Article IV of the California Constitution (1964) p. 3 [art. II, § 12's prohibition "apparently resulted from the enactment in 1948 of an initiative constitutional amendment which made the Director of Social Welfare an elective office and named the first director"].)

Most telling, the Legislature in its briefing does not claim it has the power to submit ordinary statutes to the electorate.  When pressed on this point at oral argument, counsel for the Legislature declined to assert the Legislature has such power.  This hesitation undermines the broad contention in the Legislature's briefing that no action of the Legislature may be found "inconsistent with the 'structure' of the Constitution, without it violating some *explicit prohibition* contained therein."  Even though our Constitution does not explicitly prohibit the Legislature from submitting ordinary statutes to the electorate, the Legislature refuses to claim it has such authority.

And for good reason:  Apart from the powers of initiative and referendum, the people have vested lawmaking power in the Legislature, thereby divesting it from themselves, and the Legislature may not delegate that power to the people without specific constitutional authorization.  Such authorization has occurred at various times through various provisions of our Constitution, demonstrating that

26

when our Constitution contemplates shared lawmaking authority between the people and their representatives, it has said so explicitly. Article I's declaration that "[t]he people have the right to instruct their representatives" is another provision that expressly authorizes shared accountability in lawmaking. (Cal. Const., art. I, § 3, subd. (a); but cf. dis. opn., *post*, at pp. 9–10 [the *people's* right to instruct cannot empower the *Legislature* to submit advisory questions that the people themselves cannot place on the ballot].) Absent such authorization, the Legislature may not *statutorily* alter the *constitutional* allocation of lawmaking power between the people and their representatives. And by the same logic, the Legislature may not *statutorily* authorize the people to adopt a nonbinding resolution because that power is *constitutionally* vested in the Legislature and not retained by the people. This arrangement, with its clear lines of accountability, is not the only way to structure a well-functioning lawmaking process. But it is the way the people of California have chosen.

## D.

The Chief Justice contends that advisory ballot measures have long been used by states and localities, and that this historical practice suggests that such measures are legally valid. (Conc. opn. of Cantil-Sakauye, C.J., *ante*, at pp. 2–17.) But it is unclear how probative the examples from other jurisdictions are. For one thing, the "scores" (and how many "scores" are there really?) "of legislatively initiated advisory ballot measures that have been submitted to statewide voters, both in California and throughout the country from this nation's inception" (*id.* at p. 38, fn. 39), do not seem all that impressive when considered in the context of state constitutional histories that, in the aggregate, span several *thousands* of years. In addition, we cannot assume that the constitutions and laws of the several states — with their unique texts, structures, and histories — are uniform with respect to

27

the issue before us.  For example, one important aspect of the California Constitution is that the people, by ratifying the initiative and referendum provisions in 1911, returned part of the legislative power to themselves, but not the power to adopt resolutions.  (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at pp. 694, 708.)  By contrast, at least three states from which the Chief Justice draws examples authorize voters to place advisory measures on the ballot.  (*Yute Air Alaska, Inc. v. McAlpine* (Alaska 1985) 698 P.2d 1173, 1175–1177; *Simpson v. Cenarrusa* (Idaho 1997) 944 P.2d 1372, 1376–1377; 10 Ill.Comp.Stat. 5/28-9.)  Moreover, the Chief Justice identifies only one state high court that has ever addressed an issue like the one before us.  (*Cranmer v. Thorson* (S.D. 1896) 68 N.W. 202.)  But that precedent predated South Dakota's constitutional amendment providing for the power of initiative and referendum, and since then, the South Dakota Supreme Court has been narrowly divided on whether the legislature has authority to submit questions to the voters.  (*Wyatt v. Kundert* (S.D. 1985) 375 N.W. 2d 186, 191; *id.* at p. 198 (dis. opn. of Wuest, J., joined by Fosheim, C.J.).)

What is clear is that historical practice *in California* provides scant support for the broad thesis that the Legislature has general authority to place advisory measures on the statewide ballot.  Although the Chief Justice cites a wide range of *local* advisory measures, such measures are specifically authorized by statute (Elec. Code, § 9603) and do not illuminate the constitutional question presented here.  As to the seven examples of statewide advisory measures identified by the Chief Justice, three implicated the Legislature's role under article I, section 3, or article V of the federal Constitution of expressing the state's sovereign will concerning the election of United States Senators.  (Maj. opn., *ante*, at pp. 21–23.)  That leaves four advisory measures that did not concern any function assigned to the Legislature by the federal Constitution.

28

Among those four measures, the Chief Justice places greatest emphasis on an 1879 advisory measure that asked the electorate whether it was " '[f]or' " or " '[a]gainst' " Chinese immigration.  (Stats. 1877, ch. 5, § 1, p. 3.)  According to the Chief Justice, this measure, which resulted in a 96 percent majority voting against Chinese immigration (Certificate of Vote on "An Act to Ascertain and Express the Will of the People of the State of California on the Subject of Chinese Immigration" (1879)), shows that the delegates to the 1878–1879 Constitutional Convention "obviously assumed that the Legislature possessed and retained authority to submit such an advisory measure to the statewide voters."  (Conc. opn. of Cantil-Sakauye, C.J., *ante*, at p. 19; see *id.* at p. 29 [reiterating this point]; *id.* at p. 31 [again]; *id.* at p. 33 [and again].)

But this example should not guide our constitutional inquiry.  As the Chief Justice acknowledges, the 1879 advisory measure was motivated by "virulent and racist views" (conc. opn. of Cantil-Sakauye, C.J., *ante*, at p. 19), and this court recently observed that "[a]nti-Chinese sentiment was a major impetus for the California Constitutional Convention of 1879" (*In re Chang* (2015) 60 Cal.4th 1169, 1172).  Against this historical backdrop, it is fanciful to posit that the constitutional delegates — a large portion of whom were members of the Workingmen's Party, whose slogan was "The Chinese Must Go!" (*ibid.*) — had a well-considered view of the constitutionality of the anti-Chinese advisory measure.

Scarcely a decade after ratification of the Fourteenth Amendment to the federal Constitution — section 1 of which says no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction equal protection of the law" — those delegates wrote the infamous former article XIX (titled "Chinese") into the 1879 Constitution, expressly prohibiting employment of the Chinese, authorizing the Legislature and

29

localities to remove the Chinese from their jurisdictions, and directing the Legislature to "discourage their immigration by all the means within its power." (Cal. Const., art. XIX, as ratified 1879; see *In re Chang*, at pp. 1172–1173.) The delegates also constitutionalized the denial of the right to vote to any "native of China." (Cal. Const., art. II, § 1, as ratified 1879.) Given the fact that the anti-Chinese advisory measure received "the blessing of the constitutional delegates" (conc. opn. of Cantil-Sakauye, C.J., *ante*, at p. 19) alongside these other blatantly unconstitutional provisions, I do not think the 1879 example sheds much light on the constitutionality of statutes placing advisory measures on the ballot. For the same reason, I would not assign any weight to the Legislature's submission of another anti-Chinese advisory measure in 1891 asking whether English literacy should be a requirement for voting. (Stats. 1891, ch. 113, pp. 704–705.) The fact that an advisory ballot measure, as a procedural mechanism, "is not by its nature invariably discriminatory or offensive" (conc. opn. of Cantil-Sakauye, C.J., *ante*, at p. 38, fn. 39) does not explain why we should think that legislators who *did* submit advisory measures that *were* patently discriminatory during an era of "xenophobia" (*In re Chang*, at p. 1172) thought or cared much about the constitutionality of such measures.

The two remaining examples are a pair of 1933 measures asking voters whether the Legislature should divert gasoline tax funds to pay down debt on outstanding highway bonds. (Stats. 1933, ch. 435, § 3, p. 1126.) The voter guide explained that the measures proposed an alternative means of paying down bond debt that had been previously approved by the voters, as was (and still is) required by article XVI of our state Constitution. (Ballot Pamp., Special Elec. (June 27, 1933) argument in favor of Props. 9 & 10, p. 11.) The Legislature may well have believed that the alternative payment plans, like the original debts, required voter approval. (Cal. Const., art. XVI, § 1 [Legislature may not create debt of over a

certain amount unless a law enacted by a two-thirds vote in both houses and approved by a majority of voters "provide[s] ways and means" for payment of interest and principal].)  In any event, the legality of these measures was never tested; they were placed on the ballot just one month before the election, and both were soundly defeated at the polls.  (Stats. 1933, p. xc, Propositions Submitted to Vote of Electors, Special Election (June 27, 1933) Measures Defeated, Nos. 9, 10.)

In sum, the Legislature's past uses of advisory ballot measures hardly demonstrate a "well accepted" practice (conc. opn. of Cantil-Sakauye, C.J., *ante*, at p. 18), let alone one whose constitutionality has been implicitly affirmed.  As Justice Chin notes, "the most recent of these advisory measures occurred over eight decades ago, long before the development of modern polling techniques, the Internet, and other methods of ascertaining the people's wishes in political matters."  (Dis. opn., *post*, at p. 12.)  If anything, the *paucity* of historical examples, with none in the last 80 years, tends to cast doubt on the existence and validity of the power claimed here.

## E.

No member of the court suggests that *American Federation of Labor v. Eu* was wrongly decided or that our holding in that case may be evaded by an initiative statute that directs the Secretary of State to place an advisory measure on the ballot.  But today's opinion rejects the argument that "if, under *American Federation of Labor v. Eu*, *supra*, 36 Cal.3d 697, the people are limited to placing on the ballot only proposed laws, then the Legislature must be too . . . ."  (Maj. opn., *ante*, at p. 34.)  Noting that the Legislature's powers are broader than the people's initiative power (*American Federation of Labor v. Eu*, at p. 708), the court contends that the Legislature's broader powers authorize it to pass a statute placing an advisory measure on the ballot even though the people may not do so

31

by initiative. I agree with this thesis where, as here, the Legislature is exercising its implied power under article V of the federal Constitution. But I do not agree when it comes to advisory ballot measures on ordinary matters of public policy.

The court, like the Legislature, does not rest its reasoning "on the syllogism that the legislative power includes the power to enact statutes, Senate Bill No. 1272 takes the form of an enacted statute, and thus for that reason alone the bill and Proposition 49 are within a constitutional source of power." (Maj. opn., *ante*, at p. 7.) Instead, the court accepts the Legislature's claim that a "non-lawmaking power" — the power to investigate — "encompass[es] the authority to enact a statute placing an advisory question before the voters." (*Id.* at p. 8.) This invocation of the investigative power is unpersuasive for several reasons.

As an initial matter, it is odd to characterize Senate Bill No. 1272, which the Legislature labeled the "Overturn Citizens United Act" (Stats. 2014, ch. 175, § 1), as an effort to investigate the electorate's views. The Legislature's findings include declarations that *Citizens United* "presents a serious threat to self-government" (Stats. 2014, ch. 175, § 2, subd. (e)); that "[a] February 2010 Washington Post-ABC News poll found that 80 percent of Americans oppose the ruling in *Citizens United*" (*id.*, subd. (k)); and that "Article V of the United States Constitution empowers and obligates the people of the United States of America to use the constitutional amendment process to correct those egregiously wrong decisions of the United States Supreme Court that go to the heart of our democracy and the republican form of self-government" (*id.*, subd. (*l*)). This is the language of public mobilization, not investigation, and it fits comfortably within the Legislature's role under article V in marshaling vigorous and solemn expressions of California's sovereign will on whether to amend our nation's basic charter. It blinks reality to suggest that the Legislature — plainly aware of opinion

32

polls showing that broad majorities of Americans are opposed to *Citizens United* — enacted Senate Bill No. 1272 in order to investigate the citizenry's views.

More fundamentally, the court's invocation of the investigative power in this context is a novel expansion of how we have historically construed this power. Our case law on the investigative power uniformly consists of disputes concerning the Legislature's prerogative to establish committees, boards, commissions, and agencies, and to vest such entities with authority to compel evidence and testimony and to hold noncompliant witnesses in contempt. Those issues are far afield from the question before us. As a review of the cases shows, nothing in this court's treatment of the Legislature's power to investigate suggests it encompasses the authority to submit an advisory measure to the electorate.

In *McCarthy*, *supra*, 29 Cal. 395, a newspaper editor was held in contempt by the state Senate and jailed after he refused to answer questions posed by the Senate in the course of investigating charges of bribery against its members. (*Id.* at pp. 397–399.) The petitioner challenged his detention, claiming the Senate lacked power to investigate the bribery charges. We rejected the claim and held that the Senate's power to investigate included the power to compel testimony from witnesses and to hold persons in contempt for refusing to testify. (*Id.* at pp. 403–407.)

In *In re Battelle* (1929) 207 Cal. 227 (*Battelle*), the state Senate adopted a resolution authorizing a committee of senators to investigate a possible price-fixing conspiracy among cement manufacturers. The committee subpoenaed witnesses and required them to bring certain records and documents within their control, but various witnesses refused. The Senate adopted a resolution holding the witnesses in contempt. The petitioner was arrested and sought habeas corpus relief in this court. In addressing the petitioner's claims, we said that "in many instances, in order to the preparation of wise and timely laws the necessity of

33

investigation of some sort must exist as an indispensable incident and auxiliary to the proper exercise of legislative power." (*Id.* at p. 241.) We further explained that "the inherent and auxiliary power reposed in legislative bodies to conduct investigations in aid of prospective legislation has already been held to carry with it the power in proper cases to require and compel the attendance of witnesses and the production of books and papers by means of legal process and to institute and carry to the extent of punishment contempt proceedings in order to compel the attendance of such witnesses and the production of such documentary evidence as may be legally called for in the course of such proceedings, whether conducted by the legislative body or a branch of it, directly or through properly constituted committees thereof." (*Ibid.*) We rejected the claim that the use of such compulsory process meant the Legislature was exercising a judicial function in violation of the separation of powers. (*Id.* at pp. 241–244.) But we ultimately granted the petitioner relief on the ground that the contempt order did not adequately explain how the questions the petitioner refused to answer were pertinent to the issue the Legislature was investigating. (*Id.* at pp. 246–247.) Like *McCarthy*, *Battelle* had nothing to do with advisory ballot measures.

The other cases cited in today's opinion are similarly far afield. Both *Swing v. Riley* (1939) 13 Cal.2d 513 and *Special Assembly Interim Committee v. Southard* (1939) 13 Cal.2d 497 (*Southard*) addressed issues concerning the proper appointment of legislative committees. *Parker v. Riley* (1941) 18 Cal.2d 83 held that a statute creating the California Commission on Interstate Cooperation did not violate separation of powers. The key passage in that case discussing the power to investigate gives context and substance to this power: " 'The ascertainment of facts in its essence is not a legislative function. It is simply ancillary to legislation. It may be accomplished in divers ways. While it may be done by the Legislature itself, it is a responsibility not infrequently placed upon committees and

34

individuals. . . . Frequent illustrations of this practice also are found respecting permanent boards or commissions. . . . The ascertainment of pertinent facts for legislation is within the power of the lawmaking department of government. When a legislative body has a right to do an act it must be allowed to select the means within reasonable bounds. It is not precluded from delegating incidental powers which it may exercise itself in aid of its primary functions. . . . Familiar methods are by appropriating the results of studies already made by itself or by others, by conducting an inquiry through a committee of its members, or by utilizing an existing commission or board to make and report the results of a research.' " (*Id.* at p. 91.) Amid these mentions of committees, boards, commissions, studies, and research, there is not the slightest hint that the Legislature may submit an advisory measure to the electorate pursuant to its investigative power.

The novelty of the court's reasoning has an even deeper dimension. As noted, neither the Legislature nor any member of this court has invoked the Legislature's ordinary lawmaking power as its source of authority for enacting Senate Bill No. 1272, even though a duly enacted statute (as opposed to, say, a mere committee resolution or executive order) is required to place Proposition 49 on the ballot. The court instead resorts to the Legislature's *incidental* power to investigate. Yet in every case cited by the court regarding the scope of the Legislature's incidental powers, the Legislature acted *without* passing a statute. (See *Battelle*, *supra*, 207 Cal. at pp. 230–240; *Southard*, *supra*, 13 Cal.2d at pp. 498–502; *Swing v. Riley*, *supra*, 13 Cal.2d at pp. 514–517; *McCarthy*, *supra*, 29 Cal. at pp. 397–399; *Parker v. Riley*, *supra*, 18 Cal.2d at pp. 89–91.) Today's opinion holds for the first time that the Legislature's investigative power is *itself* a font of authority, separate and apart from its ordinary lawmaking power, for the Legislature to enact statutes. This holding implies that the Legislature may enact

35

certain statutes pursuant to its investigative power that it could not enact pursuant to its ordinary lawmaking power. After all, if the Legislature's ordinary lawmaking power were sufficient in this case, presumably the court's analysis would have stopped there.

But to say that the investigative power itself encompasses a power to enact a statute, whether or not the statute could be enacted pursuant to the Legislature's ordinary lawmaking power, appears to contravene the settled principle that the Legislature's ordinary lawmaking power under our state Constitution is "plenary." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 254.) In other words, the Legislature's lawmaking power is "[f]ull," "complete," and "entire." (Black's Law Dict. (9th ed. 2004) p. 1273, col. 1.) This court has never held that the Legislature's authority under the California Constitution to *make laws* may be grounded in anything other than its *lawmaking* power, and we have never suggested that the investigative power or any incidental power subsumes a portion of the Legislature's power to make laws. Of course, the Legislature may exercise its lawmaking power to pass laws that accomplish investigative aims. (See, e.g., Ed. Code, §§ 10600–10601.5; *id.*, § 10600, subd. (a) [requiring state Dept. of Education to maintain an information system that "make[s] complete, current, and reliable information relating to education available to the Legislature"].) But that is quite different from saying that the investigative power itself authorizes the Legislature to pass such laws.

Today's opinion cautions that "[t]he investigative power is not unlimited" (maj. opn., *ante*, at p. 9) and holds only that this power authorizes an advisory ballot measure as "a reasonable and lawful means of assisting the Legislature in the discharge of its article V-related functions" (*id.* at p. 43). Whether this holding can be limited to the article V context remains to be seen. If all that is required is "any reasonable connection" between the advisory measure and the Legislature's

36

potential exercise of any power it lawfully possesses (*id.* at p. 40), then I find it difficult to discern any meaningful justiciable limit on the Legislature's use of advisory ballot measures.

In sum, today's application of the Legislature's investigative power finds no support in our precedent and disturbs the settled understanding that the Legislature's lawmaking power is plenary. It is hard to believe that the people of California — having vested "[t]he legislative power of this State" in the Legislature (Cal. Const., art. IV, § 1), including the power to adopt a resolution (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 708) — at the same time contemplated that the Legislature, by exercising an incidental power, could restore to the people a portion of that constitutionally vested legislative power.

### III.

The court's reliance on the investigative power is unnecessary to reach today's limited holding. As explained above, Senate Bill No. 1272 is a valid exercise of the Legislature's implied power under article V of the federal Constitution. Although the Chief Justice would uphold advisory ballot measures "with regard to *any* potential action that the Legislature has authority to undertake" (conc. opn. of Cantil-Sakauye, C.J., *ante*, at p. 27), the court wisely declines to go so far. A decision of this court opening the door to advisory ballot measures on virtually any subject would potentially transform the way electoral politics and policymaking are conducted in California.

I do not doubt that advisory ballot measures can provide the Legislature with valuable information about the electorate's views on public policy. But such prosaic uses of advisory measures do not exhaust the possibilities. For example, advisory measures can be used to undercut the people's initiative power, a concern expressed by Citizens in Charge, an "advocacy group dedicated to protecting and

37

expanding citizens' initiative, referendum, and recall rights throughout America," in an amicus curiae letter supporting the original emergency petition for writ of mandate in this matter. It is a common tactic for opponents of an initiative to qualify a competing measure on the ballot, thereby creating voter confusion. (Garrett, *Direct Democracy*, in Research Handbook on Public Choice and Public Law (Farber & O'Connell edits., 2010) p. 155.) A legislative majority opposed to an initiative could swell the ballot with advisory measures on the same subject. Such an approach would be much easier than qualifying a competing initiative but no less effective in confusing and exhausting the electorate. (See dis. opn., *post*, at p. 9 ["the potential, and the temptation, for legislative interference with the people's power of initiative is real"].) As many California voters would agree, it is already hard enough to cast an informed vote on the statewide ballot given the multiple propositions and competing propositions each year. The prospect of also having to vote on advisory measures can only worsen voter confusion and fatigue.

In addition, advisory measures could be used to influence voter sentiment about a qualified initiative. Suppose, not unrealistically, that one political party controls majorities in the Legislature and the governorship, and that the majority party opposes tax cuts. Suppose further that concerned citizens qualify an initiative proposing broad-based tax cuts. If the Legislature had general authority to put advisory measures on the ballot, then presumably the Legislature could pose the following questions on the same ballot as the tax-cutting initiative:

> **Proposition A.** To pay for any future tax cuts, should the Legislature consider cutting funding for police departments?

> **Proposition B.** To pay for any future tax cuts, should the Legislature consider cutting funding for state parks?

> **Proposition C.** To pay for any future tax cuts, should the Legislature consider cutting funding for higher education?

38

Moreover, advisory ballot measures could be used to entrench a political majority. Consider, for example, the 2010 gubernatorial race between Jerry Brown and Meg Whitman. Whitman, a wealthy business executive, faced controversies over her alleged inside dealings with an investment bank and the retention of a housekeeper whose undocumented status she allegedly knew. Suppose Democrats had controlled majorities in the Legislature and the governorship during the 2010 campaign season. If the Legislature had general authority to put advisory measures on the ballot, then presumably the Legislature could have posed the following questions on the 2010 ballot:

> **Proposition D.** To promote fairness, should the Legislature consider a law that would prohibit business executives from earning incomes more than 100 times the incomes of their average employees?

> **Proposition E.** To discourage corruption, should the Legislature consider a law that would more closely monitor business executives involved in inside deals with investment banks?

> **Proposition F.** To restore jobs to hard-working Americans, should the Legislature consider a law that would heavily penalize those who knowingly employ undocumented immigrants as housekeepers?

In these examples above, the advisory measures would be designed to cue voters to defeat the tax-cutting initiative (Propositions A, B, and C) or to defeat Meg Whitman (Propositions D, E, and F). I am not sure whether these measures would bear a "reasonable connection" to the Legislature's lawful power to act under today's opinion. (Maj. opn., *ante*, at p. 40.) But if we are not to "inquire into underlying motives" (*id.* at p. 39), and if the Legislature may "obtain the views of the voters concerning *all* manner of subjects reasonably within a legislative body's authority to act" (conc. opn. of Cantil-Sakauye, C.J., *ante*, at p. 2), then on what basis could this court foreclose the Legislature from placing such measures on the ballot?

39

It is easy to dismiss the possibility of such canny tactics as speculative or remote. But even if advisory measures in local elections have not been used in such shrewd ways, there is little assurance that the same would be true in statewide elections, where matters of broader scale and impact are typically at stake, and where much greater sums of money and higher levels of political sophistication are brought to bear on electioneering tactics. Moreover, because advisory measures provide an avenue for influencing voters right at the moment of voting, they are likely to be far more effective — and certainly far less expensive — than running ads on television or the Internet, or using mail, e-mail, text messages, or social media to reach voters. In a hard-fought political battle, the ability to prime voters with messages *on the ballot itself* presents an enormously attractive option. And there would be no point in calling such tactics abusive, for they would be *perfectly legal* and fair game if this court were to hold that the Legislature has general authority to place advisory measures on the ballot. As the proponents of Proposition 49 well know, the judiciary plays a critical role in setting the rules of politics, and it is no surprise when political actors seek every possible advantage within those rules.

It is true that the Legislature has not used such tactics in modern times. But in my view, that is evidence that the claimed power does not exist and that our political system has not needed it. Of course, I cannot say for sure whether a judicial decision recognizing such a power would actually change the landscape of California politics in the way suggested above. But the risk is not one that our Constitution requires us to tolerate.

*     *     *

The California Constitution, like the United States Constitution and other state constitutions, establishes the fundamental structure of government. It is

40

within this structure that the Legislature exercises its power. No issue is more basic to the structure of government than what types of matters may be placed on the ballot for a vote of the citizenry. Our state Constitution establishes the rules by which voters may propose initiatives and referenda, and it requires the Legislature to submit constitutional amendments and certain statutes to the voters for approval. This constitutional structure constrains the power of legislative majorities. Just as the Legislature does not have general authority to submit statutes for voters to approve, it does not have general authority to use advisory ballot measures to poll the electorate. As a matter of state law, the Legislature may not alter its constitutional role as the people's accountable representative body by directing the people, at the Legislature's convenience, to exercise a merely hortatory, nonbinding voice in ordinary public affairs. If this court were to revise the balance our Constitution has struck between direct and representative democracy, it would have potentially serious consequences for our political system.

The case before us is different. Here the Legislature is playing a role that originates not in our state Constitution but in article V of the federal Constitution. Under article V, the Legislature has wide latitude to marshal the electorate's views in order to express California's sovereign will to Congress and to other states on whether to amend the nation's fundamental charter. The court properly confines today's holding to advisory measures concerning federal constitutional amendments. Such a measure is all that is at issue here, and I concur in the judgment upholding its placement on a statewide ballot.

**LIU, J.**

41

**DISSENTING OPINION BY CHIN, J.**

I dissent. In August 2014, this court correctly removed Proposition 49 from the ballot. It should now prevent a similar measure from being placed on the ballot in the future. Placing advisory measures on the ballot — a right denied even to the people (*American Federation of Labor v. Eu* (1984) 36 Cal.3d 687 (*American Federation*)) — is no part of the legislative function and does not come within either the Legislature's lawmaking or ancillary powers.

## I. Factual and Procedural Background

In 2014, the Legislature adopted a resolution urging Congress to call a constitutional convention to propose an amendment to the United States Constitution that would overrule the decision in *Citizens United v. Federal Election Comm'n* (2010) 558 U.S. 310 (*Citizens United*). (Assem. Joint Res. No.1, Stats. 2014 (2013-2014 Reg. Sess.) res. ch. 77.) The Legislature also enacted Senate Bill No. 1272 (2013-2014 Reg. Sess.) (Senate Bill 1272). (Stats. 2014, ch. 175.) That bill directed the Secretary of State to submit an "advisory question to the voters" at the November 2014 election asking whether Congress should propose, and the Legislature ratify, an amendment to the United States Constitution that would overturn *Citizens United*. (Stats. 2014, ch. 175, § 4.)

The Governor permitted Senate Bill 1272 to become law without his signature. He issued a statement explaining why he did so: "[T]his bill and the

advisory vote it requires has no legal effect whatsoever. The only way to overturn a Supreme Court decision such as *Citizens United* is by the process outlined in Article V of the United States Constitution. In fact, the California State Legislature recently took action in this regard by approving a joint resolution calling upon Congress to convene a Constitutional convention for this very purpose." (Gov. Edmund G. Brown, Jr., Letter to Members of Cal. State Senate, July 15, 2014.) The Governor said he understood the motivation behind the bill because he, too, believes *Citizens United* was wrongly decided. "But," he wrote, "we should not make it a habit to clutter our ballots with nonbinding measures as citizens rightfully assume that their votes are meant to have legal effect. Nevertheless, given the Legislature's commitment on this issue, even to the point of calling for an unprecedented Article V Constitutional Convention, I am willing to allow this question to be placed before the voters. [¶] By allowing SB 1272 to become law <u>without my signature</u>, it is my intention to signal that I am not inclined to repeat this practice of seeking advisory opinions from the voters." (*Ibid.*)

The Secretary of State designated the matter Proposition 49 and began preparing to place it on the ballot. Petitioners Howard Jarvis Taxpayers Association et alia (Howard Jarvis) promptly filed a petition for writ of mandate seeking to prevent Proposition 49 from being placed on the ballot. After a divided Court of Appeal denied relief, Howard Jarvis filed the instant petition in this court. In August 2014, we issued an order to show cause and directed the Secretary of State to refrain from taking any further action to place Proposition 49 on the November 2014 ballot.

Our August 11, 2014 order to show cause quoted *American Federation*'s explanation of why it is necessary to remove a dubious measure from the ballot: " 'The presence of an invalid measure on the ballot steals attention, time and

2

money from the numerous valid propositions on the same ballot.  It will confuse some voters and frustrate others, and an ultimate decision that the measure is invalid, coming after the voters have voted in favor of the measure, tends to denigrate the legitimate use of the initiative procedure.' (*American Federation of Labor v. Eu* (1984) 36 Cal.3d 687, 697.)"  We explained that we issued the stay "[b]ecause the proposition's validity is uncertain, because this court in *American Federation* made clear that substantial harm can occur if an invalid measure is permitted to remain on the ballot, and because the measure, which the parties agree would have no legal effect, can be placed on a future ballot at the Legislature's direction if the court ultimately determines it is valid . . . ."  Justice Liu issued a separate concurring statement, while the Chief Justice dissented from the issuance of the stay.

After full briefing, the merits of Howard Jarvis's challenge to Proposition 49 are now before us.  Although I disagree with the majority's resolution of the merits, I agree that we should decide them even though the question is technically moot.  The Legislature needs to know whether it can pass a similar measure placing the same advisory question on a future ballot.  (Maj. opn., *ante*, at p. 6.)

## II.  Discussion

In *American Federation*, *supra*, 36 Cal.3d 687, the question was whether the people, invoking the right of initiative, could place on the ballot an advisory measure urging the Legislature to apply to Congress to convene a constitutional convention to propose that the United States Constitution be amended to require a balanced federal budget.  (*Id.* at pp. 690-691.)  We held that the people could not do that because the advisory measure exceeded the scope of the initiative power.  (*Id.* at p. 694.)  The question now before us is whether the Legislature can place an advisory measure on the ballot when the people cannot do so themselves.  Just as the merits of a balanced budget amendment were irrelevant to the holding in

3

*American Federation*, so, too, the merits of overturning *Citizens United*, *supra*, 558 U.S. 310, are irrelevant to the issue here.

At the outset, I stress that I agree fully that the Legislature's lawmaking power is plenary. "Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire *law-making* authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. [Citations.] In other words, 'we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited. [Citation.]' [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.' " (*Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691, italics added; accord, *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 284.)

But this plenary *lawmaking* authority does not apply here. Proposition 49 does not make law. As the Governor explained, and as everyone agrees, it is merely an advisory measure that would have no legal effect even if passed. In one sense, Senate Bill 1272 is a law because it directs the advisory measure to be placed on the ballot. But the action it directs is legally meaningless. The Legislature's power to pass it cannot be based on its lawmaking authority. If the Legislature has the power to place an advisory measure on the ballot, it must be grounded on something else.

4

The Legislature also "has the power to engage in activity that is incidental or ancillary to its lawmaking functions." (*The Zumbrun Law Firm v. California Legislature* (2008) 165 Cal.App.4th 1603, 1614, citing *Parker v. Riley* (1941) 18 Cal.2d 83, 89.) As we explained long ago, "[a] legislative assembly, when established, becomes vested with all the powers and privileges which are necessary and incidental to a free and unobstructed exercise of its appropriate functions. These powers and privileges are derived not from the Constitution; on the contrary, they arise from the very creation of a legislative body, and are founded upon the principle of self preservation. The Constitution is not a grant, but a restriction upon the power of the Legislature, and hence an express enumeration of legislative powers and privileges in the Constitution cannot be considered as the exclusion of others not named unless accompanied by negative terms. A legislative assembly has, therefore, all the powers and privileges which are necessary to enable it to exercise in all respects, in a free, intelligent and impartial manner, its appropriate functions, except so far as it may be restrained by the express provisions of the Constitution, or by some express law made unto itself, regulating and limiting the same." (*Ex parte D. O. McCarthy* (1866) 29 Cal. 395, 403 [listing several of these powers and privileges].) But these ancillary powers are not unlimited.

Often a limitation on the Legislature's power is implied rather than expressed in the Constitution. For example, the Legislature may not allow district attorneys to refile accusatory pleadings that have reached final judgments. (*People v. King* (2002) 27 Cal.4th 29, 34-37.) Similarly, the Legislature may not require a criminal court to obtain a prosecutor's consent before ordering a juvenile disposition for a minor charged with a serious crime in lieu of a sentence under the Penal Code. (*People v. Thomas* (2005) 35 Cal.4th 635, 639-642.) These prohibitions derive from the principle of separation of powers. Here, the

5

separation of powers is not among the legislative, executive, and judicial branches of government but between the Legislature and the people.  The power of the ballot belongs to the people.

The California Constitution itself so indicates.  "All political power is inherent in the people."  (Cal. Const., art. II, § 1.)  "The legislative power of this State is vested in the California Legislature . . . , but the people reserve to themselves the powers of initiative and referendum."  (Cal. Const., art. IV, § 1.)  "The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them."  (Cal. Const., art. II, § 8, subd. (a).)

The Constitution provides three circumstances in which the Legislature must place matters on the ballot if the action the Legislature proposes is to take effect.  First, the Legislature "may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval."  (Cal. Const., art. II, § 10, subd. (c).)  Second, "Each measure providing for the preparation, issuance and sale of bonds of the State of California shall hereafter be submitted to the electors in the form of a bond act or statute."  (Cal. Const., art. XVI, § 2, subd. (a), 2d par.)  Third, the Legislature "may propose an amendment or revision of the Constitution" (Cal. Const., art. XVIII, § 1), but the "proposed amendment or revision shall be submitted to the electors and if approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise."  (Cal. Const., art. XVIII, § 4.)  Additionally, a different provision seems to imply that the Legislature may, if it chooses, place a "statute" on the ballot for the electorate to ratify.  (Cal. Const., art. II, § 12.)

Because the California Constitution is a restriction on the Legislature's powers, not a grant of powers, designating these circumstances in which the Legislature may place matters on the ballot does not, by itself, necessarily mean

6

the Legislature may not do so in other circumstances.  But those circumstances are designed to protect the *people's* right to confirm an action the Legislature proposes, not to give the Legislature general access to the ballot.  The overall constitutional scheme shows that the power of the ballot is reserved to the people, not the Legislature.

This brings us to *American Federation*, *supra*, 36 Cal.3d 687.  As noted, the issue there was whether the people could place on the ballot an advisory measure urging a constitutional amendment to require a balanced federal budget. (*Id.* at pp. 690-691.)  We "conclude[d] that the measure exceeds the scope of the initiative power under the controlling provisions of the California Constitution (art. II, § 8 and art. IV, § 1).  The initiative power is the power to adopt 'statutes' — to enact laws — but the crucial provisions of the balanced budget initiative do not adopt a *statute* or enact a law.  They adopt, and mandate the Legislature to adopt, a *resolution* which does not change California law and constitutes only one step in a process which might eventually amend the federal Constitution.  Such a resolution is not an exercise of legislative power reserved to the people under the California Constitution."  (*Id.* at p. 694, fn. omitted.)  We explained that the initiative "is not a public opinion poll.  It is a method of enacting legislation, and if the proposed measure does not enact legislation, or it if seeks to compel legislative action which the electorate has no power to compel, it should not be on the ballot."  (*Id.* at p. 695.)

We further explained that "the reserved powers of initiative and referendum do not encompass all possible actions of a legislative body.  Those powers are limited, under article II [of the California Constitution], to the adoption or rejection of 'statutes.' . . . [I]t does not include a resolution which merely expresses the wishes of the enacting body, whether that expression is purely precatory or serves as one step in a process which may lead to a federal

7

constitutional amendment." (*American Federation*, *supra*, 36 Cal.3d at p. 708.) We summarized that the initiative "functions . . . as a reserved legislative power, a method of enacting statutory law. The present initiative does not conform to that model." (*Id*. at p. 715.)

Viewing the constitutional provisions as a whole, it is clear that if this court had reached a different conclusion in *American Federation*, *supra*, 36 Cal.3d 687, and held, as the dissent had urged, that the advisory measure was a valid exercise of the initiative power, the Legislature would not have the power to place a measure like Proposition 49 on the ballot. That power would have been reserved to the people.

But it is incorrect to conclude that *because* the people cannot do it, the Legislature can. As we have said, "the power of the people through the statutory initiative is coextensive with the power of the Legislature." (*Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 675.) If the people cannot place a matter on the ballot, neither can the Legislature. The people can be heard directly only through the ballot, either by electing their representatives or by the initiative or referendum process. The specified circumstances in which the Legislature has recourse to the ballot exist solely to implement the people's right to accept or reject what the Legislature is proposing. But the Legislature does not otherwise need the ballot. It can act itself. Other than in the constitutionally prescribed circumstances, the Legislature should not be permitted to hijack the ballot to serve its own agenda.

Permitting the Legislature to place advisory measures on the ballot would allow it to greatly interfere with the people's reserved initiative rights. The Legislature could easily place an advisory measure on the ballot that would compete with an initiative measure. As one commentator explains, "voter confusion often results from the appearance on the ballot of competing ballot

8

initiatives on the same subject, a tactic often used by opponents of the first initiative.  Because savvy political actors know that voters frequently react to confusion by voting 'no' on both measures, opponents of a particular initiative may work to qualify a competing measure in the hope that it will result either in both being defeated or in the more favorable competing measure being enacted instead of the initial proposal."  (Garrett, *Direct Democracy*, in Research Handbook on Public Choice and Public Law (Farber & O'Connell edits., 2010) p. 155.)

"Voter initiatives have been compared to a ' "*legislative battering ram*" ' because they ' "may be used to tear through the exasperating tangle of the traditional legislative procedure and strike directly toward the desired end." ' (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 228.)"  (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1035.)  The Legislature might sometimes be hostile to the people's use of this battering ram and do what it can to defeat an initiative measure.  Placing competing measures on the ballot might be one way to do that.  No improper motives appear in this case, but the potential, and the temptation, for legislative interference with the people's power of initiative is real.  "In light of the initiative power's significance in our democracy, courts have a duty ' "to jealously guard this right of the people" ' . . . ."  (*Ibid*.)  The way to guard against legislative interference with the people's right of initiative is to leave the ballot for the people's use, not the Legislature's.

Citing California Constitution, article I, section 3, subdivision (a), which gives the "people . . . the right to instruct their representatives," the Legislature suggests that placing an advisory measure on the ballot is a way for the people to provide this instruction.  But the people themselves cannot place an advisory measure on the ballot.  (*American Federation*, *supra*, 36 Cal.3d 687.)  A

9

constitutional right given the *people* cannot empower the *Legislature* to do something the people are prohibited from doing.

The Legislature also argues its ancillary power to *investigate* gives it the authority to place an advisory measure on the ballot. It does have the power to investigate to support its lawmaking function. The California Constitution expressly provides this power. "The Legislature or either house may by resolution provide for the selection of committees necessary for the conduct of its business, including committees to ascertain facts and make recommendations to the Legislature on a subject within the scope of legislative control." (Cal. Const., art. IV, § 11.) We described the included power in *Ex parte D. O. McCarthy* as the power "[t]o investigate, by the testimony of witnesses or otherwise, any subject or matter, in reference to which it has power to act; and, consequently, to protect parties, witnesses and counsel, in their attendance, when summoned, or having occasion to attend for that purpose." (*Ex parte D. O. McCarthy*, *supra*, 29 Cal. at p. 404, italics omitted; see *In re Battelle* (1929) 207 Cal. 227, 241 [similar].)

But the Legislature can, and already does, do all of this. Additionally, as Justice Liu observed in his concurring statement when this court issued the August 11, 2014 order to show cause in this case, "[i]f the Legislature wants to commission Gallup to do a poll on *Citizens United*," it may do so. Modern technology, including the Internet, with all of the interaction and exchange of information and views it facilitates, gives the Legislature ample ability to ascertain the electorate's wishes. It does not need recourse to the ballot to perform its proper function. The potential for interference with the people's reserved right of initiative greatly outweighs any marginal value an advisory measure might have to aid the Legislature's investigation into the electorate's wishes.

The majority confidently asserts that an advisory measure like this one would never compete or interfere with an initiative measure the people placed on

10

the ballot.  (Maj. opn., *ante*, at p. 42, fn. 16.)  Maybe, maybe not.  I cannot predict what the Legislature might try to do in the future.  Perhaps it will never test the accuracy of this assertion.  Perhaps this is a one-time event, as the Governor urged.  It appears, however, the majority would be willing to prevent a future advisory measure that does threaten to impede the people's right of initiative.  But considering the validity of an advisory measure on a case-by-case basis would entangle the courts in legislative affairs far more than simply concluding the Legislature does not possess a *nonlawmaking* authority it does not need to function fully and effectively.  With the constitutional exceptions, the Legislature does not need access to the ballot.  But the ballot is the people's *only* way to legislate directly.

The Legislature also cites past occasions in which it placed advisory measures on the ballot — all but one more than a century ago, the most recent in the 1930's — as showing it has this power.  But the Legislature's power to do so was never challenged.  "The obvious answer to this contention is that usage and custom, no matter how long continued, cannot create a right in the legislature that otherwise it does not possess . . . ."  (*Special Assembly Int. Com. v. Southard* (1939) 13 Cal.2d 497, 508-509.)

The past precedent is also far from impressive.  Two of the measures were driven by anti-Chinese immigration sentiment that was prevalent at the time.  (See *In re Chang* (2015) 60 Cal.4th 1169.)  In 1877, the Legislature asked the voters to indicate whether they were " 'For Chinese Immigration' " or " 'Against Chinese Immigration.' "  (Stats. 1877, ch. 5, § 1, p. 3.)  In 1891, the Legislature asked the voters whether they were for or against " 'an educational qualification requiring every voter to be able to write his name and read any section of the Constitution in the English language.' "  (Stats. 1891, ch. 113, § 1, p. 115.)  This is hardly sterling

11

precedent.  Given the anti-Chinese immigration sentiment, it is unsurprising no one challenged the Legislature's authority to place the measures on the ballot.

Measures in 1891, 1909, and 1911 concerned the ultimate passage of the Seventeenth Amendment to the United States Constitution, which gave the people the right to elect United States Senators directly.  (Stats. 1911, ch. 387, § 1, pp. 704-705; Stats. 1909, ch. 405, § 2, p. 691; Stats. 1891, ch. 48, § 1, pp. 46-47.)  Indeed, the 1909 and 1911 measures merely anticipated the Seventeenth Amendment's ratification by allowing the voters to state who should serve as United States Senators.  Because the measures supported the electorate's direct voting right, it is unsurprising no one challenged them on this basis.

Finally, one month before the 1933 election, the Legislature placed advisory measures on the ballot asking two questions regarding whether it should divert money from the gasoline tax funds for specified purposes.  (Stats. 1933, ch. 435, § 3, p. 1126.)  The measures were defeated at the polls.  (Stats. 1933, Propositions Submitted to Vote of Electors, Special Election (June 27, 1933) Measured Defeated, Nos. 9, 10, p. xc.)  Because the measures were placed on the ballot only a month before the election and were then defeated, it is also unsurprising that no one challenged them.

Thus, the most recent of these advisory measures occurred over eight decades ago, long before the development of modern polling techniques, the Internet, and other methods of ascertaining the people's wishes in political matters.  As Justice Liu aptly notes, "If anything, the *paucity* of historical examples, with none in the last 80 years, tends to cast doubt on the existence and validity of the power claimed here."  (Conc. opn. of Liu, J., *ante*, at p. 31.)

The Legislature also argues that the power to place Proposition 49 on the ballot derives from article V of the United States Constitution.  As relevant, that article provides that "on the application of the legislatures of two-thirds of the

12

several states," Congress "shall call a convention for proposing amendments" to the Constitution.  This provision certainly gives the Legislature the power to apply to Congress to call a convention for that purpose.  I have no doubt that allowing the Legislature to place an advisory measure like Proposition 49 on the ballot would not *violate* article V.  (See *Bramberg v. Jones* (1999) 20 Cal.4th 1045, 1058.)  Indeed, as the Legislature notes, many states have permitted their legislatures to do so.  But nothing in article V compels a state to permit advisory measures like Proposition 49 when doing so would infringe on a constitutional right reserved to the people.

Given all the other powers the Legislature has, including the right to investigate, it does not need the additional power to place advisory measures on the ballot in order to exercise its article V authority.  Depriving the Legislature of this power does not materially affect its ability to exercise this authority.  Indeed, the Legislature has *already* applied to Congress regarding the precise subject Proposition 49 was to address.  (Assem. Joint Res. No.1, Stats. 2014 (2013-2014 Reg. Sess.) res. ch. 77.)

For these reasons, I would hold the Legislature has no power to place an advisory measure like Proposition 49 on the ballot.

CHIN, J.

13

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Howard Jarvis Taxpayers Association v. Padilla

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S220289
**Date Filed:** January 4, 2016

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Bell, McAndrews & Hiltachk, Thomas W. Hiltachk and Charles H. Bell, Jr., for Petitioners.

No appearance for Respondent.

Diane F. Boyer-Vine, Jeffrey A. DeLand, Robert A Pratt; Strumwasser & Woocher, Fredric D. Woocher, Michael J. Strumwasser and Dale K. Larson for Real Party in Interest.

Douglas T. Kendall, Elizabeth B. Wydra, David H. Gans and Tom Donnelly for Constitutional Accountability Center as Amicus Curiae on behalf of Real Party in Interest.

Ronald A. Fein; Arnold & Porter, Steven L. Mayer and Amie L. Medley for Free Speech for People, Inc., as Amicus Curiae on behalf of Real Party in Interest.

Michael B. Salerno, Steven Bonorris and Nedda Black for The Center for State and Local Government Law as Amicus Curiae on behalf of Respondent and Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Thomas W. Hiltachk
Bell, McAndrews & Hiltachk
455 Capitol Mall, Suite 600
Sacramento, CA  95814
(916) 442-7757

Fredric D. Woocher
Strumwasser & Woocher
10940 Wilshire Boulevard, Suite 2000
Los Angeles, CA  90024
(310) 576-1233